IN THE CIRCUIT COURT OF THE TWELFTH ~~JUDICIAL~~ CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, ~~SARASOTA~~ COUNTY, FLORIDA

CIVIL COURTS          Receipt # 1903110

**CASE NO: 2010-DR-008976-NC**

IN RE: THE MARRIAGE OF:

ASHLEY KOZEL,

            Petitioner/Former Wife,

vs.

TODD KOZEL,

            Respondent/Former Husband.

_____/

### AMENDED FINAL JUDGMENT ON FORMER WIFE'S SECOND AMENDED SUPPLEMENTAL PETITION TO ENFORCE PROPERTY SETTLEMENT AGREEMENT AND THIRD AMENDED ASSET INJUNCTION

This matter is before the Court upon Former Wife's Second Amended Supplemental Petition to Enforce Property Settlement Agreement and Third Amended Asset Injunction and Former Husband's Answer and Affirmative Defenses. Trial was held on April 28, 2015, through May 1, 2015. Final arguments were heard on May 22, 2015. Each party submitted proposed findings of fact which the Court incorporated into its July 23, 2015 order and final judgment as the best evidence of their respective positions. On August 7, 2015, the former husband moved for rehearing. On August 22, 2015, the former wife filed her response thereto. This amended final judgment reflects the court's resolution of all of the issues raised by the former husband and the former wife on rehearing. The Court having heard the testimony and reviewed the evidence and applicable case law, makes the following findings of fact and conclusions of law:

### I. STIPULATED FACTS[1]

(a)     The parties entered into a Property Settlement Agreement on January 12, 2012 (hereinafter PSA) which was incorporated into the Final Judgment of Dissolution of Marriage dated January 12, 2012. The PSA is valid and enforceable.

---

[1] The Stipulated Facts are taken from the parties' Joint Pretrial Stipulation

(b)     Pursuant to the terms of the PSA, the Former Husband was obligated to deliver or cause to be delivered to the Former Wife 23 million shares of Gulf Keystone Petroleum, LTD (hereinafter GKP) common stock on or before 5:00 p.m. on January 27, 2012.

(c)     The Former Husband did not deliver the required stock to the Former Wife on or before 5:00 p.m. on January 27, 2012. However, the Former Husband delivered, or caused to be delivered, to the Former Wife four tranches of stock on the following dates and in the following amounts: (i) January 30, 2012 — 2,034,447 shares; (ii) February 3, 2012 — 3,798,886 shares; (iii) February 21, 2012 — 5,666,667 shares; (iv) March 1, 2012 — 11,600,000.

(d)     The total shares of stock delivered to the Former Wife as set forth above, was 23,100,000 which is 100,000 shares more than what is required pursuant to the terms of the PSA. Pursuant to an agreement between the parties, the additional 100,000 shares will be addressed post-trial.

(e)     The Former Wife suffered no "economic losses" with respect to the late delivery of the shares of stock delivered to her on January 30, 2012 and February 3, 2012.

(f)     Of the shares that were transferred to the Former Wife from the Former Husband in accordance with the terms of the PSA, the Former Wife gifted 289,000 shares to charities, transferred 238,788 shares to a vendor and transferred 2,491,000 shares to a Trust for her children, all in calendar year 2012.

(g)     Paragraph 7A of the PSA required the Former Husband to pay certain amounts to the Former Wife as "additional equitable distribution" in the event of his untimely delivery of the 23 million shares of GKP stock to the Former Wife. The Former

2

Husband made the additional equitable distribution payments to the Former Wife in a timely manner. The Former Wife was required to return those payments to the Former Husband in accordance with Paragraph 7B of the PSA. Paragraph 7A also states: "The parties stipulate that the additional equitable distribution payment is intended to provide support to the wife and children."

(h)     The closing price of the GKP stock on each day from January 3, 2012 through April 30, 2012 is set forth on Exhibit 1 to the parties' Joint Pretrial Statement.

(i)     Pursuant to the PSA, on or before June 30, 2012, the Former Husband was obligated to provide the Former Wife with "a document setting forth the 'tax basis' and holding period (as of the date of the transfer to the [Former] Wife) (including the start date of the holding period)" as to the 23 million shares of stock being transferred to her, "as well as documentation establishing such tax basis and holding period sufficient to allow the [former] Wife to properly report any gains or losses she recognizes to the IRS when she sells or otherwise disposes of the stock received pursuant this Agreement.

(j)     On August 16, 2012, the Former Husband wrote a letter to the Former Wife providing basis information regarding the stock transferred to the Former Wife.

(k)     The letter indicated, *inter alia,* that the tax basis for 17,500,000 of the shares transferred to the Former Wife was US $.01.

(l)     The third tranche of stock, i.e., the 5,666,667 shares, was among the 17,500,000 shares that the Former Husband reported to have a US $.01 basis.

(m)    The Former Wife filed a motion for partial summary judgment arguing that the Former Husband reported inaccurate tax basis information to her with respect to the third tranche of stock. The motion was granted by the court. The Former Husband has

moved for reconsideration of the order, which motion will be addressed in this Order.

## II. FORMER WIFE'S STATEMENT OF THE EVIDENCE AND ARGUMENT[2]

### 1. <u>THE DELAYED DELIVERY OF STOCK CLAIM</u>

### A. FINDINGS OF FACT

1. The court has subject matter jurisdiction and personal jurisdiction over the parties.

2. The parties entered into a Property Settlement Agreement on January 12, 2012 ("PSA"), which was incorporated into the Final Judgment of Dissolution of Marriage dated January 12, 2012.

3. The PSA is valid and enforceable.

4. Pursuant to the terms of the parties' PSA, the Former Husband was obligated to deliver 23 million shares of Gulf Keystone Petroleum, Ltd. ("GKP") common stock to the Former Wife on or before 5:00 p.m. on January 27, 2012.

5. The Former Husband did not deliver the required stock to the Former Wife on or before 5:00 p.m. on January 27, 2012. Instead, the stock was delivered in four tranches following the due date.

6. The Former Husband delivered (or caused to be delivered) the first tranche of GKP stock to the Former Wife on January 30, 2012 in the amount of 2,034,447 shares.

7. The Former Husband delivered (or caused to be delivered) the second tranche of GKP stock to the Former Wife on February 3, 2012 in the amount of 3,798,886 shares.

---

[2] Former Wife's and Former Husband's statements of the evidence are nearly verbatim from their Proposed Final Judgments. These statements are included in the Final Judgment to summarize the key factual and legal arguments made by the parties at trial and throughout the proceedings.

4

8. The Former Husband delivered (or caused to be delivered) the third tranche of GKP stock to the Former Wife on February 21, 2012 in the amount of 5,666,667 shares.

9. The Former Husband delivered (or caused to be delivered) the fourth tranche of stock to the Former Wife on March 1, 2012 in the amount of 11,600,000 shares.

10. The Former Husband was only required to deliver 11,500,000 shares to complete his delivery of stock, but the court was not asked to address any issues with respect to the "extra" 100,000 shares at trial (the parties stipulated that the court should reserve jurisdiction to address the issue at a later time).

11. The Former Wife contended that she suffered substantial economic losses with respect to the late delivery of the third and fourth tranches of stock, which claim was the subject of both lay and expert testimony at trial. The Former Wife stipulated that she suffered no economic losses with respect to the delayed delivery of the first two tranches of stock.

12. The following paragraphs of the PSA, *inter alia,* were provided to the court for consideration with respect to the delayed delivery claim.

13. Paragraph 7 of the PSA defines the "remedies upon default." The first remedy in the PSA for the failure to deliver the shares timely was temporary "support' for the Former Wife. The PSA measured the amount of temporary support to be paid as follows:

> In the event that the Husband does not transfer to the Wife all or any portion of the 23 million Shares of GKP common stock . . ., he shall be in default and he shall owe the Wife payments as and for additional equitable distribution at the rate of 6% per annum (calculated simply and not compounding) on the value of the 23 million Shares, or any portion thereof. ... which are not timely transferred . . .
> ***

5

> Notwithstanding any language to the contrary contained herein, or in the case law, the Parties stipulate that the Additional Equitable Distribution payment is intended to provide **support** to the Wife and children . . .

(PSA at ¶ 7 (emphasis added).)

14.     As a condition of receiving "support," the Former Wife agreed that she would not seek certain remedies relating to the untimely delivery of the stock until after May 1, 2012, including the remedies of contempt and specific performance, as follows:

> In addition, should the Husband fail to fully comply with paragraph 6A above with regard to all 23 million Shares on or before the close of business 5:00 p.m. EST on May 1, 2012, but he has timely paid the Additional Equitable Distribution payments described herein, then on May 1, 2012, the Wife may move the court to hold the Husband in contempt or to otherwise compel him to specifically perform and/or transfer to her all 23 million Shares in compliance with paragraph 6A, or for any other remedy at law or in equity including, but not limited to, a money judgment.

15.     Significantly, the PSA made clear that neither the "support" remedy in paragraph 7, nor any other aspect of the agreement, could be interpreted by the court as a limitation on the Former Wife's right to seek whatever other remedies at law or in equity might be appropriate if the Former Husband's failure to fully comply with the PSA caused her injury. The Former Wife reserved the right to seek any and all appropriate remedies to make herself whole as follows:

> **Nothing contained in this Agreement, or paragraph 7 thereof,** shall be construed to **limit or restrict** the Wife's right to seek or pursue **all** remedies at law and in equity to enforce her rights to receive the 23 million Shares and/or the value thereof in accordance with 6A. **Nothing contained herein – shall be construed to limit the Wife to one form of remedy versus another.**

(PSA at ¶ 7 (emphasis added).)

6

16.     In the PSA, the Former Wife did not just "reserve" all remedies at law or in equity. She expressly empowered the court to provide her with any such remedy as a method of enforcing the agreement as follows:

> [T]he Husband stipulates and agrees that the incorporation of this Agreement into the Final Judgment of Divorce . . . makes this Agreement fully enforceable as an order and/or Final Judgment of the Court. The Husband is **estopped and precluded** from **ever** asserting that this Agreement is not enforceable as an order of the court and/or Final Judgment of the court.
>
> \* \* \*
>
> Each party has the right **to enforce** and/or defend this Agreement utilizing **all legal and/or equitable remedies** including, but not limited to, **contract remedies, judgment remedies, and all other remedies at law or in equity.**

(PSA at ¶ 20 (emphasis added).)

17.     At trial, the Former Wife was the first witness to testify.

18.     With respect to the remedial provisions of the PSA, the Former Wife testified that the parties adjourned her temporary relief hearing to attempt to settle the case and that she negotiated for the 6% payment as a replacement for "temporary support" in the event of a default by the Former Husband. However, the "temporary support" was not intended to limit her remedies in the event that she was damaged with respect to the late delivery of stock. She explained that the parties were unable to agree on a specific remedy for such an eventuality (other than temporary support) and so the parties left it in the hands of the "court [to] decide for everybody" what would be appropriate by empowering the court to provide any legal or equitable remedy it found to be justified. The Former Wife's testimony is consistent with the unambiguous terms of the PSA.

7

19.     The Former Wife testified that she suffered substantial economic losses due to the lost opportunity to sell the vast majority of her settlement shares during a rising market with good volume in early to mid-February, 2012. The Former Wife testified that she wanted to sell her settlement shares into the February market for two, primary reasons.

20.     First, the Former Wife wanted "income producing" assets and, because GKP does not pay a dividend, it was not an appropriate investment for her to hold going forward. Second, she wanted to diversify her holdings because, consistent with her financial adviser's recommendations, she viewed it as imprudent "to hold the lion's share of [her] wealth and net worth in a single risky stock."

21.     Moreover, it is consistent with her conduct. In particular, of the 850,000 shares that she had at or around the time the settlement was negotiated, the Former Wife sold all but 25,000 in January 2012 prior to her receipt of any of the settlement shares. Then, when the Former Wife received the belated delivery of the first two tranches of stock in early February, she sold it all prior to her receipt of the third tranche of stock—with the exception of the approximately 2 million shares that the Former Wife directed her financial advisor to hold back for the purpose of funding trusts for the parties' children, which trusts were, indeed, funded at a later date with in excess of 2 million shares.

22.     The Former Husband suggested that the Former Wife always had "stock to sell" because she did not liquidate the stock that she set aside for the children's trusts, but the court should reject this contention because it was the Former Wife's absolute right to do whatever she wanted with that stock, including, but not limited to, giving some of it

8

away to the parties' children. Also, the Former Wife stipulated that she was not seeking any damages with respect to the delayed delivery of the first two tranches of stock.

23.    The Former Wife testified that she repeatedly informed the Former Husband of her intention to sell the stock soon after receipt, i.e., the Former Wife informed the Former Husband of her intention to sell prior to the settlement, she informed him of her desire to sell after the settlement (but prior to the breach), and she expressly demanded the third and fourth tranches of stock from the Former Husband during the delay period so she could sell it.

24.    During the time period **prior to the execution of the PSA,** the Former Wife informed the Former Husband that she wanted to sell "immediately." In response, according to the Former Wife's testimony, the Former Husband voiced concern about the "stability of the price" of GKP and potential disruptions "of the marketplace" that could occur as a result of her selling 23 million shares. Therefore, the parties agreed to certain "stipulations ... on the number of shares" that she could sell, i.e., the "orderly market" provision of the PSA.

25.    With respect to the period **following the execution of the PSA, but prior to the Former Husband's violation of the PSA,** the Former Wife testified that she put the Former Husband on notice again of her intention to sell. Specifically, the Former Wife testified that she and her financial adviser at Morgan Stanley, Rich Williams, had a lunch meeting at a restaurant called "Libby's" the day after the final judgment was entered and the settlement was signed. At the lunch meeting, the Former Wife, the Former Husband, and Mr. Williams discussed the Former Wife's desire to sell the Former Wife's settlement shares in large "blocks." The Former Husband stated, in response, that he could be

9

"helpful" in that process by connecting the Former Wife with the right persons and institutions. Again, this testimony demonstrates that the Former Wife intended to sell her stock quickly, that she was contemplating block sales following delivery, and that the Former Husband knew about the Former Wife's intentions.

