UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA           :

          -v-                              :

TODD KOZEL,                        :           19 Cr. 460 (KMW)

          Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT
AND FOR A BILL OF PARTICULARS**

                                             GEOFFREY S. BERMAN
                                             United States Attorney for the
                                             Southern District of New York

LOUIS A. PELLEGRINO
OLGA I. ZVEROVICH
 Assistant United States Attorneys
    - Of Counsel -

The Government respectfully submits this Memorandum of Law in opposition to defendant Todd Kozel's motions to dismiss the Indictment and for a Bill of Particulars. (ECF Nos. 40 and 41). For the reasons set forth below, Kozel's motions are without merit and should be denied.

**FACTUAL BACKGROUND**

<u>The Complaint</u>

On December 14, 2018, the United States Attorney's Office for the Southern District of New York filed a three-count complaint (the "Complaint") against Todd Kozel ("Kozel"), charging Kozel with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; wire fraud, in violation of 18 U.S.C. §§ 1343, 2; and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). (ECF No. 1 ("Compl.")). As set forth in the Complaint, the charges against Kozel are based on allegations that Kozel engaged in a long-running scheme to defraud his ex-wife (the "Ex-Wife") during their divorce proceeding in a Florida divorce court (the "Florida Court"), and conspired with others to make international transfers of funds in order to promote the fraudulent scheme.

From in about 2004 through in or about 2014, Kozel was the co-founder and Chief Executive Officer of a foreign petroleum company with operations in the Kurdistan Region of Iraq (the "Oil Company"). (Compl. ¶ 7). Kozel earned substantial income from the operation of the Oil Company. Between 2010 and 2014, Kozel earned approximately an average of approximately $10 million in income per year. (*Id.* ¶ 8).[1]

Between in or about February 2012 and in or about December 2018, Kozel, working together with co-conspirators, engaged in a fraudulent scheme to hide assets from his Ex-Wife

---

[1] As alleged in the Complaint, despite earning millions of dollars each year, Kozel failed to file any U.S. personal income tax returns for the tax years 2011 through 2014. (Compl. ¶ 8).

2

during their Divorce Proceeding, in violation of orders entered by the Florida Court that required Kozel to fully disclose and not dissipate his assets and to make certain payments to his Ex-Wife. (Compl. ¶ 9).

In or around February 2009, Kozel formed a foreign trust organized under the laws of the Isle of Jersey (the "Foreign Trust") with the assistance of a Swiss lawyer (the "Swiss Lawyer"), who was Kozel's long-time friend and co-conspirator. (Compl. ¶ 10(a)). One of the Foreign Trust formation documents falsely indicated that the Foreign Trust is a charitable trust with the following beneficiaries: "International Red Cross, Doctors Without Borders, United Nations Childrens [sic] Fund, World Health Organization, Any other organization which is considered to be charitable under Jersey Law." (*Id.*).[2] In April 2009, Kozel transferred approximately 20 million shares of the Oil Company to the Foreign Trust. (Compl. ¶ 10(b)). Then, in August 2010, Kozel and his Ex-Wife initiated the Divorce Proceeding in Florida Court, which enjoined Kozel's assets in January 2011. (*Id.* ¶ 10(c)-(d)). The injunction prohibited Kozel from divesting or dissipating any of his assets, which, by February 2011, included any assets that Kozel had diverted to the Foreign Trust. (*Id.* ¶¶ 10(d)-(e)). The Trust assets were substantial: according to an audit, the Foreign Trust held approximately 29 million shares of the Oil Company by in or about June 2011. (*Id.* ¶ 10(f)).

On or about January 12, 2012, the Florida Court ordered Kozel to transfer 23 million shares of the Oil Company to his Ex-Wife by January 27, 2012. (Compl. ¶ 10(g)). While Kozel ultimately transferred these shares to the Ex-Wife, he did so more than a month after the court-ordered deadline. (Compl. ¶ 10(h)). As alleged in the Complaint, as a result of the late delivery, the future

---

[2] Despite this language, to date, the Government is not aware of any use of the trust that is compatible with its charitable charter.

sale value of the 23 million shares was tens of millions of dollars lower than it could have been because of the fluctuation in stock prices. (*Id.*). In or about November 2012, the Ex-Wife filed a motion in the Florida Court seeking damages resulting from Kozel's late delivery of the 23 million shares (the "Motion for Damages"), putting Kozel on notice that he could face a substantial additional liability to his Ex-Wife. (*Id.* ¶ 10(i)).

