**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**
**v.:**
**Todd Kozel (defendant), also known as Sealed Defendant 1**

**Magistrate judge case number: 1:18-mj-10663-UA**

**Judge Kimba M. Wood**

**CRIMINAL DOCKET#:1:19-cr-00460-KMW**

**MOTION BY THE THE TELEGRAPH MEDIA GROUP TO
INTERVENE FOR THE <u>LIMITED PURPOSE OF UNSEALING
PROCEEDINGS</u>**

The Telegraph Media Group respectfully moves this Court for permission to intervene for

the limited purpose of seeking an unsealing order of a document listed in the docket as "SEALED

DOCUMENT placed in vault". As related in our accompanying Memorandum of Law, the sealed

filing appears to be related to a plea agreement between defendant Todd Kozel and the

prosecution, represented by the US Attorney Office for the Southern District of New York. We

would also request the unsealing of any other related documents already submitted or to be

submitted in the case. The "sealed document" in question is no. 61 in the docket, and the date of

filing is listed as September 16, 2020.

By making this application, we are relying on the First Amendment right of access to court

information. Should there be any national security considerations for sealing document number 61, which seems unlikely in this case, there is a methodology that both accommodates the First Amendment right of access and safeguards information that would compromise national security. We ask the Court to order the parties to redact any portions that risk compromising national security, and make all other information available to the public.

The First Amendment entrusts the public with a qualified right of access to judicial proceedings and records, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-10 (1986) (*Press Enterprise II*), and that right of access is particularly important here as the original complaint (Document 1) made serious allegations about the former chief executive of a major publicly owned company and his use of an offshore trust to hold shares in that company.

For the reasons stated in the accompanying memorandum in support of this motion we ask the Court to unseal document number 61, as well as any other filings that do not implicate national security. In the alternative, should this Court decline to grant the relief sought, we ask the Court to make findings on the record explaining its decision so that we may have an appealable Order. We further request that the Court consider this request as an ongoing one and conduct future proceedings in a manner that allows the public access to an open Court so as to comport with the public's First Amendment right of access.

Respectfully submitted,

Rachel Millard

*Rachel Millard*

Telegraph Media Group
111 Buckingham Palace Rd
London SW1W 0SR
United Kingdom
Tel.: (44) 7899 096 602
rachel.millard@telegraph.co.uk
March 24, 2021

## MEMORANDUM OF LAW IN SUPPORT OF THE TELEGRAPH MEDIA GROUP'S MOTION TO INTERVENE FOR THE LIMITED PURPOSE OF UNSEALING PROCEEDINGS

The Telegraph Media Group submits this memorandum of law in support of its motion to intervene for the limited purpose of unsealing document number 61 in this case, for matters of public interest and open justice, as described herein. To accommodate the public's right of access guaranteed under the First Amendment to the Constitution of the United States, the Court should order the parties to undertake a review of document number 61 (date of filing listed as September 16, 2020) and only redact portions if there are national security concerns, which seems unlikely in this case. Those matters that do not impact such serious concerns should be made available to the public. Document number 61 is listed as "SEALED DOCUMENT placed in vault", and appears to be related to a plea agreement between defendant Todd Kozel and the prosecution, represented by the US Attorney Office for the Southern District of New York. We would also request the unsealing of any other related documents already submitted or to be submitted in the case.

## BACKGROUND

Mr Todd Kozel was arrested in December 2018 and charged with: Conspiracy to Commit Wire Fraud, Wire Fraud, Conspiracy to Commit Money Laundering. The charges were in connection with an alleged scheme to defraud his ex-wife by hiding tens of millions of dollars' worth of assets in a foreign trust, including shares in the company he led as chief executive,

Gulf Keystone Petroleum. It was claimed he used a portion of those assets secretly to purchase a $12.75 million condominium in Manhattan. The control of the foreign trust has been important to the case, with Mr Kozel accused of repeatedly lying under oath during divorce proceedings about his control and ownership of the trust (see document number one in the docket in this case, paragraph 9b). Although not identified by name in the complaint (document one in this docket), the foreign trust in question appears to be the Gokana Trust, governed by the laws of the Isle of Jersey, (see e.g. in Document number 40, page 11). Public records indicate Gokana owned 3.4pc-6.3pc of Gulf Keystone Petroleum between 2009 and 2012. The use or misuse of offshore trusts are important matters in corporate life, raising questions over transparency and corporate governance. We respectfully argue that it is in the public interest to be as transparent as possible about the circumstances leading to the superseding indictment, and for document 61 and any other documents in this case to be unsealed.