26. Finally, **during the breach period,** the Former Wife called the Former Husband on two occasions and informed him that she was "ready to sell" and to demand information as to the stock's whereabouts. The Former Wife testified that the first call occurred shortly after the default. The second call occurred on or around February 20th **and it specifically applied to the third and fourth tranches of stock.** When this call occurred, over 17 million shares of GKP remained undelivered and the stock closed at $6.73 per share.

27. The Former Wife testified that, during the February 20, 2012 call, she demanded her stock so that she could sell it, as follows:

> BY MR. FISHER
>
> Q. And then when was the second time you called?
>
> BY THE FORMER WIFE
>
> A. The second time I called him was in around February the 20th.
>
> Q. How do you remember that date?
>
> A. I remember that, because I called him, he was in London, and his friend Nick Davis was with him, and they were out at night, it was sort of loud, they were having a good time. . .
>
> &ast;&ast;&ast;
>
> Q. And what was the substance of that phone call?
>
> A. The substance of the phone call was where are my shares? There had been an article in one of the

10

London papers, I guess it's a paper that said, well, Mrs. Kozel struck a really savvy deal and here her settlement is now valued at this, and I remember reading that saying, I'll be darned, I don't have my shares, and here there's this speculation that, you know, that I've somehow profited on this, and at any rate, and the stock had just been going up, and I was getting nervous that I wasn't getting the shares and I was losing [the] opportunity to sell them.

\* \* \*

The discussion was that I still don't have my shares and I'd like to sell my stock, and where are they.

28.    When the Former Husband testified, he did not dispute the Former Wife's description of the substance of their February 20, 2012 call. In fact, he confirmed that it occurred. The Former Husband only disputed the Former Wife's testimony as to where he was at the time, i.e., he claimed he was in the lobby of his lawyer's office in Lithuania, and not out celebrating in London.

29.    To quantify her losses from the delayed delivery, the Former Wife primarily relied upon her experts. However, by way of example, she testified that, the day after her call to the Former Husband, 5,666,667 shares were transferred into her account, which left 11,500,000 outstanding. The next trading day, the stock price took a "nose dive" before she could trade any of the shares, resulting in approximately "$18 million" in losses in one day, i.e., a little more than $1 per share on the 17,166,667 shares in the last two tranches of stock.[3]

30.    The Former Wife explained that her worst losses were associated with the fourth and final delivery of stock, i.e., the delivery of the remaining 11.5 million shares on

---

[3] Even though the 5,666,667 shares were technically delivered on February 21, 2012, they were deposited in her account after 2:00 PM Eastern time, which meant they were not tradeable in London, where the market was already closed.

11

March 1, 2012. In particular, the Former Wife testified that the Former Husband delivered "the lion's share of [her] settlement on the eve of a bloodbath."

31.     On March 1, 2012, the closing price of the stock had fallen from $6.73 per share, which was the price on the date of the Former Wife's call to the Former Husband, to $5.69 per share. Making matters worse, within three trading days of the delivery of the fourth tranche of stock, which was a huge amount of stock to liquidate by any measure, there was a large sell-off in GKP. By March 6, 2012, the stock closed at $4.06 per share, which was $2.67 less than the closing price on February 20, 2012 (when the Former Wife demanded her stock). In other words, the 11.5 million shares were worth $30,705,000 less on March 6, 2012 than they were on the day she demanded them. Also, the market was substantially different. Instead of a rising market with good volume, the Former Wife faced a rapidly declining market and, on days when the volume was high, it was for a sell-off.

32.     Mr. Williams was the second witness to testify. Mr. Williams testified credibly regarding the matters set forth below.

33.     Mr. Williams testified that he was friends with both the Former Husband and the Former Wife and that, at some point during the divorce process, he began managing the Former Wife's assets.

34.     With respect to the drafting of the PSA, Mr. Williams played a limited role, which was to make sure that, after the divorce was finalized, the Former Wife would not be subject to the types of restrictions in terms of selling GKP that applied to the Former Husband as the CEO and chairman of GKP.

12

35.     With respect to the Former Wife's pre-settlement shares of GKP, Mr. Williams confirmed that, in January 2012, he sold essentially all of them, which was consistent with the Former Wife's testimony and the documents in evidence.

36.     With respect to the settlement shares, Mr. Williams advised the Former Wife to sell her shares "as quickly as possible in a market with good volume." This, too, was consistent with the Former Wife's testimony regarding her intentions. Mr. Williams' explained his reasoning at the time as follows:

> BY MR. FISHER
>
> Q.     Okay. So getting back to selling the stock as quickly as possible, why? I mean, you're the money manager. Why?
>
> BY MR. WILLIAMS
>
> A.     From what I knew, [the former wife] after the divorce, had no real source of income, and 23 million shares of anything is a concentration, and something I usually tell most of my clients with concentrations is, you know, you concentrate to get wealthy, but you diversify to keep it. So our plan was to diversify [and] go into other assets to generate a current income that she could live off and try to grow the principal for the girls.

37.     In terms of implementing the above plan, Mr. Williams confirmed that the Former Wife, the Former Husband, and he met for lunch at Libby's, where the parties discussed the "imminent transfer of the 23 million shares" and whether the Former Husband could help "facilitate a large trade" of the Former Wife's GKP stock.

38.     Mr. Williams' testified that he took an initial step to make a large block trade with respect to the settlement shares, but that he was unable to do so during the "very unique and very liquid [market] in February" because he did not have the stock. Then, when he received the vast majority of the stock, he was unable to make block trades

13

because the market's "appetite" for the stock had changed. He testified that the market's appetite for large amounts of the stock changed on February 21 and "materially by March 1," which were the dates the third and fourth tranches of stock came in. Mr. Williams explained the situation as follows:

BY MR. FISHER

Q.    . . . Okay. Were you able to move forward with the concept of a block trade without having the stock?

BY MR. WILLIAMS

A.    No.

Q.    Okay. Explain why.

A.    If there's no stock, there's no trade. At Morgan Stanley, with a penny stock . . . , I have to get a chain of command of compliance people on the wealth management side to approve any large trade. Obviously, a $100 million trade would be large. We would then have to go to the investment bank where you would then execute block trades and get their chain of command to approve through their compliance approval, then we would have to get the traders involved to go out to the marketplace and execute a block trade. If there's no shares, we have nothing to block.

Q.    Okay. Are these people busy?

A.    Yeah. If you've ever talked to [the traders] . . . you barely get a grunt on the phone when you call these people. This is a fast-paced market. . .In trading the stock that we had, I was efficiently trading that, but. . . [i]t's 30 second to a minute conversation. When you say I think I have . . . 23 million shares coming in next week, we would like to sell them. Fine, great, talk to us when you have them.

* * *

Q.    Okay. . . [A] block came in on February 21, correct?

A.    Correct.

14

Q. How many shares?

A. 5.6 [million] and change.

Q. Okay. What happened in the market the next day?

A. It fell.

Q. How badly?

A. I want to say 30, 40 percent.

Q. And in terms of the timing in the market, did — was that a good time to try to place a large chunk of stock, millions of shares?

A. No, not in my opinion[.]

39.     Mr. Williams' testimony establishes that the Former Wife lost the opportunity to sell her shares through Morgan Stanley in early to mid-February at an advantageous time, whether by block trade or otherwise, due to the Former Husband's failure to timely deliver her shares.

40.     Having never received the vast majority of the Former Wife's shares during the rising market with good volume, Mr. Williams did not pursue a block trade. Instead, he liquidated the first two tranches of stock on the open market relatively quickly in early February (with the exception of the approximately 2 million shares being held back for the parties' daughters' trusts). Mr. Williams testified as follows:

BY MR. FISHER

Q.     Okay. So now I want to talk about not January 27, but what happened thereafter. Did you get some stock in January 30?

BY MR. WILLIAMS

A.     I believe, yes.

Q.     Is that a little over 2 million shares?

15

A.    Yes.

Q    Okay. And did you sell them?

A.    Yes.

* * *

Q    Okay. Was there some conversation in early January
or .    February 2012 about putting aside some stock
for the children?

A.    Yes.

Q.    Okay. What was that?

A.    So in that January/February, simultaneous to trading
the security and chasing down the shares with our
international clearing firm, I also was bringing in a tax
attorney to try to get some estate and tax planning
going. One of the things that Ashley had said is that
she'd like to set aside some of the shares so that the
girls could have a piece of their father's company.

Q    Okay. . . Was that ultimately done?

A.    Yes.

* * *

Q    Okay. So the 3.7 million comes in [on February 3].
What did you do with that?

A.    Sold it.

Q    Okay. Was there about 2 million shares of that left?

A.    I believe so.

41.    Mr. Williams was also questioned about whether, at Morgan Stanley, he

could have sold the former wife's stock "short" to protect her from a market downturn. He

explained that he could not have done so, and would not have done so, for the following

reasons:

BY MR. FISHER

16

Q. Okay. So there's some claim here that you could have, should have sold them without them being in the account. Is that something you could do at Morgan Stanley for Ashley in January 2012?

BY MR. WILLIAMS

A. There's no way we could have executed a trade without the shares in her account. There's no way I would ever recommend that a woman that's recently divorced with all of her net worth tied up in one delivery somehow affect a trade with the expectation of delivery of shares. I want them in the account.

\* \* \*

So a short sale is effectively a borrow. . . Ashley did have a decent amount of assets at our firm, but not relative to [a] 100 million [dollar] share short sale or 150 million [dollar] .. short sale. There's no way that would get approved. And if it would get -- if it did get approved, she would be bankrupt.

Q. Why?

A. Because the minute the stock goes up, she's got to deliver cash or collateral; securities, to make the margin maintenance.

\* \* \*

[S]hort selling and naked short selling, naked short selling meaning I do not have the shares in my account, may be the most aggressive thing you can do out there. And the reason being is, if the stock goes to infinity, you owe infinity. If it goes up, you are out of business.

42.    The next witness to testify regarding the Former Wife's claim with respect to the delayed delivery of shares was her expert, Marcia Kramer Mayer, Ph.D.

43.    Dr. Mayer graduated from Stanford University with great distinction and obtained her masters and Ph.D. from Harvard University. She was a vice president of the American Stock Exchange, where her job was to research trading on the exchange. Dr. Mayer has been an economist at National Economic Research Associates ("NERA")

17

for twenty-three (23) years, which is a consulting firm with approximately 350 economists around the globe. She previously served as the chair of NERA's securities and finance practice.

44.     Dr. Mayer regularly testifies in litigation relating to securities. She typically performs "event studies," which studies quantify the impact of an event, such as the disclosure of information, on the price of a stock by statistically "weeding out" the effects of market and industry movements on the stock price. Dr. Mayer explained that the litigation work that she does is based upon a "very large" amount of academic literature and that her testimony has been accepted by many courts. She also testified that her testimony has never been excluded from evidence. The court should find Dr. Mayer's testimony to be credible, relevant, and reliable.

45.     In this case, Dr. Mayer was asked to create a model to predict the amount of stock that the Former Wife could sell on the market without depressing the price by more than 1%, 2%, or 3% (hereinafter, the "price impact constraint"). The purpose of creating this model was to define the "reasonable selling periods" that are described in *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597 (S.D.N.Y. 1977) and its progeny, which case is described *infra*. She explained her work as follows:

> BY MR. FISHER
>
> Q.     [E]xplain to the Court what you did, please.
>
> BY DR. MAYER
>
> A.     Okay. What I wanted to find out is the impact of selling on a stock's performance, does selling depress the market. One would certainly expect so. But in particular, by how much? . . . So I conducted an analysis of daily returns, very similar to the event studies that I was referring to earlier, but here the object wasn't to explain the price response to a piece

18

of news, but to be able to speak to the price response of selling. So it was a relatively simple analysis. I looked at one year's worth of daily data for GKP, the year that ended at the end of March 2012,

46.     The variables that Dr. Mayer incorporated into her econometric model were chosen on the basis of the applicable academic literature, which she explained as follows:

BY MR. FISHER

Q.      . . . [W]hat did you do with [the GKP trade] data?

BY DR. MAYER

A.      . . . I sought to explain daily return over the 252 trading days in a year as a function of two explanatory variables. . . . [O]ne is, what was happening to the Oil and Gas Index to the AIM FTSE market on that day, because we would expect, and it's almost always the case, that stocks tend to move in sync with their index, not one for one, but it's a factor.

The second factor in my model as a potential explanation of the stock's daily return was the order imbalance, and I define this following academic literature, as the axis – as the shares in buyer-initiated trades minus the shares in seller-initiated trades. . . So I wanted to understand how order imbalance affected stock return controlling for the response to the market.

47.     Using her econometric analysis, Dr. Mayer determined that the Former Wife could sell 4% of the reported volume of GKP on a daily basis without depressing the price by more than 1%, that she could sell approximately 8% of the reported volume without depressing the price by more than 2%, and that she could sell approximately 13% of the reported volume without depressing the price by more than 3%.

48.     Dr. Mayer then used the above selling rates to determine the *Madison Fund* "reasonable sale periods" for the purpose of computing the Former Wife's economic losses. Dr. Mayer explained how the reasonable sale periods are defined, as follows:

19

BY MR. FISHER

Q.     . . . How does this formula [work]?

BY DR. MAYER

A.     It has a couple of parts. The loss is the difference between two prices; I call one the first prong and one the second prong, and each price is established over a particular period of time. The courts, the decisions refer to it as the reasonable sale period.

So the first reasonable sale period is beginning at the time of breach. How long would it have taken the plaintiff, ... if they got what they were supposed to get, how long would it have taken the plaintiff to sell them without depressing the price. . . .