After the Ex-Wife filed the Motion for Damages, Kozel made a series of material misrepresentations to his Ex-Wife and the Florida Court about his control of the Foreign Trust in order to conceal his Trust assets from the Ex-Wife. (*Id.* ¶ 11). In particular, as alleged in detail in the Complaint, Kozel made false sworn representations in the Florida Court that he had no interest in the Foreign Trust, whereas in actuality Kozel controlled the Foreign Trust and, in or about February 2012, used it to make a partial payment of approximately 5.6 million shares of the Oil Company to his Ex-Wife (toward the 23-million-share obligation). (*See id.* ¶¶ 12-14). To conceal his control over the Foreign Trust, Kozel, working with a co-conspirator (the "Friend"), routed this partial payment through a company in Lebanon (the "Lebanon Company"), and then falsely testified under oath that he had "borrowed" the 5.6 million shares from the Friend. (*Id.* ¶¶ 12, 13(e)).

As part of the fraudulent scheme, Kozel also used approximately $12.75 million of his assets from the Foreign Trust to purchase a condominium in Manhattan (the "Condominium"), with his current wife (the "Wife"). (Compl. ¶ 9(d); *see also id.* ¶¶ 15-16). As alleged in detail in the Complaint, Kozel and the Wife purchased and paid for the Condominium between June and December 2013 (while the Ex-Wife's Motion for Damages was pending in the Florida Court); created a New York limited liability company (the "LLC") secretly controlled by the Foreign Trust to pose as the paper "owner" of the Condominium; and then entered into a backdated sham lease

4

(the "Sham Lease") with the LLC, which the Wife signed, to make it falsely appear that Kozel and his Wife were leasing the Condominium and did not own it. (*Id.* ¶¶ 9(f); 15(q)-(s), 16, 18(a)). Moreover, Kozel purportedly "overpaid" for the Condominium by more than $2.55 million using Trust assets and then directed that the overpayment amount be funneled to bank accounts belonging to Kozel and his Wife in Lithuania. (*Id.* ¶¶ 9(e); 15(k)-(p)). This scheme had the effect of dissipating and diverting the assets of the Foreign Trust in order to conceal them from the Florida Court and the Ex-Wife.

In or about September 2015, the Florida Court granted the Ex-Wife's Motion for Damages and ordered Kozel to pay the Ex-Wife an additional $34 million in damages because of Kozel's late delivery of the 23 million shares of the Oil Company in or about February 2012 (the "Payment Order"). (Compl. ¶ 17). However, on or about September 10, 2015, just one day before the Payment Order was entered, the Condominium was purportedly sold by the LLC to another company organized under the laws of Belize (the "Sham Purchaser") for approximately $17.5 million. (*Id.* ¶ 19(a)). This sale was accomplished via a purchase agreement (the "Sham Purchase Agreement") that was purportedly dated September 10, 2015. (*Id.*). However, email evidence set forth in the Complaint demonstrates that that the Sham Sale documents were backdated to pre-date the Payment Order, thereby making it appear that the Condominium was not an asset of Kozel, and therefore could not be seized by the Ex-Wife pursuant to the Payment Order. (*Id.* ¶ 19(b)). There is no evidence that anyone ever paid any portion of the $17.5 million listed in the Sham Purchase Agreement, or that the Condominium was, in fact, purchased by any third party independent of Kozel. (*Id.* ¶¶ 19(c)-(d)). Indeed, Kozel and his Wife had been observed entering and exiting the Condominium repeatedly in or about 2018, when the Complaint was filed. (*Id.* ¶ 19(d)).