The description of document number 61 in the docket gives no indication as to why it has been sealed, but the developments in the case prior to and subsequent to the filing indicates that it relates to a plea agreement in which Mr Kozel has pleaded guilty to lesser charges. Document 62 in this docket (dated September 22, 2020), submitted on behalf of acting US Attorney Audrey Strauss, says "the defendant has signed the proposed plea agreement". Following this a superseding information was filed (document 64, September 25, 2020) listing five charges of "Failure to File Individual Income Tax Returns – 2011-2015 Tax Years)" and omitting further mention of any of the original three charges filed in December 2018. While these three original charges are still listed on the docket as "pending", the court filings from September 16, 2020 onwards suggest that the prosecution has *de facto* dropped those charges, and that this is likely to become formal on or before the sentencing date, currently set for May 25, 2021. The First Amendment entrusts the public with a qualified right of access to judicial proceedings

and records, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-10 (1986) (*Press Enterprise II*), and that right of access is particularly important here as this case regards a high-profile businessman who led a company that attracted significant investment from both institutional and retail shareholders in the UK and the US. For a period in 2012, the company co-founded and headed by Mr Kozel, Gulf Keystone Petroleum Ltd., was the most highly valued company on London's junior stock exchange, the Alternative Investment Market (AIM). When the company first struck oil in the Kurdish Regional Government area of Iraq in 2012, its market value rose by 2,500% to £3 billion ($4 billion). Gulf Keystone and its then Chief Executive Officer and Chairman Mr Kozel were the subject of regular media coverage in the US and the UK. The company's share price subsequently collapsed because of fears over its commercial viability, and amid controversy over the pay of Mr Kozel and other senior company figures. Gulf Keystone and Mr Kozel received further attention because of share deals with a third party whose beneficial ownership was not disclosed. There have also been questions over the Gokana Trust.

**For examples of media coverage of the above-mentioned matters, see (clippings attached):**

*1. Financial Times, March 15, 2010: Gulf Keystone placing raises £16m*

*2. Financial Times June 13, 2011: Transfer dealings – Gulf Keystone edition*

*3. Financial Times September 16, 2011: Alphaville - Gulf Keystone plots $200m fund raising*

*4. The Independent October 23, 2011: Kozel vs Kozel*

*5. Financial Times March 12, 2012: GKP update*

*6. Financial Times March 22, 2012: Gulf Keystone chief's pay boosted to £13m*

# ARGUMENT

## A. This Court Should Unseal Documents Allowing the Public to Properly Understand the Issues and the Conduct of the Case

The First Amendment entrusts the public with a qualified right of access to criminal trials and pretrial proceedings. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-10 (1986) (*Press Enterprise II*). This right "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Id.* at 13 (quoting *Press-Enterprise Co. v. Superior* Court, 464 U.S. 501, 508 (1984) (*Press-Enterprise I*)).

Two inquiries determine whether the public's right of access requires disclosure of judicial proceedings and records. First, courts must determine whether the particular proceeding at issue "has historically been open to the press and general public" and "whether public access plays a significant positive role in the function of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8-9. If the proceeding meets both prongs of this test, the public's right of access attaches. *Id.* Courts must then disclose the disputed record or proceeding unless there is an "overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 10 (quoting *Press-Enterprise I*, 464 U.S. at 510). If a court finds that such an interest exists, the court must make findings on the record "specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* (quoting *Press-Enterprise I*, 464 U.S. at 510). Even when the public's right of access does not attach, courts explain their decisions in writing. *See, e.g.*, *Dhiab v. Trump*, 852 F.3d 1087, 1091-96 (D.C. Cir. 2017). Written explanations are appropriate in such circumstances because "[a]ny step that withdraws an element of the judicial process from public view makes the

ensuing decision look more like fiat and requires rigorous justification." *United States v. Aref*, 533 F.3d 72, 83 (2d Cir. 2008) (quoting *Hicklin Eng'g L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006)).