* * *

Q.     Okay. And then what do you do next?

A.     So that's your period one analysis. Now you look at when the breach was cured; in this case, when delivery was complete, and you, again, establish a reasonable sale period. If the plaintiff had sold all of the shares without depressing the price, once those shares were in her possession, how long would it have taken for that sale or set of sales to occur. So you establish the time period of the second sale period.

And then, unlike the first, instead of finding the highest price during that period, you find the average price. And the measure of damage or loss is the high price during the first sale period minus the average price during the second sale period. And there's only loss or damage if that number is positive.

49.     In exhibit 9 to Dr. Mayer's report, she set forth the losses that the Former Wife suffered with respect to the delayed delivery of her stock using the above-described formula. In short, Dr. Mayer determined that, if the reasonable sale periods are measured using the 1% price-impact constraint, the Former Wife's losses were between $41.6 and $45.2 million. If the reasonable sale periods are measured by the 2% price-impact

20

constraint, the Former Wife's losses were between $32.0 million and $37.0 million. And, if the reasonable sale periods are defined by the 3% price-impact constraint, the Former Wife's losses were between $19.6 and $23.2 million. The court should find that the Former Wife's losses are appropriately measured by the 2% price constraint, which means that the first reasonable sales period was nineteen (19) trading days and the second reasonable sales periods were two (2) trading days for the third tranche of stock and eight (8) trading days for the fourth tranche of stock.

50. The next witness to testify regarding the Former Wife's delayed delivery claim was the Former Husband's expert, Peter Angelides, Ph.D., who was called to rebut Dr. Mayer's analysis.

51. Dr. Angelides attended college at the University of Pennsylvania and obtained his Ph.D. from the University of Minnesota.

52. In terms of his experience, Dr. Angelides is an economist who specializes in matters related to urban planning, infrastructure investment, and related topics, not securities or stock markets. For example, Dr. Angelides most recently testified in a case about whether it would be economically feasible to continue operations on a golf course.

53. Dr. Angelides acknowledged that he had little experience in the securities Field, e.g., he has not worked for a stock exchange, he has never worked with the SEC or the Department of Justice on a securities matter, and he has never published on matters relating to stock markets or securities. In terms of litigation, Dr. Angelides has not worked on a securities-related case in approximately a decade and, even then, he was not the team leader. Dr. Angelides also acknowledged that he became an expert witness in this matter at the last minute.

54.     Dr. Angelides did not, himself, develop a model to determine how fast the Former Wife's 23 million shares could have been sold without impacting the market price of GKP. In other words, Dr. Angelides has no independent *Madison Fund* computations. Instead, he solely addressed what he believed to be flaws in Dr. Mayer's analysis.

55.     Having weighed the evidence, the court should find that Dr. Angelides' testimony did not refute the credibility or reliability of Dr. Mayer's analysis. As just one example, Dr. Angelides testified that there is a historical correlation between seller-initiated volume in GKP and buyer-initiated volume in GKP. Therefore, in his view, the Former Wife's selling of shares into the market would not just be met by buyers for her shares—it would cause new and different buyers to initiate their own trades, thereby preventing a price decline. Due to this dynamic, Dr. Angelides opined that the Former Wife could sell 13.3 times more shares into the market than were calculated by Dr. Mayer without depressing the price. Essentially, in Dr. Angelides view, an excess of supply over demand does not reduce the price of GKP—it begets more demand.

56.     The implausible, or at least unproven, nature of Dr. Angelides' testimony is shown by applying it to the actual trading data that the parties relied upon. Dr. Mayer computed that the Former Wife could sell 1,411,028 shares on January 30, 2012 without depressing the price of the stock by more than 3%, which is the equivalent of 13% of the reported volume of 10,854,058 shares. By Dr. Angelides' logic, the Former Wife could have sold 13.3 times as many shares as were computed by Dr. Mayer, which means she could have sold **18.8 million shares** into the market on January 30, 2012, which is almost **double** the reported volume on that day, without depressing the market by 3%. This is difficult to believe, particularly given that the Former Husband's other expert, Paul Miskin

22

(whose testimony is discussed in more detail below), opined that sales in excess of 30% of the daily volume would impact the market price. In addition, the Former Husband (who testified that he "knew the market best" as part of the management of GKP) included a 500,000 share "orderly market" provision in the PSA to prevent the Former Wife from dumping her shares into the market too rapidly. The Former Husband testified that the orderly market clause was necessary so that trades would not "hit the screen and affect the price positively or negatively in any way."

57.    Dr. Angelides' computations, as explained by Dr. Mayer, were not meaningful in the context of this case because he assumed that the correlation between seller-initiated sales and buyer-initiated sales was the equivalent of causal relationship, when that is not necessarily the case. More importantly, Dr. Angelides failed to realize that, even if the correlation between seller-initiated and buyer-initated trades had a causal component, the new trades would come into the market at a time that was "too late" for the Former Wife. Dr. Mayer explained as follows:

> BY MR. FISHER
>
> Q.    Okay. Well, what does the data show?
> BY DR. MAYER
>
> A.    . . . We observed large imbalances, so it must be the case that the other side doesn't necessarily step in the same day to anywhere near the amount.
>
> Q.    Why is that important?
>
> A.    . . . [T]wo points. First, there's no evidence [of causation]. The more important point is that if it is countered, it would be too late for her. Dr. Angelides testified yesterday that if she were to sell a certain amount, there would be a price hit, and that would attract buyers. Now, it's reasonable to think that that will happen. How quickly, we don't know. But she will

23

> have already sold. She will have had a fire sale. And the point of the Madison Fund Rule when it says we're looking for a reasonable sale period over which price would not be depressed, it's the plaintiff's price that's at issue.

58.     Having considered Dr. Angelides' testimony, the court should find that Dr. Mayer's computation of the "reasonable sale periods" was the product of a reliable methodology.

59.     The Former Husband also offered Paul Miskin as an expert on, *inter alia,* the *Madison Fund* reasonable sales periods to rebut Dr. Mayer's testimony. Mr. Miskin is a stockbroker in the United Kingdom. Mr. Miskin testified extensively regarding his trading experience, the history of the AIM Exchange in London, and the "art" of stock trading. On the basis of his experience, Mr. Miskin testified as to the manner in which he thinks he would have sold the Former Wife's shares if given the opportunity, and how fast he could have done it.

60.     Mr. Miskin's testimony was in the nature of "pure opinion." In particular, he testified that his opinions were derived from "rules of thumb," probability weighting various imagined scenarios, and thinking about the issues "with a towel around [his] head," which meant that he "gave it a huge amount of thought" before he came to his conclusions. When questioned about this process, Mr. Miskin acknowledged that he could not testify as to the error rates of his analysis and that, to arrive at such error rates, one would need to be "an academic." Mr. Miskin acknowledged that he could not tell the court whether his opinions were "going to be erroneous 60 percent of the time versus 40 percent of the time." Also, Mr. Miskin acknowledged that some of his trading strategies were inconsistent with the manner in which Morgan Stanley operates. That means that the Former Wife, to implement the strategies, would have needed to terminate her wealth

management adviser, Mr. Williams, and somehow hire Mr. Miskin during the relevant time period, which the court should not find is appropriate to expect of her.

61. The "pure opinion" testimony of the nature offered by Mr. Miskin is no longer admissible in Florida pursuant to the *Daubert* standard.[4] However, in this case, the parties stipulated to the admissibility of their experts' testimony and left it within the court's discretion to determine the weight to accord it.

62. The court should find that, although Mr. Miskin is a very experienced and knowledgeable stock broker, his testimony is not entitled to much weight because it was not the product of a reliable methodology or reliable principles (for the same reasons that it would be inadmissible under *Daubert*). For example, to define the "reasonable selling period" following the breach, Mr. Miskin testified that, if he had been given the Former Wife's 23 million shares on January 27, 2012, he thinks that he could have implemented one of various trading strategies to dispose of the shares, e.g., a block trade, crossing, sales in dark pools, sales through "IOIs," or sales "on the screen." Mr. Miskin relied upon his experience, such as that there is a "rule of thumb" that one can sell a "third of the volume" of the market without impacting the price, to determine how fast each of these strategies could have been implemented. The court should not give weight to this testimony because there is simply no way to know whether Mr. Miskin's "rules of thumb" are accurate in general, that that they apply in the specific context of GKP stock, and that, even if they applied to GKP sometimes, that they applied during the relevant time period.

---

[4] *See, e.g., Giaimo v. Florida Autosport, Inc.,* 154 So. 3d 385, 388 (Fla. 1st DCA 2014) ("When Dr. Lee was asked how he arrived at the percentages attributable to Giaimo's pre-existing condition and those attributable to the workplace injury, he explained that 'when I was asked and thought about it, that is the answer that I came up with.' . . . Testimony of this type, though previously acceptable as pure opinion ..., no longer suffices[.]").

25

63.     There is an additional layer of unreliability to Mr. Miskin's opinions. Mr. Miskin admits that he does not know which of his trading strategies he would have implemented, so he assigned "arbitrary" probability weights to each strategy. The net result is that Mr. Miskin's opinions combine untestable, arbitrary conclusions to generate numbers that give the impression of precision, but that potentially have zero degree of reliability.

64.     Following Mr. Miskin's testimony, the Former Husband offered the expert testimony of a CPA, James Thomas O'Brien. Mr. O'Brien did not offer an opinion on how quickly the Former Wife could sell 23 million shares of GKP into the market without disturbing the price. Instead, he relied entirely upon Mr. Miskin's opinions on that topic to compute the Former Wife's *Madison Fund* losses. He testified as follows:

> BY MR. FISHER
>
> Q.     Okay. You were also present today when I asked Mr. Miskin his error rate on his belief that 30 percent of the volume in GKP can be sold without affecting the price, and . . . [h]is answer was 'no.' You were present for that, right.
>
> BY MR. O'BRIEN
>
> A.     Yes.
>
> Q.     So . . . he could be wrong 60 percent of the time in stating that, but you relied upon it in issuing these reports, right, sir?
>
> A.     That's correct. And after hearing that testimony, I'm still relying on Mr. Miskin's expertise as a skilled trader on the AIM Exchange.

65.     Using Mr. Miskin's opinions, Mr. O'Brien computed that the Former Wife's losses were $0 under the *Madison Fund* rule under every scenario that he computed. Mr. O'Brien's computations are mathematically accurate based upon Mr. Miskin's opinions.

26

However, the court should decline to utilize Mr. Miskin's opinions as a basis for computing the *Madison Fund* reasonable selling periods, so the court should also decline to utilize Mr. O'Brien's computations that are derived therefrom.

66. The Former Husband testified in support of his defenses. In relevant part, the Former Husband testified that he never had a conversation with the Former Wife about selling particular shares "at some particular time or some particular price." The Former Husband appears to be stating that the Former Wife did not place imaginary "sell orders" with the Former Husband during the delay period, but the court should not find that to be factually significant. The Former Wife informed the Former Husband that she wanted to sell immediately during the delay period on multiple occasions. During his testimony, the Former Husband did not dispute that such conversations occurred. For example, the Former Husband admitted that he did, indeed, have the lunch meeting at Libby's that was described by the Former Wife and Mr. Williams where the subject of the Former Wife's block sales was raised. The Former Husband also admitted that the Former Wife called him on February 20, 2012 to discuss the outstanding stock that was due. Again, with respect to this call, the Former Husband did **not** dispute the Former Wife's testimony with respect to the substance of the conversation, including her desire to sell the undelivered shares.

67. The Former Husband testified regarding the various efforts that he made to deliver the Former Wife's stock to her. In that regard, the Former Husband denied that he could have timely delivered all of the stock that was due to the Former Wife by obtaining it, directly or indirectly, from the Gokana Trust. The Gokana Trust is an overseas trust that the Former Husband funded with marital shares of GKP in advance of

27

the parties' divorce. It is governed by the laws of the Isle of Jersey. Since the outset of the parties' divorce, the Gokana Trust has been a heavily litigated and disputed issue.

68.    The Gokana Trust held approximately 30 million shares of GKP on January 27, 2012 when the Former Husband was obligated to (but did not) transfer 23 million shares to the Former Wife.

69.    The Former Husband testified that he borrowed the third tranche of untimely stock, i.e., the 5.6 million shares, from a friend of his named Bader Al Qabandi. The loan transaction, which was the equivalent of about a $25 million loan, occurred without security or a written note or any other form of documentation. The loan transaction is discussed in more detail *infra* with respect to the tax basis issue, but, for present purposes, the important point is that the documents admitted into evidence demonstrate that the shares originated from the Gokana Trust. Therefore, in working with his friends and the Gokana Trust, the Former Husband was easily able to access a substantial number of GKP shares. The court should find that the Former Husband could have, and should have, made similar arrangements to secure the remaining 11.5 million shares from the Gokana Trust and he should have done so with respect to all of the shares (both the third and fourth tranches of stock) prior to January 27, 2012.

70.    The evidence indicates that the Former Husband elected to make the Former Wife wait for her stock, despite the stock's volatility and despite the orders of this court, so that he could arrange for the delivery of the third and fourth tranches of stock in a manner that would not reveal his relationship to the Gokana Trust, which relationship the Former Husband and the company he ran, GKP, consistently denied existed. The Former Husband made this decision despite his knowledge of the Former Wife's desire

28

to sell the stock and despite the fact that he knew that the Former Wife might lose the opportunity to sell her shares into the unique market that existed in February, 2012. Essentially, the Former Husband intentionally took away an opportunity for the Former Wife to sell her shares in the manner she desired so that he could advance his own personal agenda.[5]

## 2. THE TAX BASIS CLAIM

### A. FINDINGS OF FACT

71.      Pursuant to the terms of the parties' PSA, the Former Husband was obligated to deliver 23 million shares of Gulf Keystone Petroleum, Ltd. ("GKP") common stock to the Former Wife. In addition, pursuant to paragraph 15 of the PSA, the Former Husband was obligated to provide the Former Wife with "a document setting forth the tax basis' and holding period (as of the date of the transfer to the [Former] Wife) (including the start date of the holding period)" as to the 23 million shares of stock being transferred to her, "as well as documentation establishing such tax basis and holding period sufficient to allow the [former] Wife to **properly** report any gains or losses she recognizes to the IRS when she sells or otherwise disposes of the stock received pursuant to this Agreement." The tax basis information was due by June 30, 2012.