In addition to purchasing the Condominium and fraudulently concealing it from the Ex-Wife and the Florida Court, Kozel falsely testified on or about April 5, 2016, that he was financially unable to satisfy the $34 million obligation, despite his control over the Foreign Trust and the Condominium. (Compl. ¶ 20(c)). In all, the Complaint alleges that "as a result of the fraudulent scheme," Kozel caused his Ex-Wife to suffer "tens of millions of dollars in financial harm." (Compl. ¶ 9(h)).

### The Indictment

On or about June 19, 2019, a grand jury in this District returned three-count Indictment 19 Cr. 460 (KMW) (the "Indictment") charging Kozel with the same offenses based on the same set of facts set forth in the Complaint. (ECF No. 14 ("Ind.")). Each of the counts in the Indictment tracks the statutory language, contains the elements of the offense, and includes a description of the conduct underlying the charge. Count One charges Kozel with participating in a conspiracy to commit wire fraud between in or about February 2012 and in or about December 2018, in violation of 18 U.S.C. § 1349. Count One alleges that, as part of a conspiracy with others, "Kozel, while subject to Florida state court orders (the 'Florida Court Orders') requiring him to disclose and not to liquidate or transfer his assets, and to transfer certain of his assets to his ex-wife (the 'Ex-Wife'), engaged with others in a scheme to defraud his Ex-Wife by concealing certain assets in a foreign trust (the 'Trust') and by using a portion of the Trust assets to purchase a condominium located in New York, New York (the 'Condominium') and concealing his ownership of the same, and effectuating such scheme through the use of interstate emails and wire transfers." (Ind. ¶ 2). Count Two charges Kozel with substantive wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, based on the same fraudulent scheme against the Ex-Wife. (Ind. ¶ 3). Finally, Count Three charges Kozel with conspiracy to commit money laundering between in or about July 2013 and in or about

6

September 2015, in violation of 18 U.S.C. § 1956(h), alleging that Kozel conspired with others to transfer funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, namely the wire fraud scheme charged in Count Two. (Ind. ¶¶ 4-5).

## ARGUMENT

I.  **Kozel's Motion to Dismiss the Indictment Should Be Denied.**

Kozel moves to dismiss the Indictment on the ground that "the conduct alleged was not in violation of the law as alleged." (Motion to Dismiss Indictment ("MTD") at 2, ECF No. 40). In making this argument, Kozel relies on a host of disputed facts outside the Complaint and the Indictment that are not properly before this Court on a motion to dismiss. For the reasons set forth herein, the Indictment is plainly sufficient and alleges conduct that would be unlawful if proven. Accordingly, Kozel's motion to dismiss should be denied.

### A. Legal Standards

Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and must include a citation to the "statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." "An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

"In reviewing a motion to dismiss an indictment, the Court must take the allegations of the

7

indictment as true." *United States v. Avenatti*, No. (S1) 19 CR. 373 (PGG, 2020 WL 108372, at *4 (S.D.N.Y. Jan. 9, 2020) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952); *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004)). A court may not dismiss an indictment simply because, as here, the defendant believes that the evidence will ultimately vindicate him—the weighing of the evidence is a function for the jury. *See United States v. Sampson*, 898 F.3d 270, 280 (2d Cir. 2018). A motion to dismiss an indictment is not an occasion to evaluate the sufficiency of the Government's evidence. Rule 12(b), which governs criminal pretrial motions, provides only that "[a]ny defense, objection, or request *which is capable of determination without the trial of the general issue* may be raised before trial by motion" (emphasis added). "In other words, there is no 'summary judgment' equivalent to Rule 56 of the Federal Rules of Civil Procedure in criminal cases." *United States v. Crember*, No. 12 Cr. 473 (KBF) (S.D.N.Y. Dec. 13, 2012) (citing *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998)); *see also United States v. Geller*, 154 F. Supp. 727, 731 (S.D.N.Y. 1957) (on a motion to dismiss an indictment, the Court "cannot re-examine the indictment and weigh the sufficiency or the competency of the evidence considered" by the grand jury).