There is no indication from the public record why the public's constitutional right of access should not be accommodated. *See, e.g.*, *id.* at 82-83. As this Court is aware, the judiciary should be especially skeptical of requests by coordinate branches of the government to seal judicial proceedings, "lest ignorance of the basis for the decision cause the public to doubt that complete independence of the courts of justice [which] is peculiarly essential in a limited Constitution." *Id.* at 83 (quoting The Federalist No. 78 (Alexander Hamilton)) (alteration in original) (internal quotation marks omitted). Even in cases involving the gravest national security threats, the First Amendment "protects the people's right to know that their government acts fairly, lawfully, and accurately." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cwir. 2002).

In the current case, this Court should enforce the public's First Amendment right of access for all court documentation to the greatest extent possible without compromising national security information (unlikely to apply in this case).

For the above reasons, this Court should unseal document number 61 and all other proceedings and documentation of significance in this case. In the alternative, if this Court refuses to unseal the relevant documents, the Court should make findings on the record explaining its decision. The Court should also unseal any future proceedings and court documents to which the public's First Amendment right of access applies.

**B. Intervention in a Criminal Case Is an Appropriate Vehicle for Asserting the Public's Right of Access**

Although the Federal Rules of Criminal Procedure do not expressly provide for motions

to intervene, intervention is appropriate for asserting the public's First Amendment right of access. *Aref*, 533 F.3d at 81. As the Supreme Court has explained, federal courts may "formulate procedural rules not specifically required by the Constitution or the Congress." *United States v. Hasting*, 461 U.S. 499, 505 (1983). "Because vindication of [the] right [of public access] requires some meaningful opportunity for protest by persons other than the initial litigants . . . a motion to intervene to assert the public First Amendment right of access to criminal proceedings is proper." *Aref*, 533 F.3d at 81 (alteration in original) (citations omitted) (internal quotation marks omitted).

## CONCLUSION

For all of the above reasons, this Court should enforce the public's First Amendment right of access and unseal all proceedings and documents of significance in this case, in particular document number 61 of the docket. If redactions are necessary, as much of the proceedings should be unsealed as possible without compromising national security information. In the alternative, if the Court refuses to unseal the proceedings, the Court should make findings on the record explaining its decision. The Court should also unseal the proceedings of any future proceedings to which the public's First Amendment right of access applies.

Respectfully submitted,

*Rachel Millard*

Rachel Millard
Telegraph Media Group,
111 Buckingham Palace Rd.,
London SW1W 0SR
United Kingdom
Tel.: (44) 7899 096 602
rachel.millard@telegraph.co.uk
March 24, 2021

**Iraq**

## Gulf Keystone placing raises £16m

Miles Johnson MARCH 15 2010

Iraq-focused oil explorer Gulf Keystone Petroleum on Monday raised £16m in a stopgap share placing to fund drilling costs after the default of its partner in Iraq last week.

Gulf Keystone, one of the 10 biggest companies on London's Aim market by value, said last week it would have to pay $40m to the Kurdistan government after the default by its joint venture partner in the region.

The company said more cash would be needed this year and it was considering the best fundraising strategy with its advisers. It plans to drill three further appraisal wells on its main Shaikan asset this year.

Analysts at Evolution Securities said Gulf Keystone could need to raise a further $100m-$125m this year based on a $150m total commitment to capital expenditure in 2010.

In July 2009 the company sold half its Iraqi assets to Etamic, a private investment fund based in the Middle East, in return for the partner funding 50 per cent of the development costs of Gulf Keystone's Sheikh Adi and Ber Bahr projects.

The company has since disclosed little about the identity or beneficiaries of Etamic, leading some analysts to question its transparency standards.

Ewen Ainsworth, Gulf Keystone chief financial officer, said Etamic had requested anonymity when the deal was signed, and none of the management or directors of Gulf Keystone had any interest in Etamic.

Gulf Keystone said last week it would have to pay $12m to Etamic after it defaulted on its first payment to the Aim-quoted explorer.