72.      On August 16, 2012, the Former Husband wrote a letter to the Former Wife providing basis information regarding the stock transferred to the Former Wife (hereinafter, the "Tax Basis Letter"). The Tax Basis Letter indicated, *inter alia,* that the

---

[5] The Former Husband offered the testimony of an Isle of Jersey attorney, Fraser Robertson, Esq. (by way of video deposition), to testify that the Former Husband is an excluded person in the Gokana Trust and, pursuant to Jersey law, could not benefit from the trust. During cross examination, however, Mr. Robertson admitted that third parties could borrow assets from the trust and then loan those assets to the Former Husband without violating the terms of the trust.

29

basis for 17,500,000 of the shares transferred to the Former Wife was US $.01. The third

tranche of stock, i.e., the 5,666,667 shares (the "Borrowed Shares"), was among the

17,500,000 shares that the Former Husband reported to have a US $.01 basis.

73.     At trial, the Former Wife testified that she relied upon the Former Husband's

tax basis letter and, in 2013, she paid capital gains taxes on the Borrowed Shares using

the $.01 basis reported to her.

74.     During his October 2013 deposition, the Former Husband revealed, for the

first time, where he obtained the Borrowed Shares, which information called into question

the accuracy of the Tax Basis Letter. Specifically, the Former Husband testified that he

borrowed the shares from a friend of his named "Bader Al-Qabandi," who is a resident of

Kuwait and who is also a large shareholder in GKP.

75.     The loan between Mr. Al-Qabandi and the Former Husband was based

upon an oral agreement with the following terms:

> BY MR. FISHER
>
> Q.   That's my question. What communications with Al-
>      Qabandi do you have on the topic of borrowing $25
>      million worth of GKP stock?
>
> BY MR. KOZEL
>
> A    Well, we spoke. . . . I need shares in order to settle my
>      obligation. I had shares coming out of the EBT, which
>      would more than cover that. He agreed to transfer the
>      shares to Ashley to settle my obligation as long as my
>      first opportunity I transferred shares back to him in
>      settlement for the value.
>                          * * *
> Q.   What were the terms of the loan?
>
> A.   We agreed I'd return shares equivalent to the value of
>      what he transferred at the time.

Q. What was the length of the loan?

A. It was as soon as I had vested those shares and was able to pay him back.

76.     After the Former Husband's deposition, the Former Wife provided the deposition transcript to her tax experts, who informed her that the Former Husband's Tax Basis Letter was inaccurate, but that they needed additional information before they could process an accurate amended tax return. Therefore, instead of amending the Former Wife's 2012 tax return, they filed a "protective claim for refund," which, essentially, extends the time for the Former Wife to amend.

77.     When the Former Husband was asked where he obtained the information he reported in the Tax Basis Letter with respect to the Borrowed Shares, he claimed that he asked an unknown auditor in the hall of GKP for his opinion. The Former Husband acknowledged that he did not know the name of the auditor, or any other material information about him. He also did not obtain an opinion from his United States-based accountants and tax lawyers. The Former Husband claimed that he acted in "good faith," but the court should find that his minimal efforts, and the resulting $25 million error described below, were not in "good faith."

78.     At trial, the Former Wife presented the expert testimony of Professor Gregg Polsky regarding the tax basis issue. Professor Polsky is a tenured tax law professor at the University of North Carolina School of Law at Chapel Hill. He was also formerly the professor in residence at the Office of Chief Counsel at the Internal Revenue Service. His testimony was largely unrebutted at trial and the court should find the testimony described below to be credible and reliable.

31

79.    Professor Polsky testified that, in light of the fact that the Former Wife received her shares "incident to a divorce," her basis in the shares was equal to whatever the Former Husband's basis in the shares was immediately before the transfer. As set forth below, Professor Polsky testified that the most conservative approach to determine the Former Husband's basis, given that the exact date of the loan transaction is unknown, would be to look at the repayment amount related to the loan, which repayment was publicly announced by GKP:

BY MR. FISHER

Q.    Okay. So now, again, please explain to the Court how the court can go at setting the basis on these shares using that document, please?

BY PROF. POLSKY

A.    So the repayment was here, again, the GKP public announcement which was consistent with Todd's testimony that there was a repayment of the loan on April 19th. There were 10 million shares that were transferred. Then GKP announces that the price of the shares at the time was 1.6875 pounds. And then you have to convert that to dollars, and so you have to report basis in U.S. dollars. And I looked at the pound to dollar exchange rate on that date, on April 19th, and it was 1.520, and so I multiplied those together and you get 25,750,000 dollars of basis, give or take a couple thousand dollars.

*  *  *

Q.    Okay. And now if one does the math, the 25.7 million dollar repayment divided by the number of shares, what is the correct basis in dollars and cents per share?

A.    Again, the most conservative, the smallest basis that is possible is $4.54 a share.

80.    Consistent with Professor Polsky's testimony, the court should find that the amount of the debt obligation that the former husband incurred in acquiring the Borrowed

32

Shares was $4.54 per share. Specifically, the court should find that the Former Husband did indeed borrow the 5,666,667 shares from Bader Al Qabandi in February, 2012. The court should also find that he promised to repay the loan at a later date at the fair market value of the shares at the time of the loan, which promise is no different than paying for the shares with a promissory note. Finally, the court should find that the Former Husband did, indeed, pay the loan back pursuant to his agreement with Bader Al Qabandi.

81. In terms of how much tax was overpaid, Professor Polsky testified that the Former Wife faced a 15% capital gains rate in 2012 and that she over-reported $4.53 per share, given that she reported a $.01 basis in the stock. Therefore, the Former Wife's overpayment of tax is computed as follows: .15 x 4.53 x 5,666,667 = $3,850,500. The Former Wife made this over-payment due to her reasonable reliance on the Tax Basis Letter provided by the Former Husband.

82. Professor Polsky also testified that the tax consequences of the back-to-back loans between the Gokana Trust, Bader Al Qabandi, and the Former Husband are as follows:

> BY MR. FISHER
>
> Q. Okay. So what's the consequence to the assumption that the trust, you know, sold it to Bader Al-Qabandi or Goldmark in exchange for a promise to repay?
>
> BY PROF. POLSKY
>
> A. So when the trust sells it to Al-Qabandi or Goldmark for a promise to pay, that's a sale of GKP stock, and there would be gain recognized on that sale to the extent of the fair market value at that time over the basis in those shares, and that gain would be reported by the trust, Gokana Trust, and because Gokana Trust is a grantor trust under the federal tax law, that -- and Todd -- Mr. Kozel is the grantor of that trust, that gain would be reportable by Mr. Kozel on his 2012 individual tax

Filed 09/15/2015 11:11 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

return.

Q. And that's on Schedule D?

A. Schedule D.

83.     Given this testimony, it appears that the Former Wife paid the Former Husband's tax liability as a result of the erroneous Tax Basis Letter. Professor Polsky testified that, without evidence that the Former Husband paid the tax due and/or without foreclosing the Former Husband from taking an inconsistent position in the future, there is a danger that the Former Wife's attempt to obtain a refund will be compromised by what the IRS refers to as being "whipsawed," which is where taxpayers take inconsistent positions on a transaction resulting in no tax being paid.

84.     To avoid this danger, Professor Polsky testified that the Former Husband should be required, pursuant to the PSA, to provide a corrected Tax Basis Letter to the Former Wife to eliminate the inconsistency between his testimony and his previous position on the basis of the shares.

85.     The Former Husband presented the testimony of Joel Podgor, CPA, with respect to the tax basis issue. Mr. Podgor did not dispute the accuracy of Professor Polsky's computations, or his analysis of the proper method of determining the basis in the Borrowed Shares. Instead, he simply testified that no one knows whether the IRS will issue a refund in response to the filing of an amended return by the Former Wife. He also testified that the IRS will not examine the Former Husband's return when evaluating the Former Wife's amended return. Nonetheless, he acknowledged that, before the Former Wife files her amended return, she should have the best documentation available.

34

## III. FORMER HUSBAND'S STATEMENT OF THE EVIDENCE AND ARGUMENT[6]

86. In accordance with Paragraph 7A of the PSA, the Former Husband could "cure" his default by delivering the required shares to the Former Wife. The Former Husband no longer had an obligation to pay any additional equitable distribution once the shares were delivered to the Former Wife. The PSA and Exhibit C attached thereto contained numerous examples of how the interest was to be calculated in the event of the Former Husband's "default" and how he could "cure" the same.

87. When the Former Husband did not timely deliver all of the shares required, the Former Wife demanded he pay her the additional equitable distribution payments in accordance with the terms of the parties' PSA.

88. In accordance with Paragraph 7A of the PSA, in the event the Former Husband failed to timely deliver all of the stock required before May 1, 2012, then the Former Wife was entitled to move the Court to have the Former Husband held in contempt, or to otherwise compel him to specifically perform and transfer to her all of the shares required or she could obtain a money judgment against him. This set the outside date by which the Former Husband could "cure" the delayed delivery as May 1, 2012. The Former Wife testified that one of the purposes of providing in Paragraph 7A that she intended to use the additional equitable distribution for support was to allow her to obtain the remedy of contempt against the Former Husband should he fail to pay the additional equitable distribution. The evidence established that the Former Wife's net worth was in excess of $18 million at the time that the first tranche of stock was delivered to the Former Wife

---

[6] Former Husband's Statement of the Evidence and Argument began with the Stipulated Facts that have been placed at the beginning of this Order.

Filed 09/15/2015 11:11 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

before the first additional equitable distribution payment was made to her. It is undisputed that GKP paid no dividend. Consequently, the failure to have the stock delivered to her did not result in her actual loss of income generated by GKP stock. Any claim that the Former Wife actually needed the additional equitable distribution in order to support herself and the children is unfounded.

89. The intent of the parties is clearly set forth in Paragraph 7B of the PSA wherein it states: "It is intent of this Agreement that the Wife receive 23 million shares of GKP stock or the value thereof." The Former Wife received the 23 million shares by March 1, 2012.

90. In accordance with Paragraph 7B of the PSA, the Former Husband was entitled to receive a refund of the additional equitable distribution payments he made to the Former Wife in the event he "(i) timely paid the additional equitable distribution payments and (ii) "cured the default" within 120 days from the date the default occurred and (iii) and on the date the default is cured the price of the GKP stock in default exceeds the price of GKP stock on the 11th day following the signing of a Final Judgment of divorce." The Former Wife was entitled to retain any increase in the value of the shares.

91. Upon the Former Wife's demand, the Former Husband timely paid the additional equitable distribution. He partially "cured his default" on January 30, 2012, February 3, 2012, February 21, 2012 and cured his remaining default on March 1, 2012.

92. The value of GKP stock on the due date of January 27, 2012, and on the date of each transfer to the Former, Wife was as follows:

| TRANSFER DATE | SHARES | AIM CLOSING PRICE Per share (on transfer date) | TOTAL VALUE OF SHARES — at closing price |
|---|---|---|---|
| January 27, 2012 | 23,000,000 | $4.34 | $99,757,210 |

36

| January 30, 2012 | 2,034,447 | $4.34 | $8,837,272 |
|---|---|---|---|
| February 3, 2012 | 3,798,886 | $4.80 | $18,234,083 |
| February 21, 2012 | 5,666,667 | $6.55 | $37,106,979 |
| March 1, 2012 | 11,500,000 | $5.69 | $65,461,450 |
| | | | |
| | | | |

93. The effect of the additional equitable distribution payment was to guarantee the Former Wife that she would receive at least 6% rate of return on the undelivered stock.

94. Time was not of the essence in the PSA. The parties clearly anticipated that there may be a delay in the delivery of the stock and provided for that possibility in their PSA, by requiring the Former Husband additional equitable distribution calculated at the rate of 6% of the closing price of the stock until it was delivered.

95. The Former Husband did not materially breach the provisions of the PSA with respect to the delivery of stock and the Former Wife is not therefore entitled to any damages as a result of the untimely delivery of the stock.

96.     Based upon the evidence presented at trial, it is clear that the Former Wife seeks to recover damages for the Former Husband's delayed delivery of stock. The fact that she has, in her pleadings, chosen to characterize her damages as "economic losses" does not change the relief she is requesting. The damages which she seeks are not provided for in the PSA. To the extent the Former Wife requests any relief as it relates to the delayed delivery of stock by the Former Husband, her request is not one to "enforce" the PSA. It is undisputed that the Former Husband delivered the stock prior to May 1, 2012 and that he timely paid all additional equitable distribution payments required. There is, therefore, nothing to "enforce." The Court is without jurisdiction to entertain any claim by the Former Wife for damages arising out of an alleged breach of the PSA by the Former Husband related to the untimely delivery of stock to her.

37

97.   The Former Wife's reliance on the sentence in paragraph 7A that "Nothing contained in this Agreement, or Paragraph 7 thereof, shall be construed to limit or restrict the Wife's right to seek or pursue all remedies at law or in equity to enforce her rights to receive the 23 million shares and/or the value thereof in accordance with Paragraph 6A, does not give her the right to claim damages for the delayed delivery of stock that was delivered to her to prior to May 1, 2012. The phrase upon which the Former Wife relies gives her the right to <u>enforce</u> her right to receive the stock. It is undisputed that she received the stock, and she received it prior to May 1, 2012. The provision upon which the Former Wife relies does not give her a remedy not specified in the contract and not related to enforcement of her right to receive the stock.