Put another way, arguments centered on a defendant's counter factual narrative, or the defense's argument that the Government's case will fall short at trial, are not appropriate for consideration at the motion to dismiss stage. *See e.g., Avenatti,* 2020 WL 108372, *8 (declining to dismiss wire fraud charge where the indictment tracked the language of the respective statutes, apprised the defendant of the nature of the accusations against him, and provided notice generally of where and when the crime occurred); *United States v. Bout*, No. 08 Cr. 365(SAS), 2011 WL 2693720 at *5 n.73 (S.D.N.Y. July 11, 2011) ("To the extent [that defendant's] challenges are to the sufficiency of the Government's evidence to *satisfy*—as opposed to the

8

sufficiency of the Indictment to *allege*—the federal elements of the crimes charged, those arguments are not appropriately decided on a motion to dismiss." (internal quotation marks omitted) (emphasis in original)), *aff'd*, 731 F.3d 233 (2d Cir. 2013).

### B. Discussion

Judged by the applicable legal standards, the three counts in the Indictment are plainly sufficient because they contain the elements of the charged offenses and fairly inform Kozel of the charges against him with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events. *See Stringer*, 730 F.3d at 12. Each count tracks the statutory language, alleges each element of the charged offense, and states the approximate time and place of the charged crime. Moreover, while an indictment need not allege "the particulars of how a defendant effected the crime," *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012), the Indictment here contains a specific and detailed description of the charged criminal scheme. In particular, Counts One and Two allege that, from at least in or about February 2012 through at least in or about December 2018, Kozel conspired with others to commit wire fraud and in fact committed wire fraud through the following conduct:

> Kozel, while subject to Florida state court orders (the "Florida Court Orders") requiring him to disclose and not to liquidate or transfer his assets, and to transfer certain of his assets to his ex-wife (the "Ex-Wife"), engaged with others in a scheme to defraud his Ex-Wife by concealing certain assets in a foreign trust (the "Trust") and by using a portion of the Trust assets to purchase a condominium located in New York, New York (the "Condominium") and concealing his ownership of the same, and effectuating such scheme through the use of interstate emails and wire transfers.

(Ind. ¶ 2; *see also id.* ¶ 3). With respect to Count Three, the Indictment alleges that, between in or about July 2013 and in or about September 2015, Kozel conspired with others to commit money laundering that involved international transfers of funds to, from, or through the United States "with the intent to promote the carrying on of specified unlawful activity, to wit, the wire fraud

9

scheme alleged in Count Two." (*Id.* ¶ 5). These allegations are sufficient under Rule 7 and, contrary to Kozel's dubious assertions, plainly allege violations of federal criminal laws. *See United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) ("[W]e have consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." (citation and internal quotation marks omitted)).

In arguing that the Indictment should be dismissed, Kozel relies on a disputed counter-narrative of the facts, and posits theories as to why the evidence may ultimately vindicate him. (*See* MTD at 2-5).[3] For example, Kozel alleges that "[t]he essence of the facts" is that "Defendant and his ex-wife resolved their divorce by a property settlement, with which he fully complied"; that Kozel "was ultimately generous in giving his ex-wife $100 million of stock, which he did so that he could move on and start his life"; and that "Defendant had no obligation to his ex-wife other than what he gave her." (MTD at 10).

Kozel cannot succeed on a motion to dismiss the Indictment by simply presenting a counter-narrative of the facts. As set forth in the Indictment, and further described in the Complaint, the Government alleges that Kozel engaged in a wide-ranging course of fraudulent and deceptive conduct against the Ex-Wife in connection with the Divorce Proceeding. Among other things, the Government alleges that Kozel caused the Ex-Wife substantial financial harm by

---

[3] Kozel also attacks the Government and the grand jury for filing a criminal case based on a divorce proceeding and for accepting "the ex-wife's version of the disputed facts, including her disputed claims that she should have received an additional $34 million on top of the $100 million in GKP stock she agreed to receive." (MTD at 5; *see also id.* at 6-7). But the grand jury found probable cause to believe that Kozel's conduct in connection with the Divorce Proceeding violated federal wire fraud and money laundering charges. *See* 18 U.S.C. § 1343 (reaching "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" executed through the use of interstate or foreign wires). The Government therefore is entitled to proceed to trial, where the Government will bear the burden of proving these charges.