When asked about the payment to Etamic, Mr Ainsworth said: "It's just a commercial reality. While they made no payment to us or the Kurdish regional government, they do have their signature on the documents. We didn't want to get involved in legal proceedings, but wanted to move forward quickly and make them go away."

Gulf Keystone, which currently funds itself partly through a so-called equity drawdown agreement, meaning it can issue new shares as collateral for loans, said it would continue to use the facility.

Todd Kozel, Gulf Keystone chief executive, said in a statement: "We are very pleased to be commencing the first stage of our drilling campaign, which has the prospect of substantially furthering the company's resource base."

The company placed 20.9m shares with existing and institutional investors at 76½p, a 12 per cent discount to Friday's closing price of 87¼p.

Fox-Davies Capital co-ordinated the placing. Gulf Keystone shares fell 3.5p in early trading to 83.8p.

Copyright The Financial Times Limited 2021. All rights reserved.

Opinion **FT Alphaville**

Transfer dealings – Gulf Keystone edition

**NEIL HUME**

**Neil Hume** JUNE 13 2011

This almost certainly does not pass the smell test.

One of Gulf Keystone Petroleum's biggest shareholders (the confusingly named Gulf Keystone Petroleum Co. LLC) has transferred legal title over 5.25 per cent of the £1bn Kurdish exploration company (which discovered billions of barrels of oil) to among other people, its chief executive Todd Kozel.

From Monday's very odd press release:

> Gulf Keystone Petroleum Limited (AIM: GKP) announces that after examining changes in the Company's share register for the month of May 2011 and making subsequent inquiries that Gulf Keystone Petroleum Co. LLC ("GKP LLC") transferred legal title to 11,600,000 common shares of US$0.01 each in the Company ("Common Shares") to Todd Kozel, Executive Chairman and Chief Executive Officer and 4,000,000 Common Shares to Ali Al-Qabandi, Business Development Director at nil cost (the "Transfer"). A further 20,400,000 Common Shares were transferred to Gibca Ltd and 4,000,000 Common Shares to Ibrahim Al-Khaldi.

> Mr. Kozel has informed the Company that the shares transferred to him by GKP LLC are beneficially owned by his brothers and father ("Family") and he is obliged to transfer the shares to his Family as soon as he is able to. Under the terms of his ongoing divorce proceedings he is not currently able to do so but will keep the Company updated of any transfer. Pending transfer Mr. Kozel has the authority to vote the shares.

So let' get that straight, Mr Kozel didn't know that his brother and father had transferred 11.6m shares to him from a company in which he is a 40 per cent shareholder!

> GKP LLC, a company in which both Mr. Kozel and Mr. Al-Qabandi are shareholders, previously held 40,000,000 Common Shares representing approximately 5.25 per cent. of the issued Common Share capital of the Company. Following the Transfer the Company has been informed that GKP LLC is no longer a shareholder in the Company.

How does that happen?

Stranger are the other transfers, which can't be explained away by a divorce settlement.

Still, at least we have a better idea of who owns what at Gulf Keystone…



… and it gives us a chance to reprise Mr Kozel's divorce case, starting with some nuggets about Gulf Keystone Petroleum Co. LLC and a gem about its (cough) expenses policy.

Via the Independent on Sunday:

Mrs Kozel's legal team claims her husband has been squirrelling away assets in trusts as "divorce planning", so that she will not be able to get hold of some of his fortune. They describe these trusts as Mr Kozel's "alter egos".

Gulf Keystone Petroleum LLC (GKP LLC) owns 5.25 per cent of GKP's stock. The named shareholders of LLC are Mr Kozel and Ali Al-Qabandi, the business development director at GKP. Mrs Kozel alleges that her husband owns between 40 and 50 per cent of GKP LLC, worth up to $60m depending on how the shares are performing.

However, Mr Kozel says that although he is named as owning 40 per cent, the majority of that stake is held on behalf of his father and brothers.

The Gokana Trust is GKP's eighth-biggest shareholder, with just shy of 4 per cent of the stock. Mrs Kozel's legal team allege in one motion that this is "a trust with $90m of marital assets in it".