98. Paragraph 6B of the PSA identified certain shares of stock that were to be delivered to the Former Wife. The source of the balance of the shares owed, was not identified and could come from any source at the Former Husband's sole discretion. The Former Husband represented that the shares specifically identified were received as compensation for his service. He further testified that during the divorce he provided documentation concerning the tax basis of those shares. The tax basis in those shares is not disputed. The only dispute concerns the tax basis in 5,666,667 shares of GKP stock that were delivered to the Former Wife on February 21, 2012.

99. The Former Husband provided the Former Wife a letter on or about August 16, 2012 setting forth the tax basis (Exhibit 5) of the 5,666,667 shares of GKP stock. The letter contained no "documentation." The letter ended with "If you need any further information, please get in touch with me." Neither the Former Wife nor anyone on her

38

behalf ever contacted the Former Husband after receiving his letter to request any additional information.

100. The Former Husband borrowed the 5,666,667 shares from a friend, pursuant to an oral agreement. There were no documents concerning the loan. The Former Husband testified at his deposition on October 15, 2013 with respect to the specifics of the transaction. The Former Husband also testified with respect to the repayment of that loan with 10 million shares of GKP stock on April 19, 2013. The repayment was disclosed in a public announcement made by GKP dated April 22, 2013, a copy of which was produced by the Former Husband and which was otherwise available to the public. (Exhibit 47).

There is no evidence, and no witness suggested, that the Former Husband's testimony was not truthful. The Former Wife's expert relied upon the Former Husband's testimony concerning the source of the stock, repayment of the loan, and knowledge of tax law, to form his opinion as to the correct tax basis for the shares.

101. The Former Wife's tax expert, Gregg Polsky, Esq. is a tax professor at the University at North Carolina. He was retained by the Former Wife prior to the entry of the Final Judgment and was the drafter of the tax clause contained in Paragraph 15 of the PSA. When the Former Wife received the Former Husband's tax letter she did not provide it to Mr. Polsky. Mr. Polsky did not prepare the Former Wife's 2012 tax return. The accountants that prepared her return did not contact the Former Husband to inquire as to the information contained in his tax letter.

102. The Former Husband has no tax expertise. The Former Husband's

39

unrebutted testimony was that he made inquiry from individuals at GKP including the corporate secretary and its auditor Deloitte, as to the tax basis of the shares of stock transferred to the Former Wife. He reported that information in his letter to the Former Wife. There is no evidence that he did anything other than pass the information he had received from those whom he thought possessed the necessary knowledge and expertise to the Former Wife without any changes. There is no allegation that the Former Husband acted in bad faith.

103. The Former Wife did not file her 2012 tax return until October 15, 2013 (Exhibit 7). Because she sold the 5,666,667 shares of GKP in 2012, she reported a capital gain on the same utilizing the basis of .01 per share. Mr. Polsky opined that the basis on those shares was $4.54 a share. The first time he offered that opinion was at trial and there was no evidence anyone ever advised the Former Husband prior to trial that it was the Former Wife's opinion that the basis in those shares was $4.54. As a result of the difference in basis, the Former Wife alleges that she has overpaid taxes and is therefore entitled to a refund.

104. Mr. Polsky does not prepare tax returns. By his own admission, the Former Wife has had the necessary information to file an amended return requesting a refund of any over paid taxes. In his opinion it may be optimal, although not necessary, for the Former Wife to have additional information when she files her amended return, including but not limited to, a determination from this Court as to the tax basis of the shares in question and the filing by the Former Husband of a 2012 tax return that is consistent with the Former Wife's position. Mr. Polsky admits that the IRS is not bound by any decision of this Court regarding the tax basis of the shares in question and that he has never been

40

involved in any case where the determination regarding an amended tax return requesting a refund has been dependent upon what their spouse or former spouse reflected on their return. Further, he candidly acknowledged that no one knows what will happen when the Former Wife files her amended return. While he "believes" the Former Wife's return "may" draw scrutiny his belief is not based upon any personal experience he has had with similar claims. Mr. Polksy agreed that ultimately the Former Wife is only required to pay tax based on the gain calculated as the difference between the tax basis as determined by the IRS and the sales price of the stock when it was sold. The Former Wife will never be required to pay more tax then that which is based upon the proper tax basis as determined by the IRS and if she overpaid her taxes she is entitled to seek a refund of any overpayment with interest. He acknowledged that the IRS may just send the Former Wife a check based on her amend return.

105. The Former Husband's tax expert, Joel Podgor, has been a CPA for 43 years. His practice is predominately tax advocacy work. He has been involved in the filing of over 1,000 amended tax returns and testified that as to the procedure for filing an amended return that there is no requirement that any documentation be submitted with an amended return requesting a refund. According to his testimony there is nothing preventing the Former Wife from filing an amended tax return and requesting a refund of any overpaid taxes.

Mr. Podgor testified that what the Former Husband reports on his tax return is not only not relevant but the IRS may not consider another taxpayer's return and is prohibited from looking at another taxpayer's tax return when considering the Former Wife's amended return. This testimony was undisputed and unrebutted.

41

According to Mr. Podgor, the IRS examines less than 4% of tax returns and he was of the opinion that there is no reason to assume that there is any greater or less likelihood that the Former Wife's amended tax return would be accepted or not accepted than any other return. He also testified that no one knows what the IRS will do and further that the IRS may accept the Former Wife's amended return and send her a check for any overpayment of taxes.

106. Paragraph 15 of the PSA provides that each party shall file separate returns and each party is solely responsible for any taxes due on their return. The Former Husband is not responsible for the Former Wife's taxes due as a result of her sale of GKP stock. Taxes will be determined by the IRS upon its determination of the correct tax basis. (In Mr. Polsky's opinion the basis in the 5,666,667 shares transferred to the Former Wife is $4.54 per share, which is not to say that the IRS will be bound to accept the same.)

107. The Former Wife has not stated a recognized cause of action with respect to any claim arising out of the erroneous tax basis information provided by the Former Husband. The Court does, however, have the jurisdiction to require the Former Husband to provide the Former Wife with a tax basis letter setting forth the correct tax basis per Mr. Polsky's opinion. That is all the Former Husband is required to do pursuant to the PSA and therefore there is nothing further to enforce. There is no basis or cause of action asserted upon which the Former Wife is entitled to any of the other relief she requests.

108. Further, the Court should find that the Former Wife has suffered no damages as a result of the erroneous tax basis letter provided by the Former Husband. The Former Wife is, and always has been liable for the tax due on the sale of the stock. The Former Wife's tax liability is, as a matter of law, the difference between the tax basis

42

as determined by the IRS and the sales price of the stock. If the Former Wife used an erroneous basis when she filed her return, then according to her own expert, she is entitled to seek a refund.

109. The Former Wife has been able to file an amended tax return and request a refund since soon after the Former Husband's deposition in October, 2013. It is undisputed that the Former Wife has the right to file an amended tax return and request a refund of any overpaid taxes. She has in fact filed a Protective Refund Claim setting forth her claim for a refund based upon the overpayment of taxes in order to avoid the statute of limitations barring her claim. (Exhibit 8).

110. The Former Wife has elected not to file an amended tax return because she believes that a finding of this Court may be of some assistance to her when she files her amended tax return. While that is her choice, given the unrefuted testimony that the IRS is not bound by any such determination, the Court should find that the Former Wife has failed to mitigate her damages by failing to file an amended tax return.

111. In order to have a complete record for purposes of appeal or otherwise, given the extensive testimony and evidence presented to the Court, it is suggested that the court make findings of fact.

112. The Former Wife relied upon her financial advisor/portfolio manager, Richard Williams, a broker to manage the shares she received from the Former Husband. Mr. Williams is not a broker, had no previous experience selling stock in the UK or on the AIM Exchange and had no prior knowledge about GKP. He relied on others to complete any trades. He is employed by Morgan Stanley and although it had a London office, he did not deal with people in London.

43

113. When the former Wife received stock from the Former Husband she instructed Mr. Williams to sell the same as quickly as he could "without moving the market" and further instructed him to sell not more than 500,000 shares per day. There is no provision of the PSA that prohibits the Former Wife from selling shares and, in doing so, "moving the market." Richard Williams testified consistent with the Former Wife's testimony that he had received instructions from the Former Wife to sell the shares as quickly as possible without moving the market and limited to 500,000 shares per day. Mr. William's understanding was that "without moving he market" meant sell without making the price of the stock go down.

114. At no time did Mr. Williams tell the Former Wife he wanted to sell more than 500,000 shares or was he ever instructed by the Former Wife to do so.

115. Mr. Williams testified that he sold the stock as fast as he could without adversely affecting the market. He did exactly what the Former Wife requested. He further testified that on two occasions he sold 500,000 shares in a day and on one of those occasions he sold more than 500,000 shares in a day but that the sales in excess of 500,000 shares was inadvertent. He further acknowledged that on all the other days he sold less than 500,000 shares because he could not get the price he wanted for the stock.

116. It is undisputed that the Former Wife, at all times since January 27, 2012 had shares of GKP stock in her brokerage accounts available for sale which she chose not to sell. Upon, delivery of the initial tranche of 2,034,447, the Former Wife had 2,059,447 shares in her account. Notwithstanding that fact, the next day she chose to sell only 24,000 shares. When she received the second tranche of stock on February 3,

44

2012 she already had 1,363,847 shares in her account which she had chosen not to sell. Upon receipt of the second tranche she had 4,888,033 shares in her account. The following day she chose to sell only 44,700 shares. By the time she received the third tranche on February 21, 2012 of 5,666,667 shares she already had 1,918,333 shares in her account unsold. Upon receipt of the third tranche, she had 7,460,000 shares in her account. The next day, February 22, 2012, although she was trading her shares on the London Stock Exchange, which was open on that date, she chose to sell no shares. The following day she only sold 43,200 shares. By the time the Former Wife received the fourth tranche on March 1, 2012 of 11,500,000 (excluding the 100,000 shares of extra stock) she already had in her account 6,296,400 shares of unsold stock. Upon receipt of the 11,600,000 shares she had 17,608,000 shares. Between March 2, 2012 and March 8, 2012, the Former Wife sold only 749,740 shares, yet 109,670,167 shares of GKP stock sold during that same period. (See Respondent's Exhibit 12.)

117. An analysis of the Former Wife's brokerage account statements and the testimony of her and her broker clearly reflect that the Former Wife was "playing the market" to the extent that she was attempting to sell the stock in the rising market at the best price she could achieve without "moving the market." That was the Former Wife's right as is specifically provided in the parties' PSA, wherein the parties specifically stated that upon the Former Wife's receipt of the stock she could sell it to whomever she wanted, at whatever price she wished. However, having made the decision to "play the market" the Former Wife cannot now make the Former Husband a guarantor of her investment decisions.

118. The Former Husband's delay in delivery of stock to the Former Wife was

45

not the cause of any loss suffered by the Former Wife. The Former Wife lost no opportunity to sell undelivered shares in that it was clear based on her actual trading and instructions to her broker, that she would not have sold shares in any manner other than the manner that she directed had additional shares been delivered to her in a timely manner.

119. At no time did the Former Wife advise the Former Husband that she intended to sell the shares she received on a particular date or at a particular time.

120. The Court heard testimony from the Former Wife's expert witness, Dr. Marcia Mayer, with a Ph.D in economics. By her own admission, Dr. Mayer made a significant error in her first report concerning the regression analysis that she performed. Dr. Mayer selected the oil and gas index on the AIM exchange as an "independent" variable, along with order imbalance. Only after her deposition did she realize that GKP was a significant part of the oil and gas index and therefore it was not an independent variable.

121. Originally, in her regression analysis, Dr. Mayer claimed that 65% of the change in price in GKP stock for a one year period was explained by movements in the oil and gas index and order imbalance. After discovering her error, Dr. Mayer had to re-do her regression analysis and as a result her model only explained 35% of the change in price of GKP stock. By her own admission, 65% of the change in price of GKP stock was not explained by those variables.

122. An assumption underlying Dr. Mayer's opinion was in part that the Former Wife would sell 23 million shares of her stock without generating any "buyer initiated"

46

shares which would represent additional shares of stock traded. While acknowledging that there was a correlation between buyer initiated shares and seller initiated shares, Dr. Mayer did not consider the same.

123. Dr. Peter Angelides, who also has a Ph.D. in economics, testified on behalf of the Former Husband. After Dr. Mayer issued an amended report and after she was deposed with respect to her amended report, Dr. Angelides evaluated Dr. Mayer's amended report and the methodology employed by her. Dr. Angelides testified that, in his opinion, Dr. Mayer's report and the methodology that she used was unreliable. He specifically testified with respect to the correlation between buyer initiated and seller initiated shares and the fact that order imbalance only represents the difference between the two. Therefore, a greater number of shares are actually sold in order to generate order imbalance. The correlation between buyer initiated shares and seller initiated shares was 98.6% based upon the data that Dr. Mayer relied upon. Considering the correlation between the two and the definition of order imbalance, Dr. Angelides testified that approximately 22.27 million more shares would be sold if the Former Wife sold all of the 23 million shares she was to receive thereby allowing the 23 million shares to be sold in two or three days.

Dr. Angelides also testified that the one variable used by Dr. Mayer, (*i.e.*, order imbalance) was in fact not an independent variable and that after applying the Granger Causality test, he determined the variable was biased, rendering Dr. Mayer's report unreliable. As explained by Dr. Angelides, it was not true that GKP's return is caused by order imbalance but rather that yesterday GKP's return causes today's order imbalance. Dr. Angelides pointed out other factors which, in and of themselves, in his opinion,

47

rendered Dr. Mayer's report unreliable including the fact that Dr. Mayer, by her own admission, did not consider all of the transactions concerning GKP stock either because they were not reported on the London Stock Exchange or were excluded pursuant to the information received from Tick Data, the vendor of the information relied upon by both experts in this case.