belatedly delivering the 23 million shares of the Oil Company; repeatedly lied under oath during the Divorce Proceeding about his control and ownership of the Foreign Trust; and fraudulently concealed from his Ex-Wife the Condominium that Kozel had purchased using Trust assets by, among other things, entering into a backdated Sham Sale of the Condominium "to prevent his Ex-Wife from seizing the Condominium after the Florida Court ordered Kozel to pay her an additional $34 million in or about September 2015." (Compl. ¶ 9).[4] The Government alleges that "as a result of the fraudulent scheme," Kozel caused his Ex-Wife to suffer "tens of millions of dollars in financial harm." (Compl. ¶ 9(h)).

To be sure, Kozel is entitled to seek to disprove or discredit these allegations at trial, but he cannot prevail on a motion to dismiss by denying the allegations and setting out a counter-narrative of the facts. *See Sampson*, 898 F.3d at 280 ("[C]ourts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations . . . ." (quoting *United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011)); *United States v. Coffey*, 361 F. Supp. 2d 102, 111 (E.D.N.Y. 2005) ("Simply put, the validity of an indictment is tested by its allegations, not by whether the Government can prove its case." (citing *Costello v. United*

---

[4] Kozel alleges that, at the time the Condominium was purchased, "there was no injunction in place, so no crime based on violation of the injunction could have been committed by its purchase as the Indictment alleges." (MTD at 8). But even if that were so, a state-court injunction is not a prerequisite for a federal wire fraud scheme. The Government alleges that Kozel was on notice of the Ex-Wife's Motion for Damages at the time of the Condominium purchase and purchased the Condominium in an effort to dissipate and divert Trust assets to hide them from his Ex-Wife. Moreover, the Government alleges that, in September 2015, the Florida Court entered a Payment Order ordering Kozel to pay the Ex-Wife an additional $34 million in damages. (Compl. ¶ 17). The Complaint further alleges that, *after* the Florida Court entered the Payment Order, Kozel continued to engage in a fraudulent course of conduct against the Ex-Wife, including by entering into a backdated Sham Purchase Agreement to make it falsely appear that the Condominium had been sold before the Payment Order was entered, and therefore to prevent the Ex-Wife from seizing the Condominium pursuant to the Payment Order. (*See id.* ¶ 19). Finally, as described above, the alleged criminal scheme included a host of other fraudulent and deceptive conduct, including lying under oath in court filings and testimony.

*States,* 350 U.S. 359, 363 (1956))).

Kozel also argues that, in 2019, a state appellate court vacated some of the Florida Court's orders in the Divorce Proceeding. (*See* MTD at 4-5). To start, this appellate court decision post-dates the charged criminal conduct and therefore is irrelevant to whether Kozel engaged in a scheme to defraud the Ex-Wife years earlier. Kozel is alleged to have backdated a document, made multiple misrepresentations, and engaged in the sham transactions at issue in the Indictment *with the intent to defraud* the Ex-Wife from property she would have been entitled to under the Payment Order *before* he had the benefit of the appellate court decision. Moreover, as Kozel acknowledges, the appellate court decision was not based on the merits of the Ex-Wife's claims or the propriety of Kozel's conduct before the Florida Court; rather, the Florida appellate court found that the trial court lacked jurisdiction to enter the Payment Order. (MTD at 5). This state law jurisdictional holding has no bearing on whether Kozel engaged in the federal wire fraud and money-laundering offenses charged in the Indictment. Moreover, even if the appellate court decision somehow was relevant (which it is not), the proper forum to make that argument would be before a trial jury, not in a motion to dismiss the Indictment.[5]

Accordingly, Kozel's motion to dismiss should be denied.

## II. A Bill of Particulars is Not Warranted.

Kozel's request for a bill of particulars should be denied as both untimely and meritless. A defendant may move for a bill of particulars "before or within 14 days after arraignment or a later time if the court permits." Fed. R. Crim. P. 7(f). Kozel was arraigned on June 27, 2019, and

---

[5] Kozel's musings about state contempt law (MTD at 8-9) are similarly inapposite. The Indictment charges violations of federal criminal law, not Florida contempt law. The elements of the three charges against Kozel do not require the Government to prove that Kozel independently violated state law by engaging in the charged conduct.

therefore his request is more than six months late. Nor did Kozel attempt to make his motions for more than six months after discovery was produced on July 19, 2019. His request should be denied as untimely.