Mr Kozel's deposition also revealed that he regularly entertains customers and company members at a number of strip clubs, which are put through GKP's expenses. These include the Windmill International in London and the Bourse Restaurant in Zurich. Questioned about one strip-club bill that came to more than $5,100, Mr Kozel replied: "When we do it, we take a lot of people and do it properly."

We expected nothing less.



**Related links**:
[Sunrise over Erbil](#) – FT Alphaville
[Gulf Keystone Productions](#) – FT Alphaville

Copyright The Financial Times Limited 2021. All rights reserved.

Opinion **FT Alphaville**

## Gulf Keystone plots $200m fund raising

**NEIL HUME**

**Neil Hume** SEPTEMBER 16 2011

Earlier this week Gulf Keystone Petroleum – the next super major oil company – spelled out its plans for the future.

The highlights were a move to the main market of the London stock exchange from Aim and a plan to develop a pipeline capable of carrying 440,000 barrels a day north from its Shaikan field to the Kirkuk-Ceyhan export pipeline.

Chief executive Todd F Kozel said this would be funded by the sale of its 20 per cent stake in the Akri-Bijeel block, which is majority owned by partner MOL Hungarian Oil & Gas and could fetch as much as $300m-$350m.

However, FT Alphaville understands Gulf Keystone is also trying to raise $200m via an issue of new shares. The fund raising is being overseen by Mirabaud Securities and could be completed in the next couple of days. Gulf Keystone declined to comment.

The company has net cash of $137m, which say analysts should be sufficient to fund an active drilling programme in 2012. However, Kozel wants to "aggressively" appraise and explore the Shaikan, Sheikh Adi and Ber Bahr blocks in the Kurdistan Region of Iraq to prove up the resource base.

The company has started to prepare a development plan for the Shaikan field, which is expected to be submitted to the Kurdistan Regional Government in 2013. While still in early planning stages, a 200-well program with a 400,000-450,000 barrel-a-day peak production could entail capital spending in the $7bn range, broker Madison Williams said in a recent research report.

Gulf Keystone was recently forced to deny reports that it was looking to sell itself in a deal that could value the explorer at up to £1.4bn.

Iraq's oil wealth has attracted a number of operators to the Kurdish region over the past year including Repsol, Hess Corp and Marathon Oil.

Earlier this month Vallares, the oil investment vehicle backed by former BP chief executive Tony Hayward and financier Nat Rothschild, announced plans to buy Turkey's Genel Energy in a $2bn deal.



**Related links**:

Sunrise over Erbil – FT Alphaville

Copyright The Financial Times Limited 2021. All rights reserved.

THE INDEPENDENT ON SUNDAY
24 APRIL 2011

THE INDEPENDENT ON SUNDAY
24 APRIL 2011

# Kozel vs Kozel

A certain mystique surrounds tough American businessman Todd Kozel, but a $100m divorce battle has laid bare many of the affairs of his complex oil business. **Mark Leftly** reports

Todd Kozel is said to be one tough American. There are stories of how, shortly after the fall of the Saddam Hussein regime, the one-time George-Cheney campaign contributor marched into the deserts of northern Iraq to negotiate huge oil deals with Kalashnikov-wielding Kurds. Mr Kozel didn't blink.

True or not, he gained a certain mystique from such tales. His Kurdistan-focused company, Gulf Keystone Petroleum (GKP), has fascinated the City, and shares have surged on some of the most extraordinary finds the oil market has seen in years.

Just this month, the estimated oil reserve of GKP's Shaikhan discovery went up more than 150 per cent to 4.9bn barrels. This is a conservative measure, but still makes the find a massive, world-class asset.

GKP is now worth more than £1.2bn, making it one of the biggest companies on the junior AIM market and a likely contender for promotion to the main board of the Stock Exchange. One day, the company, at which Mr Kozel is both executive chairman and chief executive, could be an oil major.

But the company has occasionally frustrated as much as it has wowed. There have been questions over the identities of certain partners, while advisers are known to have told GKP that it should provide the market with more information over several issues, including details of trusts that hold significant stock.

This has led to several clashes. The reason RBC Capital Markets stopped acting as broker in autumn 2009 was due to "poor communication" and "personality clashes", according to an industry source. Jeremy Asher, a non-executive director, is understood to have left last April as he was angered by the lucrative remuneration awards that executives were receiving.