124.    According to Dr. Mayer's model, the Former Wife could not have sold the 23 million shares of GKP stock had they been delivered to her on January 27, 2012 for a period of 37 days or until March 20, 2012 with a 1% decrease in stock price. The effect of Dr. Mayer's calculation is that the Former Wife has the benefit of calculating her alleged damages based upon the highest price ever achieved for GKP stock in the history of the company. Dr. Mayer calculated the Former Wife's damages for Period 1 (the reasonable period after the stock was due) at $7.30 per share for 11,500,000 shares. Dr. Mayer was unable to testify as to the number of shares that were actually sold for $7.30 per share or when those sales occurred. Mr. O'Brien, however, the expert retained by the Former Husband, was able to analyze the data relied upon by Dr. Mayer and located the specific transactions upon which Dr. Mayer relied. In fact, the only shares that were sold for $7.30 per share were 2200 shares sold at 8:04 a.m. on February 20 and 1500 shares sold at 8:05 the same day. Dr. Mayer's model is based upon an impossible assumption, i.e. that the Former Wife could have sold her shares (or at least 11.5 million of them) at a price that only 17200 shares were sold. By her own admissions such a result would require "perfection" and is not likely. Further Dr. Mayer did not consider at all the Former Wife's own trading of the stock she had received from the Former Husband.

125.    The Court heard testimony from only one broker, Paul Miskin, who is

48

currently a broker in the United Kingdom and who has been a broker for in excess of 25 years. He is a licensed broker in both the U.K. and the USA. In addition to his work as a broker in the UK, he opened an office for a significant USA brokerage house in Boston and ran the equity desk of that company with respect to the transactions concerning European stocks for several years. He was employed by one of the brokerage houses that initially was involved in taking GKP public when it initially became a publicly traded stock. He has followed GKP's performance since it was initially listed as a publicly traded company in September of 2004. He is an institutional broker who regularly deals with transactions involving large blocks of stock. He testified at length as to the manner in which a competent broker would sell a large block of stock such as GKP if one wished to sell it. He distinguished the method used by the Former Wife's financial advisor (Mr. Williams) ("screen" method) as opposed to the methods an experienced broker would use. He was intricately familiar with the market for GKP stock during the first quarter of 2012 and described in detail the demand for the stock at that time. He is a skilled broker with actual knowledge of how GKP stock would likely have been traded should someone actually have wanted to sell a large block of it in the first quarter of 2012. It was his opinion that had the Former Wife received the 23 million shares of stock on January 27, 2012 and actually wished to sell it, he could have sold all of it within one day and in fact within hours. Mr. Miskin also testified with respect to the length of time in his opinion it would have taken the Former Wife to sell the shares of stock after she actually received them from the Former Husband, i.e., Period II (the reasonable time after the stock was delivered.)

126. The Former Husband's expert/accountant, James O'Brien, utilized the

49

opinions of Mr. Miskin in determining whether or not the Former Wife suffered any damages as a result of the delay in delivery of stock to her. (If there had been a breach by the Former Husband and if the Former Husband's breach was the cause of any such damage). He concluded the Former Wife did not suffer any damages.

127.   The Court should find that Dr. Angelides, Mr. Miskin's and James O'Brien's testimony is more credible and reliable and should find that (even if one were to apply *Madison Fund,* which the Court should find is not applicable) the Former Wife suffered no damages as a result of the delay in delivery of stock to her.

128.   The Court entered an Agreed Third Amended Asset Injunction on January 12, 2012. In accordance with the terms of that injunction, the Former Husband was enjoined from directly or indirectly selling, transferring, or encumbering any interest he had in GKP stock without the Former Wife's written consent or Order of the Court. The Injunction applied to GKP stock which the Former Husband owned and/or controlled. The Injunction further provided that with respect to the lost share certificate for 11.6 million shares of stock, the Former Husband was required to deposit the same with the Court within 20 days and if unable to do so to file a motion explaining why he needed additional time.

129.   The Former Wife alleges that the Former Husband had control over the assets owned by the Gokana Trust. There was evidence that the Gokana Trust, but not the Former Husband, sold shares of GKP stock during the period of time in which the injunction was in force. (Exhibit 50) The unrefuted evidence at trial, however, was that the Former Husband advised the Trustee of the Gokana Trust of the Court's injunction, that he had no knowledge of the Trust's sale of GKP stock and that he received no

50

proceeds from the same. Further, the Court heard expert testimony from Frasier Robertson a lawyer licensed to practice in the Isle of Jersey. He testified that the Gokana Trust is governed by the law of the Isle of Jersey. According to Mr. Robertson's unrefuted testimony, the Former Husband's has no interest in the Gokana Trust, had no control over the Trustee of the Gokana Trust, had no ability to replace the Trustee of the Gokana Trust, and was powerless to order the Trustee to do anything.

130. The purpose of the Third Amended Asset Injunction was to ensure that the Former Wife received the stock she was entitled to receive and to prevent the Former Husband from disposing of any GKP stock that he controlled without first giving the Former Wife the shares she was entitled to receive. Once the Former Wife received the shares she was entitled to receive and the parties jointly acknowledged the same in writing, the Third Amended Asset Injunction terminated pursuant to its own terms and the Former Wife was entitled to a return of the $1 million Injunction bond she had posted. The Court should find that there is no evidence to support the Former Wife's claim that the Former Husband violated the Agreed Third Amended Asset Injunction.

131. During this case the Former Husband was requested to produce various documents. Various orders were entered requiring production to which the Former Husband responded. At no time did the court find that the Former Husband failed to produce any documents in his possession, custody or control. He was never found in contempt. His unrefuted testimony at trial was that he produced everything in his possession and requested others whom he thought may have any of the requested records to produce the same as well. (Exhibits 90 and 91) There was no evidence the Former Husband withheld any discovery.

51

## IV. **FINDINGS OF FACT BY THE COURT**

### a. **FORMER HUSBAND'S LIABILITY FOR LATE DELIVERY OF STOCK**

On January 12, 2012, the parties entered into a property settlement agreement ("PSA") wherein, in relevant part to this proceeding, Former Husband agreed to transfer 23million shares of Gulf Keystone Petroleum "GKP" stock to Former Wife by 5:00pm on January 27, 2012. Former Husband is the Founder, President and CEO of GKP. After the settlement was reached, Former Husband was placed under oath and testified that he would and could deliver the 23 million share on a timely basis.

This matter is before the court because Former Husband failed to deliver the stock on time. The stock was delivered as follows:

(1) 2,034,447 shares on January 30, 2012;

(2) 3,798,886 shares on February 3, 2012;

(3) 5,666,667 shares on February 21, 2012; and,

(4) 11,500,000 shares on March 1, 2012.

The Court believes that the reason(s) the stock was delivered late is tied to the historically unprecedented trading activity in GKP stock during a "hot market", which occurred between February 3 to February 21, 2012 (approximately). During this time, a rumor was circulating that GKP was about to be taken over/merged with a major U.S. oil company. This "rumor" substantially affected GKP share price and volume. Former wife was unable to participate in this high-volume, rising market because her shares were not timely delivered. On January 27, 2012 the closing price of GKP stock was $4.12. Over the next several weeks, the price increased rapidly with the accompanying increase in volume. The stock price peaked before the majority of Former Wife's share were delivered to her.

52

In 2009, the year before this action for dissolution was filed, former Husband created the Gokana Trust which is located in the Isle of jersey, a known tax haven. Former Husband funded the Gokana Trust with millions of marital shares of GKP stock. Early in these proceedings, former Husband denied having any control over the Gokana Trust, denied knowing who the trustee was and emphatically denied that his attorney and friend, Markus Hugelshofer was involved with the Trust in any way. This was all proven to be untrue. In particular, it is now known that Markus Hugelshofer is intimately involved with the Trust and that Former Husband is able to withdraw GKP stock when he chooses.

The court has jurisdiction to enforce the terms of the PSA. The Former Husband materially breached the PSA and as a result, the Former Wife suffered damages beyond the remedial provisions in Paragraph 7.

The Former Husband's material breach was the late delivery of tranches three and four. Former Wife is not claiming damages for the late delivery of tranches one and two as she was able to sell that stock during the hot market. The Former Husband makes sound arguments against finding that he profited from his breach, arguments that would be persuasive if it were not for the unprecedented activity in GKP stock during the delay/breach period. Did Former Husband take advantage of the hot market and trade the stocks that were owed to Former Wife? Did former Husband cause Gokana Trust to trade its shares during this market?

The evidence indicated that Former Husband failed to deliver the promised stock to Former Wife because he was trading those stocks during the hot market. Discovery directed to this issue was not produced. It was compelled two (2) times but not produced. Of particular note are Former Husband's claims that he has not prepared a draft or final 2012 personal tax return, that he has not filed a Form 3520, and that he lacks access to

53

information about transactions in the Gokana Trust. This testimony was not credible. In 2011, Former Husband entered into a tax amnesty program with the IRS wherein he agreed to pay back taxes and be relieved of accompanying penalties. It is inconceivable that, by April 2015, the Former Husband would have done nothing with respect to his 2012 return after entering into this amnesty program. Also, the Former Husband's testimony and his professionals' testimony was contradictory on this topic. During a deposition early in the case, the Former Husband testified under oath that a Mr. Perry, his accountant, was preparing his 2012 Tax Return. Mr. Perry, in contrast, testified that he was not preparing Former Husband's 2012 tax return. If properly reported, Former Husband's 2012 Tax Return would disclose gains he made by trading GKP stock, whether his own stock or Gokana stock. But, he doesn't know where it is.

Former Husband claims that he responded to all discovery orders and "at no time did the Court find that Former Husband failed to produce any documents in this possession, custody or control." It is true that no such ruling was made prior to trial, but the court finds, based upon the evidence received at trial and reasonable inferences derived therefrom, that the Former husband withheld court-ordered documents to avoid disclosure of his participation in and/or profit from violations of the Third Amended Asset Injunction by trading the Gokana Trust shares while he was withholding the Former Wife's shares from her.

Another key piece of missing evidence relates to an incomplete audit of the Gokana Trust activity in GKP stock during the hot market that was belatedly produced. The "audit" was provided (finally) but was missing all supporting documentation.

Despite the discovery violations, what is known with certainty is that throughout the entire time that Former Husband was withholding Former Wife's stock, there were more than sufficient shares in the Gokana Trust to satisfy his promise to

timely transfer 23 million shares.

Former Husband insists that the remedy in Paragraph 7 of the PSA is the only remedy available to Wife under the doctrine of election of remedies. Paragraph 7 defines remedies upon default:

> In the event that the Husband does not transfer to the Wife all or any portion of the 23 million shares of GKP common stock...he shall be in default and he shall owe the Wife payments as and for additional equitable distribution at the rate of 6% per annum on the value of the 23 million shares, or any portion thereof....which are not timely transferred...
>
> \* \* \*
>
> Notwithstanding any language to the contrary contained herein, or in the case law, the Parties stipulate that the Additional Equitable Distribution payment is intended to Provide support to the Wife and children.

The PSA does not, however, limit the Former Wife's remedies to those in Paragraph 7A as Former Husband urges. That Paragraph goes on the say:

> Nothing in this Agreement or Paragraph 7 thereof, shall be construed to limit or restrict the Wife's right to seek or pursue all remedies at law and in equity to enforce her rights to receive the 23 millions shares and/or the value thereof in accordance with 7A. Nothing contained herein shall be construed to limit the Wife to one form or remedy versus another.

Paragraph 20 provides:

> Each party has the right to enforce and/or defend this Agreement utilizing all legal and/or equitable Remedies, judgment remedies, and all other remedies at law or in equity.

This provision expands the enforcement remedies beyond those in Paragraph 7 and provides the court the vehicle to fashion an equitable remedy that will make the Former Wife whole.

The Former Wife intended to sell all the shares she received. Husband was fully aware of this fact. She informed the Former Husband of her intent prior to the settlement

and after the settlement. She demanded the third and fourth tranches during the delay or hot market period so she could sell the stock. See Paragraph 27 of Former Wife's Statement of the Evidence.

The Third tranche of late delivered stock was 5,666,667 shares which the Former Husband testified he "borrowed" from a friend, Mr. Bader Al Qabandi. There were no loan documents, no security, no writing whatsoever for this approximately $25,000,000 loan. It was later proven that the 5,666,667 shares came from the Gokana Trust, the very same Trust over which Former Husband claims he has no control. Evidently, Former Husband could not directly "borrow" stock under the terms of the Trust but someone else, i.e., Bader Al Qabandi could "borrow" the shares for Former Husband. A transaction of this kind would not violate the Trust.

During the delay period, the Gokana Trust was trading GKP stock. The "in black and white" paper as proof of these transactions was requested, but never produced. It appears that the Gokana Trust traded millions of shares in the "hot' market.

The bottom line is that Former Husband could have and should have delivered all 23,000,000 shares of stock on January 27, 2012 as he promised under oath on January 12, 2012 when he testified that he was willing and able to timely deliver the stock. Former Wife was substantially damaged by Former Husband's failure to comply with his own promises which were encompassed in the PSA and Final Judgment.

**b. FORMER HUSBAND'S LIABILITY FOR INCORRECT TAX BASIS**

The former husband's liability as to the above claim was established when the court granted the former wife's motion for partial summary judgment. The procedural

history of this claim is briefly described below.

The former wife required information from the former husband regarding his taxable basis in the GKP shares transferred to her pursuant to the PSA so that she could properly report her federal income taxes after she sold the shares. This is because the former wife assumed the former husband's tax basis in the shares. 26 U.S.C. § 1041(a) ("No gain or loss shall be recognized on a transfer of property from an individual to ...a former spouse, but only if the transfer is incident to the divorce.")

To address the above issue, the PSA, paragraph 15 provides:

> The Husband agrees to provide the Wife on or before June 30, 2012, with a document setting forth the 'tax basis' and holding period (as of the date of the transfer to the Wife) (including the start date of the holding period) with respect to the stock being transferred to the Wife pursuant to paragraphs 6 A and B as well as documentation establishing such tax basis and holding period sufficient to allow the Wife to properly report any gains or losses she recognizes to the IRS when she sells or otherwise disposes of the stock received pursuant to this Agreement.