Kozel's request also fails on its merits. The proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charge to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense. *See* Fed. R. Crim. P. 7(f); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). A bill of particulars is required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres*, 901 F.2d at 234. A defendant is not entitled to seek a bill of particulars as a general investigative tool, *United States v. Morales*, 280 F. Supp. 2d 262, 274 (S.D.N.Y. 2003), or as a device to compel disclosure of the Government's evidence prior to trial. *United States* v. *Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citing *United States* v. *Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974)).

Nor is supplying evidentiary detail the function of the bill of particulars. *Torres*, 901 F.2d at 234. Accordingly, the Government is not required to: (a) "particularize all of its evidence," *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991); (b) disclose the precise manner in which the crimes charged in the indictment were committed, *see Torres*, 901 F.2d at 233-34; or (c) provide the defendant with a preview of the Government's case or legal theory, *see United States v. Muyet*, 945 F. Supp. 586, 598-599 (S.D.N.Y. 1996). The ultimate test is whether the information sought is *necessary*, not whether it is helpful. *See United States v. Conley*, No. 00 Cr. 0816 (DAB), 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 2002); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); *United States v. Taylor*, 707 F. Supp. 696, 699 (S.D.N.Y.

13

1989); *United States v. Persico*, 621 F. Supp. 842, 868 (S.D.N.Y. 1985). Furthermore, where, as here, the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," no bill of particulars is required. *Bortnovsky*, 820 F.2d at 574; *see also Stringer*, 730 F.3d at 124 (where the government provided the defendant with "the criminal complaint, which outlined his crimes in detail" as well as additional disclosures "well in advance of trial," it was "beyond question" that the defendant "was sufficiently informed to defend against the charges and to be protected against the risk of double jeopardy"); *United States v. Rigas*, 258 F.Supp.2d 299, 305 (S.D.N.Y.2003) (no bill of particulars is warranted where "the Indictment, discovery, and other information provided by the government adequately notify Defendants of the charges against them"); *United States v. Barnes*, 158 F.3d 662, 665-66 (2d Cir.1998) (finding district court did not abuse its discretion by denying a bill of particulars to defendants where the government had already provided "extensive additional information" regarding their alleged involvement in the charged offenses "so as to enable them to understand the nature of the charges against them, to prepare a defense, and avoid unfair surprise at trial").

No bill of particulars is warranted here. As described above, the Indictment has a detailed and specific description of the fraudulent scheme underlying the charges. It alleges that "Kozel, while subject to Florida state court orders (the 'Florida Court Orders') requiring him to disclose and not to liquidate or transfer his assets, and to transfer certain of his assets to his ex-wife (the 'Ex-Wife'), engaged with others in a scheme to defraud his Ex-Wife by concealing certain assets in a foreign trust (the 'Trust') and by using a portion of the Trust assets to purchase a condominium located in New York, New York (the 'Condominium') and concealing his ownership of the same, and effectuating such scheme through the use of interstate emails and wire transfers." (Ind. ¶ 2; *see also id.* ¶ 3). The Indictment further alleges in Count Three that, in order to promote the

14

fraudulent scheme, Kozel and his co-conspirators made international wire transfers to, from, or through the United States. (Ind. ¶¶ 4-5). Furthermore, the Complaint contains a detailed narrative and description of particular means and manner in which Kozel and his co-conspirators carried out the fraud scheme and money-laundering conspiracy. Finally, the Government produced voluminous discovery in this case supporting the allegations in the Complaint and the Indictment.