If only the critics had known it, much of the information they wanted has been publicly available for months in a Florida courthouse. Since August, swathes of motions and testimony related to a $100m divorce fight have been placed with the Sarasota circuit court.

Which is a shame, because they make for a rip-roaring read: there's a Lithuanian mistress, a socialite wife, strip clubs, some of the world's most glamorous bars and restaurants, extraordinary shopping bills, lawyers who have represented the world's greatest golfers, and, of course, one tough American.

Juicy though the details of this divorce might be, the case's importance is that it is slowly shedding light on the ownership structures of those trusts, and the way that GKP goes about its business.

**KEY PLAYERS** Todd Kozel at his GKP offices in Mayfair; Ashley Kozel, far right; and, below from left, John Daly, Greg Norman and Tiger Woods
CHARLIE BIBBY; AFP/GETTY

### THE SOCIALITE AND THE MISTRESS

Ashley Kozel started divorce proceedings against her husband last August after 18 years of marriage. She is represented by Jeff Fisher, who clearly likes to hit the fairways. He previously acted for Greg Norman in a divorce that cost the former world number-one golfer a reported $105m. Mr Fisher is also thought to have at least given advice to Tiger Woods in his well-publicised divorce. Another attorney at his Palm Beach-based firm, Fisher & Bendeck, once defended a newspaper in a defamation case brought by the high-spending golfing star John Daly.

Mrs Kozel seems to be something of a fixture at Sarasota's grandest events, and last year she was photographed attending a gala dinner that raised $300,000 for the Conservation Foundation of the Gulf Coast.

Mr Kozel, meanwhile, was spending much of his time in Europe building up GKP. The couple lived separately and grew apart.

He is now in a relationship with a Lithuanian woman in her mid-20s, called Anna. According to his deposition, Mr Kozel lavishes gifts on his girlfriend. In October 2007 alone he spent $10,320 at some of Milan's top fashion houses, including Prada and Versace.

This spending, Mrs Kozel's lawyers claim, is just one example of "marital waste" – money spent of which she argues she is still entitled to half. The couple have assets that can be easily valued and divided, such as properties, three jet skis, and a wine collection worth more than $700,000.

What are more difficult to value are Mr Kozel's business assets. In total, Mrs Kozel is fighting for $100m and is demanding extensive records of trusts and shareholdings that her husband's team argue are already in the public domain.

US companies that Mr Kozel has or had interests in – Texas Keystone (TKI), Falcon Drilling and Falcon Partners (FP) – are named as defendants. In one motion, TKI and FP say of the information requests: "This is a proverbial 'fishing expedition'. For example, Husband as a shareholder in TKI has a very limited right to review corporate documents."

But the dispute that really catches the eye is over trusts related to GKP.

### A QUESTION OF TRUSTS

Mrs Kozel's legal team claims her husband has been squirrelling away assets in trusts as "divorce planning", so that she will not be able to get hold of some of his fortune. They describe these trusts as Mr Kozel's "alter egos".

Gulf Keystone Petroleum LLC (GKP LLC) owns 5.25 per cent of GKP's stock. The named shareholders of LLC are Mr Kozel and Ali Al-Qabandi, the business development director at GKP.

Mrs Kozel alleges that her husband owns between 40 and 50 per cent of GKP LLC, worth up to $60m depending on how the shares are performing. However, Mr Kozel says that although he is named as owning 40 per cent, the majority of that stake is held on behalf of his father and brothers.

The Gokana Trust is GKP's eighth-biggest shareholder, with just shy of 4 per cent of the stock. Mrs Kozel's legal team allege in one motion that this is "a trust with $90m of marital assets in it".

Jersey-based Gokana was once called Emerald. Gokana's trustee is called Emeralp. This seems to have confused all parties with Emerald and Emeralp often used interchangeably.

Mrs Kozel's team argues that Mr Kozel used Gokana to place the $90m "beyond the jurisdiction of this court". The husband put the money there, the lawyers allege, because Jersey is "a notorious asset protection jurisdiction" where Mrs Kozel would struggle to get any of the money that a judge might eventually decide she is owed.