On November 21, 2014, the former wife moved for a partial summary judgment as to liability for violating the above provision of the PSA on the basis of the following facts:

- On August 16, 2012, the former husband wrote a letter to the former wife to purportedly comply with paragraph 15 of the PSA.

- The untimely August 16, 2012, letter identified the taxable basis for 5,666,667 shares that were delivered to the former wife on February 21, 2012, to be $.01.

- On October 15, 2013, the former husband was deposed. At that time, he was questioned as to the source of all shares that were delivered to the former wife pursuant to the PSA. With respect to the 5,666,667 shares (hereinafter, the "Borrowed Shares"), the former husband revealed for the first time that he obtained the shares by securing them through a loan agreement with Bader Al Qabandi.

57

- The terms of the oral loan agreement were that the former husband promised to repay Mr. Al Qabandi the "value of what he transferred at the time."

- Due to the loan transaction, the former husband's taxable basis in the shares was the amount he agreed to repay, which was at least $25,000,000. GKP announced that the former husband transferred 10 million shares to a "third party" on April 22, 2013, which was apparently the repayment.

- As a direct result of the former husband's erroneous tax basis letter, the former wife overpaid capital gains taxes on tens of millions of dollars in "gains" that she did not incur.

At the summary judgment hearing, the former husband contended that he acted in "good faith." The former wife argued that "good faith" was irrelevant to the question of liability, but, even if it were relevant, the former husband did not act in "good faith." As it turns out, the former husband's statement that the tax basis for the 5,666,667 million shares was not derived from a reliable source. Rather, the former husband asked a person who he did not know, whose name he does not remember, and who the former husband met in the hall at GKP. This unknown person, if he really exists, got it wrong by at least $25 million. Former husband's initial response was "he is not a guarantor of the correct tax basis." The Court finds that Former Husband did not act in good faith or make a reasonable effort to give Former Wife an accurate tax basis.

When presented with the above facts and evidence, the court granted the Former Wife's motion for partial summary judgment as to liability. The Former Husband has moved for reconsideration of the summary judgment order, but he has presented no new facts or case law — he is simply re-arguing matters that the court already rejected. Accordingly, the former husband's motion for rehearing is denied.

58

In terms of remedies, the former wife requests that the court order the former husband to reimburse the former wife for her overpayment of taxes. Thereafter, the parties can attempt to process a refund request, which may be difficult due to problems that are entirely of the Former Husband's own creation. The court will order Former Husband to provide a corrected tax basis letter and escrow funds equal to Former Wife's overpayment of taxes.

### c. PARTIES' EXPERTS

Dr. Mayer often testifies in litigation relating to securities. She is highly credentialed and previously served as the chair of NERA's securities and finance practice. The court finds that her testimony was credible, relevant and reliable. Her testimony has never been excluded by a court. Dr. Mayer created a model to predict the amount of stock the former Wife could sell on the market without depressing the price more that 1%, 2% or 3% called ('the price impact constraint.') The model was designed to set out the reasonable selling periods that are described in Madison Fund. A full explanation of Dr. Mayer's testimony and methods are contained in Former Wife's Statement of the Evidence. The Court finds her testimony to be reliable and relevant.

The econometric model developed by Dr. Mayer provided the Court with a reliable method of computing the "reasonable sales periods" outlined in Madison Fund: (l) the highest intermediate price of the shares during a reasonable time at the beginning of the restricted period, which functions as an estimate of the price that the stockholders would have received fi they had been able to sell their shares (first selling period); and, (2) the average market price of the shares during a reasonable period after

59

the restrictions were lifted-(second selling period.) Dr. Mayer's analysis and testimony (paragraph 42-49) in Former Wife's Statement of the Evidence is accepted by the Court as credible and reliable.

Dr. Peter Angelides testified as Former Husband's expert who was called to rebut Dr. Mayer's analysis. He is an economist who specializes in urban planning, not securities or stock markets. He has little experience in the securities field and was called at the last minute. He did not develop a model to determine how fast the Former Wife's shares could have been sold without impacting the market price of GKP. He did no independent Madison Fund calculations. The court finds his testimony to be unpersuasive.

Former Husband also offered Paul Miskin as an expert on the Madison Fund reasonable sales periods to rebut Dr. Mayer's testimony. Mr. Miskin is a stockbroker in the United Kingdom and testified regarding his trading experience and to the manner in which he thinks he could have sold the Former Wife's shares. He testified that his opinions were derived from 'rules of thumb,' probability weighting various imagined scenarios, and by thinking about the issues "with a towel around his head". By that term, he meant he gave it a huge amount of thought. Mr. Miskin impressed the Court with his experience and knowledge of trading on the AIM market in London. Former Wife did not know Mr. Miskin. Her GKP shares were delivered in the United States. The Court finds Mr. Miskin's testimony to be unpersuasive.

James O'Brien is a CPA from Philadelphia, who testified for Former Husband. Mr. O'Brien opined that Former Wife suffered no damages as a result of the late

60

delivery of her stock. He based his opinion of zero damages on Mr. Miskin's opinions regarding large block trading on the AIM market. The Court found that Mr. Miskin's opinions are unpersuasive and so finds Mr. O'Brien's to be unpersuasive.

Mr. Pogdor is also a CPA. He testified that Former Wife has the ability to file an amended tax return.

Professor Gregg Polsky is a tenured tax law professor at the University of North Carolina School of Law at Chapel Hill. He testified on the tax basis issue. He opined that the accurate tax basis for Former Wife's shares is 4.54 a share. The parties are in agreement with this figure. Professor Polsky opined that Former Wife overpaid income tax by $3,850,500.

### d.  FORMER HUSBAND'S LIABILITY AND THE REMEDY FOR VIOLATION OF THIRD AMENDED ASSET INJUNCTION

The Third Amended Asset Injunction required the Former Husband to escrow all proceeds from his sale of GKP stock during the relevant time period. He failed to do so. The Court reserves jurisdiction to fashion an appropriate remedy if Former Wife is not made whole according to this order.

### CONCLUSIONS OF LAW

### a  SUBJECT MATTER JURISDICTION

The Florida Supreme Court in Paulucci v. General Dynamics Corp., 842 So.2d 797 (Fla. 2003) held:

> When a court incorporates a settlement agreement into a final judgment or approves a settlement agreement by order and retains jurisdiction to enforce the terms of the settlement....However, the extent of the court's continuing

61

> jurisdiction to enforce the terms of the settlement agreement
> is circumscribed by the terms of that agreement. Id @ 589.

The Final Judgment in this case retained jurisdiction to "enforce this Final Judgment and orders referred to above, and to grant such other relief as is appropriate."

The PSA, incorporated into the Final Judgment, provides a broad range of remedies upon default. Paragraph 20, among others, states that "each party has the right to enforce and/or defend this Agreement utilizing all legal and/or equitable remedies including, but not limited to, contract remedies, judgment remedies, and all other remedies at law or in equity." The expansive remedies granted to the Court in the PSA were agreed to by both parties. The Court has jurisdiction to fashion a remedy.

### b. LATE DELIVERY OF STOCK

Former Wife maintains and the record supports, that she had two concerns if the 23 million share transfer did not occur on January 27, 2012: (1) she wanted to ensure that she would receive temporary support because the temporary relief hearing had been adjourned to negotiate a settlement and, (2) the economic losses she might suffer if the stock was delivered late due to the volatility of GKP.

The PSA addressed both concerns. As previously discussed, Paragraph 7 provided for support, i.e., the 6% value of the undelivered shares. With respect to the volatility issue, the parties could not agree on a specific method for remedying a default and could not agree on how to calculate the loss flowing from such an event. So they agreed, according, to Former Wife, to leave the remedy in the court's discretion by reserving the Former Wife's right to seek all remedies in law and equity.

62

Paragraph 7 of the PSA provides that, in the event Husband fails to fully comply with the terms of paragraph 6 (deliver 23 million shares of GKP by January 27, 2012) then he shall be required to pay, as additional equitable distribution (intended as support) at a rate of 6% per annum the value of the undelivered shares. Paragraph 7A states that should the Husband fail to comply with paragraph 6A with regard to delivery of all 23 million shares on or before the close of business at 5:00 p.m. on May 1, 2012, but he has timely paid the additional equitable distribution payments, then on May 1, 2012, Former Wife may move the court to hold the Former Husband in contempt or otherwise compel him to specifically perform. The PSA clearly provided that the Former Wife would have all legal and equitable remedies available, but did limit the Former Wife's right to seek contempt and/or specific performance until after May 1, 2012.

The Former Husband makes two arguments regarding the support payments: (1) the support payments were the Former Wife's exclusive remedy and the only remedy contemplated by the parties in the event of Former Husband's default in the delivery of the stock and, (2) the Former Wife elected her remedy for the default by accepting the support payments.

Both arguments fail. Paragraph 7A further states that nothing contained in the PSA, or paragraph 7 thereof, shall be construed to limit or restrict the Wife's right to seek or pursue all remedies at law and in equity to enforce her rights to receive the 23 million shares and/or value thereof. Former Wife did eventually receive her 23 million shares but she did not receive the value thereof, at least not the value thereof had the shares been timely transferred. The Former Wife was not made whole by support payments so the

63

election of remedies does not apply. See *Goldstein v. Serb*, 556 So.2d 1338 (Fla. 4th DCA 1990).

The record is clear that there were sufficient GKP shares in the Gokana Trust to satisfy Former Husband's obligation to timely deliver the shares. The record is equally clear by inference that Former Husband was either trading his own GKP shares or causing the Gokana Trust to trade its shares during the delayed delivery hot market period in February, 2012.

When the Former Husband needed 5,666,667 shares of GKP, he went through Bader Al Qabandi transfer/loan machination to obtain those shares from the Gokana Trust. This demonstrates that he could have obtained all his promised shares in a timely manner, but chose not to do so.

"The law is clear, where a final judgment of dissolution of marriage provides for the transfer of assets, it is the responsibility of the spouse in possession of those assets to effectuate the transfer. With the responsibility to transfer the asset must also come the risk of loss if the asset is not timely transferred, therefore, on remand, the trial court should award economic damages the Wife suffered as a result of Husband's failure to comply with the Final Judgment." Sewell v. Hargarten, 28 So.3d 152, 156 (Fla.1st DCA 2010).

The Former Wife urges that the monetary relief that she is requesting is well within the court's discretion and it is based upon an objective rule that was adopted for precisely this type of situation, i.e., when stock is delivered late to someone who expressed an intent to sell during the period of delay. The rule is referred to herein as the *"Madison Fund* rule". The case that first described the rule, *Madison Fund, Inc. v. Charter Co.*, 427

64

F. Supp. 597 (S.D.N.Y. 1977), involved the application of **Florida** law and it has been cited approvingly by courts around the country in similar situations (including by District Courts of Appeal in Florida). *See, e.g., Lindon v. Dalton Hotel Corp.,* 49 So.3d 299 (Fla. 5th DCA 2010) (citing *Madison Fund); Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC,* 38 Fla. L. Weekly D2511 (Fla. 3d DCA Nov. 27, 2013) (citing *Madison Fund); see also Cole v. Am. Capital Partners Ltd., Inc.,* 394 Fed. Appx. 544, 546 (11th Cir. 2010) (affirming the district court's holding that *Madison Fund* is a proper statement of Florida law).

In *Madison Fund,* the defendant breached a contract, which delayed the plaintiff's ability to sell a privately purchased block of common stock in an "over-the-counter" market by approximately nine (9) months. During the period in which the defendant was in default, the stock price peaked at $45.25 and then declined to $29.37. The plaintiff argued that the court should award damages based upon subjective testimony regarding its intent to sell. The defendant argued that the stock should be valued as of the date of the breach. The court rejected both approaches and adopted a three-step approach based upon its analysis of Florida law. *(See generally Lindon v. Dalton Hotel Corp.,* 49 So.3d 299, 306 (Fla, 5th DCA 2010) (citing *Madison Fund* and stating, approvingly that courts "deem evidence of the subsequent value of stock relevant in assessing damages for breach of contract or the negligent failure to sell the stock at a specific time").

The first question under the *Madison Fund* files is whether there has been a preliminary showing that the plaintiff might have sold the stock during the delay period. If there was some evidence of such an intent, the court held that such evidence is sufficient to meet the preliminary inquiry. The *Madison Fund* court explained the issue as follows:

65

> [T]here can be no certainty that Madison would have sold its
> Charter shares between December 3, 1971, and August 31,
> 1972, if it had been free to do so; accordingly, there can be no
> certainty that Madison was damaged at all by Charter's failure
> of due performance.
>
> This is not to say, however, that the record fails to support an
> inference that Madison desired to sell during that
> period...More important, this Court concludes, fundamental
> justice requires that, as between Charter and Madision, the
> perils of such uncertainty should be laid at the defendants
> door. Were it otherwise, Madison would be required to prove
> a disposition to take the very steps that defendant's wrongful
> act prevented it from taking.

*Madison Fund, Inc.,* 427 F. Supp. At 608.[7]

There is ample evidence that clearly demonstrates that the Former Husband knew

the Former Wife wanted to sell her stock "immediately," that she met with him and her

broker regarding her plan to sell the shares immediately and in blocks, and that the former

wife called the former husband in mid-February — prior to the time the stock peaked in

price — to demand her outstanding shares. The former husband testified that the former

wife never told him a particular date and a particular price she would have sold them at,

but that is not the test. The former wife told the former husband she wanted to sell the

shares during the relevant period and she informed him that she wanted the stock

immediately. Nothing more is required.

After the preliminary inquiry regarding "intent" is answered, the court no longer

looks at subjective evidence. Instead, the case law turn to an objective test as follows:

> [C]ontract damages are measured by calculating the
> difference between:

---

[7] If it can be proven definitively that the plaintiff had no intention of selling the stock during the delay period,
then it may be that no damages would be appropriate. *See, e.g., Shearson Loeb Rhodes, Inc. v. Medlin,*
468 So.2d 272, 274 (Fla. 4th DCA 1985). This, however, is not the case.