Kozel requests that the Government specify "all funds transfers alleged to be willful violations of federal criminal law, by date, amount, sender and recipient." (Motion for a Bill of Particulars at 3-4, ECF No. 41; *see also id.* at 6). But the Indictment and the Complaint provide ample notice to Kozel of the bases for the Government's allegations that Kozel and others used interstate wire transfers and communications in furtherance of the fraudulent scheme charged in Counts One and Two, and made international money transfers in connection with the money laundering conspiracy charged in Count Three. For example, the Complaint alleges that, in furtherance of the fraudulent scheme, Kozel "[u]sed approximately $12.75 million of Kozel's assets from the Foreign Trust to purchase the Condominium in New York, New York, with his [Wife]." (Compl. ¶ 8(d)). The Complaint further describes the particular money transfers that Kozel caused to be made in connection with the Condominium purchase, namely an "initial deposit" of approximately $2.55 million that was "sent via wire transfer from an overseas bank account in the name of the Friend to a bank account in New York, New York, with the notation 'Intial [sic] Deposit Financing [the Wife]'" (*id.* ¶ 15(d)); an "additional deposit" of approximately $1.275 million, paid by the Wife, that was "sent via wire transfer from an overseas bank account belonging to the Lebanon Company to a bank account in New York, New York" (*id.* ¶ 15(g)); and the "balance of the purchase price" of approximately $11.475 million, also paid by the Wife, that was "sent via wire transfer from a bank account in New York, New York to another bank account

in New York, New York" (*id.* ¶ 15(i)). The Complaint further describes how Kozel funneled Trust assets under the guise of an "overpayment" for the Condominium: "On or about December 16, 2013, an 'overpayment back to purchaser' of approximately $2.55 million was repaid via wire transfer, from a bank account in New York, New York" to a bank account in the name of the Wife located at a bank in Lithuania. (*Id.* ¶ 15(l)). These money transfers plainly furthered and promoted the fraudulent scheme by enabling Kozel to dissipate and divert the assets of the Foreign Trust in order to conceal them from the Florida Court and the Ex-Wife.

In addition to bank transfers, the Complaint also describes multiple emails, as well as a fax, that Kozel and his co-conspirators sent in furtherance of the criminal scheme, including to coordinate the execution of the backdated Sham Lease and the Sham Purchase Agreement in order to conceal Kozel's ownership of the Condominium from the Ex-Wife after the Florida Court entered the Payment Order. (*See, e.g.*, Compl. ¶¶ 13(c), 15(f), 15(q), 19(b)). Moreover, the Rule 16 discovery provided to Kozel on July 19, 2019, included copies of the wire transfers, associated requests for payment, and related communications sent by Kozel and his co-conspirators in furtherance of the criminal scheme. Unlike *United States v. Silver*, 117 F. Supp. 3d 461 (S.D.N.Y. 2015), there is not such an "exceptional volume of mailings and wire transmissions" in furtherance of this scheme that "could easily number in the hundreds or thousands." *Id.* at 471. The above disclosures are therefore more than sufficient to allow Kozel to adequately prepare for trial. *See Stringer*, 730 F.3d at 124; *United States v. Reinhold*, 994 F. Supp. 194, 201 (S.D.N.Y.1998) (denying request for bill of particulars where the "indictment is detailed in its allegations" and the "defendants have had extensive discovery"); *United States v. Pacheco*, 902 F. Supp. 469, 475 (S.D.N.Y.1995) (denying request for bill of particulars because "the charges are adequately set forth in the indictment, the criminal complaint, and in discovery"); *United States v. Conesa*, 899

F. Supp. 172, 176 (S.D.N.Y.1995) (denying request for bill of particulars because "[t]he Indictment sufficiently advises defendants of the specific acts of which they are accused" and "the Government ... has made available to defense counsel extensive discovery that supplements the information provided in the . . . Indictment").

Accordingly, the motion for a bill of particulars should be denied.

## CONCLUSION

For the reasons stated above, Kozel's motions to dismiss the Indictment and for a bill of particulars should be denied.

Dated: June 4, 2020
      New York, New York

                                         Respectfully submitted,

                                         GEOFFREY S. BERMAN
                                         United States Attorney for the
                                         Southern District of New York


                           By: _____/s/_____
                                         OLGA I. ZVEROVICH
                                         LOUIS A. PELLEGRINO
                                         Assistant United States Attorneys