In April 2009, Mr Kozel transferred 20 million shares to what was then Emerald in a move described as "by way of gift" and "as part of advised estate planning". It has emerged that the controlling shareholder of Emeralp, the trustee, is Markus Hugelshofer, Mr Kozel's Swiss lawyer.

A second tranche of shares, transferred in August 2009, has caused quite a stir. Mr Kozel lent Mr Hugelshofer nearly £1m to buy 10.35m shares on behalf of Gokana as part of a fundraising, the proceeds of which were to be used to explore and drill in Kurdistan.

An unfortunate phrasing in Mr Kozel's deposition, though, means that Mrs Kozel's team argues that the transfer was of "questionable legality", and that the loan was made during a time when they say that he was not allowed to trade shares:

**Fisher**: How did you lend money to the Gokana Trust?
**Kozel**: When we did the fund-raising in July of '09, we approached all of our top shareholders. And it would be just not me, it would be the Board of Directors, finance director, chief operating officer. Legal, maybe not so much. Approached all of them trying – you know, "do you want to protect your dilution?" ... The other directors approached Gokana to see if they wanted to participate. Gokana did. Markus made the decision, asked me if I would loan money for them to participate. He believed in me. I loaned him money. That's where the loans are coming back from. That was a board approach, and Todd Kozel [referring to himself in the third person] excluded himself.

In the file, Mr Fisher has highlighted the "Legal, maybe not so much" phrase. However, this was not some sort of admission of guilt. It is understood that Mr Kozel was in fact saying that GKP's in-house legal team did not approach shareholders over the fundraising.

### EXPENSES

At least that exchange between Mr Fisher and Mr Kozel, which took place in December, was civil. It appears that there was great hostility between the two, their showdown dripping with bitter sarcasm. At one point, Mr Fisher was asking about a number of credit card bills, including $4,434 spent on food and drinks at the five-star Hotel de Paris in Monaco.

**Fisher:** Well, we don't have time to go through all of these charges, but we will another day.
**Kozel:** I'm looking forward to it.
**Fisher:** I am too. I am too. We'll find time and make – you know what? If we could – if we could maybe do it at some of these nice restaurants, it will make it less – less painful.
**Kozel:** That's not possible. I'm too busy trying to make money.
**Fisher:** Well, after spending all this money, you'd better work hard.
**Kozel:** Well, you're arguing over a whole bunch of Gulf Keystone that's responsible for this, my friend.

Mr Kozel's deposition also revealed that he regularly entertains customers and company members at a number of strip clubs, which are put through GKP's expenses. These include the Windmill International in London and the Bourse Restaurant in Zurich.

Questioned about one strip-club bill that came to more than $5,100, Mr Kozel replied: "When we do it, we take a lot of people and do it properly."

The deposition also teases out some detail on the Etamic Trust. In 2009, this group was granted a 50 per cent stake in GKP's main operational vehicle, and little information was given about the identities of those behind Etamic, except that it was a Beirut investment fund. There was press speculation that Gulf Keystone directors could even be involved, though this was denied.

Last year, GKP bought Etamic out of the joint-venture for $12m, after the Middle Eastern group missed some of its payments. When questioned, Mr Kozel makes clear that he was in no way related to Etamic, as some had speculated, and said that the trustees were "two bankers in Beirut". He also told the court that his lawyer, Mr Hugelshofer, had helped the bankers establish Etamic.

### EXCALIBUR

Mr Kozel currently has an asset injunction placed against him. This means that he is unable to trade any of his GKP shares, which account for 0.49 per cent of the company. His lawyers have argued that he would not sell up anyway as that would give the wrong signals to the market, that he was not confident that the stock price would continue to rise. GKP has not announced this restriction, and there is no need to, under AIM rules.

However, together with the stock of GKP LLC and Gokana, nearly 10 per cent of the company's shares have been affected by this divorce. And there is a feeling that the divorce will not be finalised this year, which is not what GKP needs, when it is already involved in another ugly legal case.

In New York and London, a US company called Excalibur Ventures is trying to claim up to 30 per cent of GKP's interests in Kurdistan. GKP has argued that this claim is "spurious" as it relates to an old deal Excalibur had with Kozel's family company, TKI, not GKP.