Filed  09/15/2015 11:11 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

> (1) the highest intermediate price of the shares during a reasonable time at the beginning of the restricted period, which functions as an estimate of the price that the stockholders would have received if they had been able to sell their shares ["first selling period"], and

> (2) the average market price of the shares during a reasonable period after the restrictions were lifted ["second selling period"].

*Stuckey v. Online Res. Corp.*, 909 F. Supp. 2d 912, 930 (S.D. Ohio 2012) (applying *Madison Fund*). The rule is a balancing act that addresses the foreseeable and reasonable expectations of the parties to a contract involving the transfer of an asset, such as stock, that can fluctuate in price substantially in the short run.

With respect to the first component of the equation, the court provides the plaintiff with the benefit of the high price within a "reasonable" amount of time following the breach to make the plaintiff whole with respect to the loss of "elective" action during that time period. The rationale for such a rule is as follows:

> The intuition behind this rule is that the [breaching party] should bear the risk of uncertainty of the share price because the defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable.
>
> * * *
>
> The injury is not the loss of a specific transaction but the loss of the ability to trade the shares as desired.

*Stuckey v. Online Res. Corp.*, 909 F. Supp. 2d 912, 930 (S.D. Ohio 2012).

The second component of the equation relates to mitigation, i.e., it answers the question: "What was the value of the stock in the plaintiff's hands after it was delivered on an untimely basis?" *See Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1024 (Del. 2001) (discussing the *Madison Fund* mitigation calculation). Once again, the courts adopt an

67

objective approach. To that end, the *Madison Fund* rule looks at the value of the stock over a reasonable period of time, but, for mitigation, it uses the "average price" of the shares following delivery. *See Madison Fund, Inc.,* 427 F. Supp. At 610 n.3. "This Court concludes that the 'average price' standard is appropriate...involving damages mitigation. The 'highest price" standard applied earlier, by contrast, is designed to allow plaintiff some recoupment of lost opportunity." As an objective measure, the mitigation computation does not change if the plaintiff did well, or poorly, when trading the belated shares. *See Duncan v. Theratx, Inc.,* 775 A.2d 1019, 1026-27 (Del. 2001) ("Securities are different from traditional goods subject to the `cover' rule in that securities' prices generally follow a `random walk' and can fluctuate substantially over short periods. It therefore makes little sense to consider the stockholders' speculative retention of shares after the restrictions are lifted as a form of substitute transaction that mitigates the damages"). The bottom line is that there are aspects of the *Madison Fund* rule that are advantageous to the former wife and aspects of it that are disadvantageous. Overall, however, it is an objective approach that measures economic losses in a manner that is foreseeable and fair to both sides. In *Lindon v. Dalton Hotel Corp.,* 49 So.3d 299 (Fla. 5th DCA 2010), the Fifth District held that Courts "deem evidence of the subsequent value of stock relevant in assessing damages for breach of contract or the negligent failure to sell the stock at a specific time." (Citing *Madison Fund).*

In *Madison Fund,* the court picked one month as a reasonable period for selecting the highest price for the "first selling period" and two months for determining the average price for the "second selling period." In one of the recent cases that applied the *Madison Fund* rule, the court picked 44 trading days for the "first selling" period and 86 trading

68

days for the second selling period. *See Stuckey v. Online Res. Corp.,* 909 F. Supp. 2d 912, 931 (S.D. Ohio 2012).

Following *Madison Fund,* courts calculate the "reasonable" periods by relying on expert testimony as to how long it would take to sell the shares in dispute without "depressing" the market. Using this approach, the former wife presented scientific evidence as to how many shares (of her 23 million shares) she could sell into the market on a daily basis without depressing the price by more than 1%, 2%, or 3%. Depending upon which of these three options the court deems appropriate, the former wife's *Madison Fund* losses range between $23.2 and $44.6 million. The former wife's expert is a highly credentialed economist who has testified in countless securities cases, which often involve billions of dollars in dispute. The methodology that she employs is based upon scientific principles and peer-reviewed literature.

The former husband, in contrast, presented testimony regarding the "reasonable selling periods" by offering opinions from a broker/acquaintance of his, Mr. Paul Miskin, who has never testified before and who has no scientific basis for his conclusions. In fact, Mr. Miskin admitted that he came up with his opinions by reference to the "rules of thumb" that have no knowable error rates. Basically, in his opinion, the "reasonable" period for the former wife to exercise her range of elective options in terms of selling 23 million shares is one (1), hour, one (1) day, or, at most, a few trading days. This testimony is largely based upon a broker's opinion as to how fast he could have implemented "alternative" trading strategies (such as selling into "dark pools"), but that is not how the "reasonable" time periods are measured. *See Stuckey v. Online Res. Corp.,* 909 F. Supp. 2d 912, 943 (S.D. Ohio 2012) (declining to define the duration of the "first selling period"

69

on the basis of "alternative trading mechanisms" such as "dark pools", "intraday cross[es]," and "blocks"). On the basis of Mr. Miskin's opinions, the former husband presented testimony from an accountant who does "the math" and computes $0 in losses. The accountant's conclusions, however, are entirely dependent on Mr. Miskin's opinions about the selling periods. Dr. Mayer on the other hand, bases her opinion on event studies in which she analyzes what actually occurred in transactions involving a particular stock. In this case, she created a model to define reasonable selling periods as described in *Madison Fund*. Her testimony was credible, relevant and reliable.

The Court adopts Dr. Mayer's calculations on how long it would take Former Wife to sell her 23 million shares without depressing the market. The Court finds that Dr. Mayer's 2% is the fairest option for the Court to consider and in so doing finds Former Wife's loss to be $34,611,702.00.

The highest closing price of GKP came 16 days after the breach — and in very close proximity to the time that the former wife called the former husband and demanded her missing shares. The closing prices of the stock around this time ranged from $6.50-$6.74. By March 1, 2012, which is when the last 11.5 million shares finally hit the former wife's account, the closing price of the stock was $5.69 per share. Three (3) trading days later, the closing price was $4.05 per share. In short, in the matter of a few days, the former wife's stock had declined in value by tens of millions of dollars.

Former Husband insists that the applicable measure of damages for delayed delivery of stock is set forth in *Shearson Loab Roades, Inc. v. Medlin,* 468 So.2d 272 (Fla. 4th DCA 1985). Specifically, the measure of damages is the difference between the value of the stock on the day it was due and the value of the stock on the day it was delivered.

70

As stated in *Shearson,* in order for the Former Wife to recover any damages other than those in the general rule (stated above), she would have had to advise the Former Husband she intended to sell the stock on a particular date at a particular price. *Shearson,* 468 So.2d 274. Former Wife acknowledges that she did not tell Former Husband the particular day and price at which she intended to sell. However, the record is clear that Former Wife did not have the shares to sell and her Financial Planner, Mr. Williams, testified that an order cannot be placed to sell stock not in the account.

Former Husband insists that this Court is required to comply with and follow Shearson rather than Madison Fund. In Shearson, the plaintiff failed to prove he suffered any damages for the delay on the delivery of stock because, during the period of delay, plaintiff never communicated to defendant that he wanted to "sell at a particular time." The Court declined to award damages on the basis of a "secret intent to sell" during the breach period. Shearson does not apply in this case because there was no secret intent to sell. Former Husband was fully aware of Former Wife's intent to sell, especially after the February 20, 2012, call in which she demanded the third and fourth tranches so she could sell. Therefore, "the general rule" as applied in Shearson does not apply here. See Lindon v. Dalton Hotel Corp., 49 So.3d 299, 306 (Fla. 5th DCA 2010), stating that the "time of the breach" standard is not an inflexible principle and the courts have deemed evidence of subsequent value of stock relevant in assessing damages for breach of contract, where supported by the facts.

Former Wife contends that even under the subjective test in Shearson, she is entitled to substantial damages. Under Shearson, the Former Wife's damages would be appropriately measured by the difference in the closing price of the stock on the day she

71

demanded the shares minus the value of the shares that she actually received, which would be measured as the average price that she could have obtained for the untimely shares if she sold them using Dr. Mayer's 2% price constraint (i.e., 8% of the reported volume).

At the time the Former Wife made her demand, on February 20, 2012, 17,166,667 shares were outstanding. The closing price of the stock on that date was $6.73851. The value of the undelivered shares was, therefore, $115,677,757. Deducted from this amount would be the value of what the Former Wife actually received. The Former Wife received 5,666,667 shares on February 21, 2012. If the Former Wife sold the shares at the rate of 8% of the reported volume once the market opened the following day, she would have sold all of the shares by February 23, 2012 at an average price of $5.860. According to Former Wife, the post-delivery value, for the third tranche of stock, is $33,206,669. The remaining 11,500,000 shares were delivered on March 1, 2012. If Former Wife liquidated those shares at a rate of 8% of reported volume, she would have liquidated them by March 13, 2012 with an average sales price of $4.423. The post-delivery value, for the fourth tranche of stock, is therefore $50,864,500. The combined value of the untimely deliveries is $84,071,169.

Under the above analysis, according to Former Wife, her damages under Shearson, using the price of the stock on the date that the Former Wife demanded her undelivered shares, would be $31,606,588 (i.e., $115,677,757 - $84,071,169 = $31,606,588). The Former Wife's *Madison Fund* losses are slightly in excess of this number, and she is not entitled to a double recovery. Either way, the Former Wife's losses are in excess of $30 million. The Court will use the *Madison Fund* damage but incorporates

72

this analysis to demonstrate that Former Wife would, in fact, have damages under Shearson as well as under *Madison Fund.*

A recent case addressing the standard for measuring damages in a case such as this is *Lindon v. Dalton Hotel Corp.,* 49 So.3d 299, 306 (Fla. 5th DCA 2010). In *Lindon,* the defendant, as here, argued that the "time of breach" standard should be applied, which would have resulted in an award of $0 damages for the defendant's wrongful redemption of the plaintiff's stock. The *Lindon* court reviewed authorities from Florida, including the Shearson case cited by the former husband herein, and concluded as follows:

> [The general rule] is that damages for breach of contract are measured as of the date of the breach.. .fluctuations in value after the breach do not affect the nonbreaching party's recovery. While that correctly sets forth the general rule, **it is subject to exceptions**... For instance, in [New York] cases the courts deemed evidence of the subsequent value of stock relevant in assessing damages for breach of contract or the negligent failure to sell the stock at a specific time.
>
> * * *
>
> [W]e are [also] of the view that the 'time of breach' standard is **not an inflexible principle** that served to freeze Lindon's loss to the value of his stock at the time that it was allegedly wrongfully redeemed, a principle supported by the cases that DHC and Dalton rely upon.
>
> * * *
>
> Fundamental justice requires that, as between [the plaintiff and defendant], if the calculation of damages is less than precise, the perils of such uncertainty should be laid at the [defendant's] door[.]

*Lindon,* 49 So.3d @. 306.

Accordingly, it is **ORDERED AND ADJUDGED:**

Filed 09/15/2015 11:11 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

1.    The Court has jurisdiction to enforce the terms of the parties' PSA. The Former Husband materially breached the PSA and Former Wife is entitled to damages as a result thereof.

2.    Former Wife shall recover from Former Husband, TODD KOZEL, the sum of $34,611,702.00, which shall bear interest at the statutory rate pursuant to §55.03, Fla. Stat., for which let execution issue.

3,    Former Wife is entitled to enforcement of the provision of the PSA requiring the Former Husband to provide her with a corrected tax basis information. Former Husband's liability to Former Wife is $3,850,500.00 for his failure to provide an accurate tax basis. This sum shall bear interest at the statutory rate pursuant to §55.03, Fla. Stat., for which let execution issue. Former Husband is ordered to place this sum ($3,850,500.00) in an escrow account to be agreed upon by both parties.

4.    Former Husband is ordered to provide Former Wife a corrected tax basis letter within twenty (20) days of the July 23, 2015 order. Upon receipt of the corrected tax basis letter, Former Wife shall file her amended tax return within ninety (90) days of receipt of the corrected tax basis letter. Any refund obtained by Former Wife shall be placed in the above ordered escrow account and the Court, upon motion of either party, will allocate the escrowed funds in light of the PSA and other orders and judgments of the court.

5.    The Court re-approves and re-incorporates the PSA into this Order.

6.    The Court hereby denies Former Husband's Motion for Reconsideration of the Summary Judgment Order in Former Husband's Liability for Inaccurate Tax Basis.

74

7.    The Court reserves jurisdiction over the parties and the cause for all matters relating to enforcement of the PSA, the Settlement Agreement Regarding Children Issues and the Parenting Plan.

8.    Former Husband violated the Third Amended Asset Injunction as was demonstrated by the incomplete audit of transactions by the Gokana Trust. The Court reserves jurisdiction to award Former Wife appropriate remedies if she is not otherwise made whole by this Order.

9.    Pursuant to the Pretrial Stipulation, the Court reserves jurisdiction to address fees, costs, prejudgment interest and all other matters related to this proceeding by separate motions.

10.    The Court reserves jurisdiction to adjudicate any claims related to the extra 100,000 shares of the GKP stock delivered to Former Wife.

11.    Except as set forth in this Amended Final Judgment, the former husband's motion for rehearing dated August 7, 2015 is otherwise denied.

**DONE AND ORDERED** in chambers, Sarasota County, Florida, this __/ /__ day of September, 2015.

_Nancy K. Donnellan_
**NANCY K. DONNELLAN**
**CIRCUIT JUDGE**

Copies furnished to:

TODD F. KOZEL
Ezereliu 21
Vilnius, Lithuania 10301
toddfkozel@gmail.com

JEFFREY D. FISHER, ESQ.
501 South Flagler Drive
Suite 450
West Palm Beach, FL 33401
eservice@fisherbendeck.com

75

Robert Young - Jeard Merrill
Special / Limited Appearances
for Former Husband -
2033 Main St.
Sarasota, FL 34237