Again, then, there might be confusion over just how all these various companies are interrelated. Kozel vs Kozel should, eventually, establish just how the tough American has organised this otherwise most impressive of businesses.

Opinion **FT Alphaville**

GKP update

**PAUL MURPHY**

**Paul Murphy** MARCH 12 2012

Gulf Keystone's Shaikan prospect in Kurdistan just gets bigger and better, seemingly...

> The first five tests have been conducted in the northern "footwall" – on the lower side of the inclined fault bounding the Shaikan structure. This is the first occurrence of flow from the footwall and proves an extension of the Triassic and Jurassic reservoirs outside the central part of the structure. The latest test (Test 6) is being conducted in the "hanging wall" (the upper side of the inclined fault) from a new reservoir in the uppermost Sargelu formation which had not been previously flow tested. The test is ongoing and rates in excess of 4,000 boepd have been recorded.

Full operational update.

**Related links:**

Sunrise over Erbil - FT Alphaville

Copyright The Financial Times Limited 2021. All rights reserved.

Markets

# Gulf Keystone chief's pay boosted to £13m

Michael Kavanagh MARCH 22 2012

Gulf Keystone, the Aim-quoted oil explorer focused on the Kurdistan region of Iraq, has agreed to pay a cash bonus of £1.78m to its executive chairman and chief executive Todd Kozel in addition to his salary and share bonuses worth up to £11m under its executive bonus scheme for 2011.

The handsome reward follows a year in which shares in the company, which traded as low as 5p in 2009, entrenched its position as a favourite but volatile Aim stock for both institutional and retail investors as the shares rose from 169p to just under 190p by the end of the year.

Since then, high hopes that Gulf Keystone can establish itself as a valuable takeover target for larger oil companies seeking to extend their positions in northern Iraq saw shares in the company trade as high as 417p in February.

But concerns over how disputes between the autonomous government of the Kurdistan region and Iraq's central government in Baghdad might limit the prospects for early-stage oil explorers, along with an unresolved legal dispute with Excalibur Ventures, which claims a 30 per cent stake in the company's blocks in Iraq, has seen its share price fall back.

On Thursday Gulf Keystone shares traded at 256¼p, valuing the company's equity at £2.2bn.

The cash and shares bonus awarded for last year's performance – worth up to nearly £13m at Wednesday's prevailing share price – are in addition Mr Kozel's salary, which was $675,000, or just over £400,000 in 2010.

Mr Kozel saw his pay, comprising salary and share bonuses, rise from $2.6m in 2009 to $9.9m in 2010, according to Gulf Keystone's last published annual report.

The company also announced that key executives are to be granted "exit event awards" should, as is expected, the company be eventually taken over. Leading executives will be entitled to a maximum of 10m shares, currently valued at £25m, following the sale of Gulf Keystone or "a substantial proportion, that is, more than 50 per cent, of its assets".

The awards leave Mr Kozel holding 17m in share options and an interest in more than 5m shares accumulated under three years of executive bonus schemes. In January he agreed to transfer 17.4m shares worth £47m to his wife to fund a divorce settlement.

The granting of the awards follows wider controversy over executive pay among UK-listed companies, which has led to clashes between remuneration committees and institutional investors.

In January objections from the Association of British Insurers prompted Cairn Energy to abandon plans to reward its chairman Sir Bill Gammell with pay and bonuses worth nearly £5m– part of which was to be paid to charity – after the successful conclusion of a sale of $5.5bn oil assets in India to Vedanta Resources. The sale paved the way for a $3.5bn return of funds by Cairn to shareholders in February.

But Mehdi Varzi, Gulf Keystone's deputy chairman, who leads the company's remuneration committee, said the awards were justified.

"Gulf Keystone's management and employees have achieved considerable growth with the increase in the company's share price from 5p in March 2009, before the first Shaikan well was drilled, to today's levels, which would place Gulf Keystone within the FTSE 100 index by market capitalisation."

The granting of the exit event awards, under the 2011 executive bonus scheme including cash awards, were being made "following consultation with a number of the company's leading institutional and other shareholders" who, the company said, hold more than 35 per cent of Gulf Keystone shares.

Copyright The Financial Times Limited 2021. All rights reserved.