UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,                    Case No. 19-cr-00460-KMW

          Plaintiff,

vs.

TODD KOZEL,

          Defendant.

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Defendant Todd Kozel, by his undersigned counsel, hereby submits this Sentencing Memorandum to the Court for its assistance in sentencing. This Court is set to sentence Todd Kozel on June 1, 2021. For the reasons set forth herein, a below-guidelines sentence is proper and just. Notwithstanding the seriousness and nature of the offense, given Mr. Kozel's acceptance of full responsibility for his role in the same, the extraordinary circumstances of his personal history and characteristics, and his ongoing battle with cancer (diagnosed in late 2020), undersigned counsel respectfully suggests that a sentence of probation and home confinement is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a).

Mr. Kozel pled guilty to five misdemeanor counts of willful failure to file tax returns, in violation of 26 U.S.C. § 7203, specifically that he failed to file tax returns for the years 2011 to 2015. During these years, Mr. Kozel was embroiled (and still is) in a bitter divorce with his ex-wife, Ashley Kozel ("Ashley"). The divorce was a nuclear attack on Mr. Kozel's life. Ashley used all of her resources to attack Mr. Kozel's personal life, reputation, and finances. One of the many tools she used to cripple Mr. Kozel was an incredibly broad asset injunction. If not for the

divorce and multiple asset injunctions, Mr. Kozel would have been able to pay his taxes during these years.

After his arrest in November of 2018, Mr. Kozel wore an ankle monitor for six months and has since been reporting to probation on a weekly basis. He surrendered his passport and, due to the nature of his business, has been unable to work because of the travel restrictions. Under the terms of his release, Mr. Kozel is also subject to periodic drug testing.

In compliance with the terms of his plea agreement, Mr. Kozel recently elected to enter into a Form 870 Waiver of Restrictions on Assessment and Collection of Deficiency and Acceptance of Overassessment for tax years 2011 through 2019. Importantly, Mr. Kozel did not profit from his failure to file taxes and has been under an asset injunction since 2011, which by its terms prevented even the payment of taxes or use of any funds.

Mr. Kozel accepts full responsibility for his conduct and now comes before this Court remorseful and prepared to face the consequences of his actions. The undersigned has provided to the Court copies of letters of support, including from the people who know him best. *See* **Composite Exhibit A**. Mr. Kozel asks the Court to review and consider these statements.

## BACKGROUND

### 1.    Personal Background

Mr. Kozel, age 54, was born in Pittsburg, Pennsylvania on January 18, 1967. He is one of three children born to Mr. Frank Kozel and Ms. Shirley-Ann Corrigan. Frank, Mr. Kozel's father, has various business interests in oil and gas companies. In 1988, Mr. Kozel and his brothers founded Texas Keystone Inc., an independent oil and gas exploration, development, and production company, headquartered in Pittsburgh, Pennsylvania. Kozel served as Texas Keystone's President from 1995 to 2004. He also co-founded with his family Falcon Drilling, an

American drilling and oilfield services company, and Falcon Partners, a pipeline and land company. These three companies focused on exploration and development in the Appalachian area and Texas.

In 2002, Falcon Drilling was involved in the rescue of nine miners during the Quecreek Mine accident in Pennsylvania. On July 24, 2002, a crew of miners was trapped underground when their continuous mining machine broke through the wall of a long-abandoned mine, loosing an estimated 60-million gallons of water into the current excavation shafts. The Pennsylvania Department of Environmental Protection called for emergency assistance from several drilling contractors shortly after midnight. Falcon Drilling was one of the local companies that responded to the call. Mr. Kozel and his brother, David Kozel, spent three days on site working around the clock to rescue the miners. All nine miners were successfully rescued and none suffered any lasting effects from decompression sickness.

Right after the first Gulf War, a friend in the industry invited Mr. Kozel to Kuwait. He drove through the Burgan oil fields because he wanted to see the first Burgan oil field drilled by Gulf Oil Pittsburgh. His uncle had worked on an oil field in that exact location. Mr. Kozel became intrigued by the possibility of an international oil and gas company and focused on the Middle East and North Africa.

To seize this opportunity, in 1999, Mr. Kozel founded Gulf Keystone Petroleum ("GKP") based in London, an oil and gas exploration and production company, with the help of UAE and Kuwaiti private equity investments. The company is registered in Bermuda with branch offices in Erbil, Kurdistan, London, United Kingdom, and Algiers, Algeria. GKP stock is traded on the London Stock Exchange, which has an intensive regulatory system comparable to the U.S. Securities and Exchange Commission. Mr. Kozel served as President, CEO, and Chairman of

GKP until 2014. Today, GKP is the operator of the Shaikan Field, one of the largest developments in the Kurdistan Region of Iraq and in fact the world.

Mr. Kozel was a trailblazer in his field in the early 2000s when Kurdistan was isolated, dangerous, and politically untouchable. Mr. Kozel learned that the way to build a successful company was by working closely with the Kurds. Mr. Kozel took a hands-on approach to his business and spent a great deal of time on the ground in Kurdistan meeting with foreign leaders and developing relationships with the local community. It was important to him to be a good corporate citizen in Kurdistan and have meaningful contact with the local cities, towns, and villages. In 2007, when GKP established its office in Kurdistan, the company hired young people from the local community and also sponsored chairs and departments at universities to enhance the study of petroleum geology and petroleum economics. Each week, the company offered "Gulf Keystone University" where GKP senior staff would teach locals who have graduated from the university about the oil and gas industry. When Mr. Kozel stepped down as CEO, GKP's staff in-country was currently 75% Kurdish at all levels. Mr. Kozel's work with GKP in Kurdistan helped a people build a strong identity and gain autonomy in one of the most war-torn regions in the world.

Mr. Kozel also established the Adnan Samarrai scholarship, named after the late Iraqi geologist and "father of Shaikan." This scholarship selected talented local geologists and engineers to attend a top university in the United Kingdom. All travel, living expenses, and course fees were covered by the program. John Stafford, a former colleague of Mr. Kozel's, recalls that by the time he left the project in Kurdistan, at least six people had benefited from the scholarship. *See* Exhibit A at 1. Mr. Stafford also recalls that Mr. Kozel was always insistent that engagement with the local community was paramount. For example, the Yazidi people, a

Zoroastrian religious group, has its most sacred site near the Shaikan oil field. During the Yazidi's annual pilgrimage to this religious site, Mr. Kozel authorized GKP to provide water stations for the pilgrims and clearance of highways as many were barefoot. After the pilgrimage, he further offered the company's resources to clear the area of litter. *See id.* Through GKP, Mr. Kozel also partnered with an international mission of heart surgeons to pay for Kurdish children to receive heart surgery.

Especially critical was Mr. Kozel's involvement with the Yazidi and Syrian refugee crises in Kurdistan after the ISIS invasions of 2013 and 2014. ISIS perpetrated a genocide of the Yazidi people in the Sinjar region of Northern Iraq. Thousands of Yazidi women and girls were forced into sexual slavery by ISIS and thousands of Yazidi men were killed. The persecution of the Yazidis by ISIS resulted in approximately 500,000 refugees. ISIS also expanded its brutal reach into Syria during this time and displaced hundreds of thousands of Syrians. Since the crisis began, over two million refugees have fled to Kurdistan.

In Kurdistan, the GKP oil fields are close to the Syrian border. In late 2013 and early 2014, there were at least 200,000 refugees in Kurdistan, many of them children. When the Ministry of Natural Resources of Kurdistan asked for help, Mr. Kozel and GKP stepped up. GKP drilled water wells, built schools, and supplied children with coats, jackets, book bags, and community centers. During this time, GKP donated $1 per barrel to the refugee camps and the Oil Ministry matched this contribution dollar for dollar. Before Mr. Kozel stepped down as CEO of GKP, the direct cash donations were estimated to be between $10 and $12 million. A video featuring Mr. Kozel's visit to the Kawergosk refugee camp is available here: https://www.youtube.com/watch?v=ZKR3mQe4hyE. Although some members of GKP's executive board objected to the cost of such support, Mr. Kozel's leadership and humanitarian

spirit prevailed. Attached as Composite Exhibit B are two letters from the Rise Foundation, a local Kurdish NGO, thanking Mr. Kozel for his work with the refugee camps.

GKP and the Rise Foundation also embarked on a winterization project for the Kawergosk refugee camp because the refugees were not prepared to survive the harsh conditions of the upcoming winter. GKP donated the money and tools to the refugees but required that they built the project themselves. The refugees were hired directly, given materials, taught how to do the work, and fortified the camp themselves with the help and support of GKP. This "cash-for-work" project was extremely successful and helped the refugees gain a sense of autonomy and empowerment during incredibly dark times. The Rise Foundation's final report on the project is attached hereto as Exhibit C.

### 2.     The Divorce Proceedings

In 1992, Mr. Kozel married his now former wife, Ashley. Mr. Kozel and Ashley have two children. Ashley has a brilliant legal mind, graduating first in her law school class at the University of Pittsburg and landing a prestigious position in corporate finance at Morgan Lewis. Ashley later developed an expertise in trusts and estates law. With this expertise in trusts, it was Ashley who suggested the formation of the trust that would be known as the Gokana Trust. But the extended periods of living apart while Mr. Kozel worked primarily in Europe did not foster a successful marriage.

In 2010, Ashley filed for divorce. Long after the divorce was settled, Mr. Kozel met his current wife, Inga Kozel ("Inga"). Unfortunately, when Ashley learned of Mr. Kozel's new relationship with Inga, she began a campaign to destroy Mr. Kozel's life, including bankrupting him, terrorizing his family, preventing him from seeing his children, and even imprisonment. To accomplish her goal, Ashley hired one of the most aggressive divorce attorneys in Florida.

Together they have successfully ruined Mr. Kozel's life. Indeed, this criminal case arises from the decade-long divorce proceedings in Sarasota, Florida.[1] The Government's original indictment, although no longer operative, relied heavily on the filings and erroneous accusations of the divorce case.

The parties seemingly resolved the divorce via a Property Settlement Agreement ("PSA"), dated January 12, 2012. Based on the PSA, and the finding that "the parties engaged in extensive discovery in this proceeding," "the parties discovered all they wished to discover about the other's financial affairs and waived the right to any further disclosure or discovery," that "each party agreed to accept what they are to receive in accordance with" the PSA, and that its terms were "fair and equitable," a Final Judgment of Dissolution of Marriage was entered thereon the same day. *See* Exhibit D. The central financial term of the PSA was that Mr. Kozel would transfer to his wife 23 million shares of GKP stock or "the value thereof." The agreement contemplated transfer of the shares by January 27, 2012 but allowed for delayed delivery within an express cure period by May 1, 2012, conditioned on the payment of "additional equitable distribution payments."[2]

Mr. Kozel did not deliver the GKP stock to his wife by the initial due date, in January 2012, but did so within the cure period. At the time of delivery, the 23 million shares were valued at more than $100 million, although Ashley made the unilateral decision to hold many of the GKP shares rather than liquidate them.[3] Thus, as of January 12, 2012, all claims that Ashley may have had against Mr. Kozel (other than for GKP stock or its value) were released in the

---

[1] The dispute is still ongoing and has amassed 2,461 docket entries in the trial court and multiple appeals to the Second District Court of Appeal located in Lakeland, Florida.

[2] The PSA was authoritatively interpreted in this regard by the appellate court which addressed the parties' dispute. *Kozel v. Kozel*, 302 So. 3d 939 (Fla. 2d DCA 2019).

[3] While not directly material, the record indicates that the wife did liquidate some $50 million of the GKP stock.

PSA. By March 2012, Mr. Kozel (by Ashley's admission and undisputed fact) had transferred what he was required to transfer.

But the divorce did not end there. Shortly thereafter, Ashley, albeit baselessly, changed her position and decided that she had a claim to an additional $34 million due to the two-month delay in delivery. Ashley filed a claim for damages in this regard. Florida law did not allow the family court judge who handled the divorce to retain jurisdiction for post-judgment damages actions (to protect the right to jury trial, among other things), but the family court judge who had handled the divorce nonetheless erroneously assumed jurisdiction to litigate Ashley's damages actions. These severely flawed proceedings (later reversed on appeal) would later become the foundation of the U.S. Attorney's original indictment in 2019.

In these unauthorized proceedings, which would prolong the divorce another eight years, the judge ruled in Ashley's favor in an Amended Final Judgment filed September 15, 2015 and ordered Mr. Kozel to pay Ashley $34,611,702. *See* Exhibit E hereto. Soon thereafter, another asset freeze order was entered by the divorce judge, on September 11, 2015. *See* Exhibit F hereto.

On November 24, 2015, to execute the post-divorce money judgment she had obtained against Mr. Kozel, Ashley filed a motion to commence proceedings supplementary to execution. In her motion, she sought to implead several third-party defendants, including the Gokana Trust ("Gokana") and Inga Kozel (Mr. Kozel's current wife). In support of her claims against Gokana, Ashley alleged that Mr. Kozel had made certain transfers and conveyances to the trust to hide assets from her and defraud her, despite the fact that she had already received 23 million shares of GKP valued at more than $100 million. Ashley's claims regarding Gokana, the trust she originally devised, are unsubstantiated.

As part of her vindictive efforts to collect on her erroneously obtained judgment, Ashley and her lawyers sent letters to Mr. Kozel's banking institutions and financial professionals advising them of the asset freeze and demanding that they restrict Mr. Kozel's access to his assets. Ashley, through her lawyers, also sent a letter to the New York Fertility Institute, where Mr. Kozel's new wife, Inga, was receiving fertility treatments. After reviewing Mr. Kozel's credit card statements and seeing certain charges for fertility treatments, Ashley's legal team threatened the clinic that if they accepted money from Mr. Kozel, all rights and remedies would be pursued against the clinic to recover those funds.

The $34 million damages award was ultimately vacated on appeal because the trial court never had jurisdiction to enter it. *Kozel v. Kozel*, 302 So. 3d 939 (Fla. 2d DCA 2019). The 2015 judgment and asset freeze order had previously been stayed (a sign of likely reversal) after briefing and argument on the appeal by order of July 5, 2017. *See* Exhibit G hereto. As the appellate court said: "we reverse the monetary awards contained in the amended final judgment as well as the asset freeze injunction that the family court awarded to secure their payment." *Kozel,* 302 So. 3d at 953. The appellate court also awarded Mr. Kozel his attorneys' fees.

Ashley appealed the Second DCA's ruling to the Florida Supreme Court. On April 15, 2021, the Florida Supreme Court declined to exercise jurisdiction over the appeal and granted Mr. Kozel's motion for attorneys' fees, the amount to be determined by the trial court. *See* Exhibit H.

At every turn, Ashley and her lawyer have done the utmost to use the criminal indictment as a battering ram to pound Mr. Kozel and Inga into submission. Not surprisingly, her lawyer

purports to specialize in cases that are "equal parts divorce and white-collar litigation."[4] They have even initiated lawsuits in Lithuania, where Todd's current wife is originally from, New York, where Mr. Kozel currently resides, and have corresponded with the government and IRS seeking charges of money laundering and wire fraud, charges ultimately dropped in this prosecution. An ex-IRS agent attended a 2013 deposition of Mr. Kozel—likely invited by Ashley's attorney to further intimidate Mr. Kozel. Ashley's legal team continues to misrepresent the status of the asset injunction to Mr. Kozel's financial institutions and the court in Lithuania, making it impossible for Mr. Kozel to do the most basic things such as open a bank account. He currently maintains a Venmo[5] account with a balance of approximately $100—a loan from his father.

### 3.     Mr. Kozel's Cooperation and Transparency with the IRS

During the divorce proceedings, Mr. Kozel was subject to endless depositions, court hearings, and financial discovery. His bank accounts were frozen and his finances were a mess. Unfortunately, during these years, Mr. Kozel failed to file tax returns. However, in 2011, he entered the IRS's Offshore Voluntary Disclosure Program and provided all the requisite information regarding his assets.

Mr. Kozel, through his accountants and tax professionals, continued to communicate with the IRS. Mr. Kozel was subpoenaed for his records and provided all documents to the IRS. This included monthly bank statements from all of Mr. Kozel's current accounts. Following this, in 2016, Mr. Kozel was informed by his accountant at the time, Peter Friedman, that the IRS would

---

[4] "How to Hide $400 Million," https://www.nytimes.com/2016/11/30/magazine/how-to-hide-400-million.html?_r=0 (last accessed May 18, 2021).

[5] Venmo is a mobile payment service owned by PayPal. Venmo account holders can transfer funds to others via a mobile phone app.

prepare his income tax returns for the years 2011, 2012, and 2013. *See* Exhibit I. Apparently, the IRS never did so.

### 4.   Mr. Kozel's Medical Conditions

In March 2020, Mr. Kozel was diagnosed with Covid-19 involving multiple organ systems. *See* Exhibit J (letter from Dr. Acquista). His symptoms included chest pain, severe headache and confusion, progressive shortness of breath, pneumonia, and oxygen desaturation. Mr. Kozel recovered from Covid-19 but was left with mildly decreased cognitive function. *Id.*

Unfortunately, his condition seriously worsened. In November 2020, Mr. Kozel presented with a left posterior submandibular tumor and was diagnosed with stage two/three pharyngeal squamous cell carcinoma. *Id.* Follow up testing revealed that the cancer had metastasized, rendering the cancer inoperable. *Id.* Mr. Kozel's cancer is potentially fatal.

On December 21, 2020, Mr. Kozel began the first stage of his treatment plan. His treatment consisted of daily radiation therapy and weekly chemotherapy with CIS-platinum for seven weeks. As a result of chemotherapy and radiation, Mr. Kozel has been complicated with oral mucous ulcers, radiation mucositis, and oropharyngeal candidiasis (oral thrush). As he was unable to eat solid foods during much of the treatment, he lost over 35 pounds. *See* Exhibit K. (letter from Dr. Novoselac). His therapy also resulted in chronic pain and short-term memory loss. Mr. Kozel also developed hypotension causing episodes of fainting and difficulty walking. *See* Exbibit J. His symptoms may continue for months after treatment. *Id.*

Mr. Kozel concluded radiation and chemotherapy in mid-February 2021. He is currently under the care of his medical oncologist and radiation oncologist. The medical team will perform follow-up scans and examinations in August (six months after the last radiation session) to determine if the treatment was successful or if he will require another round. *See* Exbibit K.

Mr. Kozel is also currently undergoing treatment for clinical depression.

## SENTENCING CONSIDERATIONS

For the reasons set forth below, we respectfully urge the Court to sentence Mr. Kozel to probation and home confinement. This sentence is sufficient, but not greater than necessary, to meet the objectives set forth in 18 U.S.C. § 3553.

### A.    Sentence Under The Sentencing Guidelines

Mr. Kozel has no prior criminal history. In this matter, he has pled guilty to five counts of failure to file individual income tax returns in violation of 26 U.S.C. § 7203 (Class A Misdemeanor). The statutory maximum penalty for each count is one year for a total of five years.   The Probation Officer's Presentence Report includes a tax loss of approximately $22,168,177 and a guideline imprisonment range of 57 to 60 months. This is based on a total offense level of 25 and a criminal history category of I. *See* Federal Sentencing Guidelines Manual (hereinafter "USSG") § 5G1.2(b).

### B.    Section 3553(a) Factors

- *Section 3553(a) Factors Support A Non-Custodial Sentence*

Congress has directed that a sentencing court should consider a defendant's personal characteristics *equally* with "the nature and circumstances of the offense." 18 U.S.C. 3553(a)(1). Yet these factors are given no weight in the guideline calculations; indeed, the Sentencing Guidelines recognize only the defendant's criminal record, providing for higher offense levels for a greater criminal history, rather than reductions for no prior record. In *Rita v. United States*, 551 U.S. 338, 364-65 (2007), the Supreme Court acknowledged that "the Commission has not developed any standards or recommendations that affect sentencing ranges for any individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family

ties, or military, civil, charitable, or public service are . . . matters that 3553(a) authorizes the sentencing judge to consider."

Section 3553(a)(2) also directs the Court to consider the need for a defendant's sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant." Here, the 3553(a) factors support a sentence of probation and home confinement. Such a sentence will be sufficient–but not greater than necessary–to satisfy the factors outlined in 18 U.S.C. § 3553(a). *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

In *U.S. v. Snipes*, 611 F.3d 855 (11th Cir. 2010), the Eleventh Circuit affirmed Wesley Snipes' three-year sentence for three misdemeanor counts of willful failure to file income tax returns. However, Mr. Snipes was a known tax protestor. That is, he knew of his obligation to pay taxes but chose not to file returns. This is not the case with Mr. Kozel who believed his tax professionals were in constant communication with the IRS.

Thus, we urge this Court to balance the calculations by giving fair and due consideration to Mr. Kozel's personal characteristics, the circumstances surrounding the divorce, and his medical conditions, which weigh heavily in favor of a non-custodial sentence. With the exception of the charges at issue here—for which Mr. Kozel takes full responsibility and does not seek to minimize his involvement—Mr. Kozel has led an exemplary life, one filled with genuine care and concern for others, including his neighbors in Kurdistan. He led a long and distinguished career as a senior executive of a reputable oil and gas company, GKP. During his time as CEO of GKP, Mr. Kozel prioritized being a good corporate citizen. GKP gave back to

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900  F. 305·858·5261

the Kurdish community, supported refugee camps in the region, and always acted as a guest in foreign lands.

Mr. Kozel currently resides with his wife Inga and their four-year old daughter. He maintains a close relationship with his father and brothers.

Mr. Kozel accepted responsibility for his actions from the outset and fully cooperated with the government. Mr. Kozel has always maintained transparency with the IRS. He enrolled in the government's Voluntary Disclosure Program in 2011 and filed multiple FBARs (Foreign Bank Account Reports) disclosing various foreign bank accounts for the years 2010, 2011, 2012, 2013, 2014, and 2015.[6] Mr. Kozel, through his accountants and tax professionals, continued to communicate with the IRS. Indeed, in 2016, he was informed by his accountant at the time, Peter Friedman, that the IRS would prepare his income tax returns for the years 2011, 2012, and 2013. *See* Exhibit I.

- **"[T]he need for the sentence imposed to reflect the seriousness of the offense . . . and to provide just punishment for the offense[.]" 18 U.S.C. § 3553(a).**

While Mr. Kozel committed a serious offense that merits punishment, incarceration for a misdemeanor is not needed to reflect the seriousness of the offense. Even without any sentence imposed by this Court, Mr. Kozel has been seriously punished. At the age of 54, his life savings are depleted, whatever assets he once had have been frozen and he cannot open new accounts, he has not seen his children with his ex-wife in years, and he is currently battling cancer. Thus, the Court should consider a downward variance in this case.

---

[6] The original FBAR filings are not included as exhibits to this memorandum because they contain confidential information. If requested, the Defendant will make these documents available for the Court's review.

Mr. Kozel's sentence will not reflect the seriousness of the offense if sentenced under the advisory guideline range to five years. Notably, Mr. Kozel has been under an asset freeze since 2011 and has relied entirely on loans from his father to pay his living expenses, child support obligations, and legal fees. As a result, Mr. Kozel currently owes his father over $6 million, plus interest. Mr. Kozel voluntarily moved to the United States full time in 2016 and filed FBARs with the IRS from 2010 to 2015. He relied on his tax professionals when they informed him that the IRS would be preparing his income tax returns for the years 2011-2013. This is not the conduct of a person that intended to evade his tax responsibilities.

- **"[T]o afford adequate deterrence to criminal conduct [and] to protect the public from further crimes of the defendant[.]" 18 U.S.C. § 3553(a).**

Mr. Kozel has great personal remorse for violating the law. Probation and home confinement will more than adequately reflect the seriousness of the offense and would provide sufficient deterrence to any person in Mr. Kozel's situation who might otherwise consider acting as he did.

A custodial sentence is not necessary to protect the public from Mr. Kozel. Mr. Kozel poses no risk whatsoever of recidivism. *See* § 3553(2)(c). The Sentencing Commission commissioned a report, *The Criminal History Computation of the Federal Sentencing Guidelines, Recidivism and the "First Offender."* This report sets forth a statistical analysis of the type of person most likely and least likely to re-offend. According to this analysis, the risk of Mr. Kozel re-offending is non-existent. The study showed that: 1) college graduates are less likely to recidivate than non-college graduates; 2) non-violent offenders are less likely to recidivate than violent offenders; 3) first-time offenders are less likely to recidivate than repeat offenders; 4) those who were employed are less likely to recidivate than those who weren't; 5) non-drug users are less likely to recidivate than drug users; and 6) older individuals are less

likely to re-offend than those in their 20's and 30's. Every one of these factors indicates that Mr. Kozel poses no risk of re-offending.

### C.   Unique physical condition warrants downward departure under § 5H1.4

The Sentencing Guidelines instruct that a physical condition "may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes cases from the typical cases covered by the guidelines." U.S.S.G. § 5H1.4.  Section 5K2.0 of the Guidelines "allows departure from a guideline range if the district court finds that 'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines.'" *United States v. Hammond,* 37 F. Supp. 2d 204, 206 (E.D.N.Y. 1999). A serious medical illness "may be a reason to depart downward." U.S.S.G. § 5H1.4. *See also U.S. v. Velasquez,* 762 F. Supp. 30, 40 (E.D.N.Y. 1991) (granting downward departure on "the ground that [defendant's] metastasized cancer is a serious, life-threatening illness, which constitutes an extraordinary physical impairment as the term is defined in the guidelines."); *U.S. v. Maltese*, No. 90-cr-8719, 1993 WL 222350, *10 (N.D. Ill. June 22, 1993) (granting downward departure where defendant had liver cancer and would require "chemotherapy and other medical treatment which is incapacitating and very expensive"). Based on Mr. Kozel's medical condition, a downward departure is warranted here.

In November 2020, Mr. Kozel presented with a left posterior submandibular tumor and was diagnosed with stage two/three pharyngeal squamous cell carcinoma. *See* Exhibit J. Follow up testing revealed that the cancer had metastasized, preventing him from being a surgical candidate. *Id.* Mr. Kozel's cancer is a potentially fatal form of cancer.

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900  F. 305·858·5261

On December 21, 2020, Mr. Kozel began the first stage of his treatment plan. His treatment consisted of daily radiation therapy and weekly chemotherapy with CIS-platinum for seven weeks. As a result of chemotherapy and radiation, Mr. Kozel has been complicated with oral mucous ulcers, radiation mucositis, and oropharyngeal candidiasis (oral thrush). As he was unable to eat solid foods during much of the treatment, he lost over 35 pounds. His therapy also resulted in chronic pain and short-term memory loss. Mr. Kozel must also receive physical therapy on his neck to drain his lymphatic system. The radiation weakened his neck muscles and the lymphatic fluid does not drain naturally. He receives therapy two to three times a week for this condition. Mr. Kozel also developed hypotension causing episodes of fainting and difficulty walking. This symptom may continue for months after treatment.

Mr. Kozel concluded radiation and chemotherapy in mid-February. He is currently under the care of his medical oncologist and radiation oncologist. They will perform follow-up scans and examinations in August (six months after the last radiation session) to determine if the treatment was successful or if he will require another round of radiation and chemotherapy. With the metastasis of the cancer, it cannot be determined whether Mr. Kozel will be in remission until the tests are conducted and evaluated in late August. Mr. Kozel is also currently receiving treatment for clinical depression.

At this stage, if Mr. Kozel is sentenced to time in prison, the Bureau of Prisons, and in turn the U.S. government, will have to take over Mr. Kozel's treatment. Accordingly, a downward department is warranted in this case.

### D.   <u>Sentencing in Criminal Tax Cases</u>

Below is a brief summary of criminal tax cases in which the defendant received little or no prison time. Notably, the majority of these cases are felony tax cases. This Court should be

mindful that § 7203 (willful failure to file) is not a felony—it is a misdemeanor. A misdemeanor is the least serious criminal offense enacted by Congress in a "carefully graduated scheme of criminal penalties" for violations of the tax code. *See U.S. v. Hajecate*, 683 F.2d 894, 904 (5th Cir. 1982); *U.S. v. Weisberg*, No. 07-cr-66, 2010 WL 3944964, at *16 (W.D.N.Y. Oct. 6, 2010) ("While these [misdemeanors] are serious offenses, the Tax Code itself recognizes that other related offenses (such as tax fraud or tax evasion, I.R.C. §§ 7206, 7201) are more serious."). However, the tax sentencing guidelines for misdemeanors result in a sentencing range identical to that of the most serious of tax felonies. Thus, we request that his Court consider the seriousness of Mr. Kozel's offense, as well as the mitigating factors outlined above, in exercising its discretion during sentencing.

- *U.S. v. Warner*, **792 F.3d 847 (7th Cir. 2015):** The defendant, the billionaire creator of Beanie Babies, pled guilty to one count of tax evasion. The Sentencing Guidelines provided a recommended sentence of 46 to 57 months in prison. The district judge sentenced the defendant to two years of probation with community service based on the defendant's record of "charity and benevolence" and the uncharacteristic nature of defendant's crime. The Seventh Circuit affirmed.

- *U.S. v. Greene*, **249 F. Supp. 2d 262 (S.D.N.Y. 2003):** The defendant pled guilty to thirteen counts of aiding and assisting in the preparation of false income tax returns. The Sentencing Guidelines provided a recommended sentence of 18 to 24 months in prison. The district court sentenced the defendant to three years of probation based on the defendant's charitable works and extraordinary family circumstances. The defendant was the sole provider of financial and emotional support for his three sons.

- *U.S. v. Weisberg*, **No. 07-cr-66, 2010 WL 3944964 (W.D.N.Y. Oct. 6, 2010):** Following a trial, the defendant was convicted on three counts of failure to file a tax return. The guideline range provided a recommended sentence of 21 to 27 months. The court found that the "guideline range here exceeds what is required for a just sentence because it factors in the amount of reported taxes for the three years defendant was convicted for, as well as other amounts under relevant conduct." *Id.* at *16. The court sentenced defendant to 12 months in a halfway house.

- *U.S. v. Barry*, **No. 05-mj-00556-DAR (D.D.C. Oct. 28, 2015) (ECF No. 3):** Former Washington, D.C. Mayor Marion Barry pleaded guilty to two misdemeanor tax charges

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900  F. 305·858·5261

for failing to file tax returns. Despite having a criminal history, he was sentenced to three years of supervised probation. *See* Exhibit L (Barry Plea Agreement).

- ***U.S. v. Willis*, 322 F. Supp. 2d 76 (D. Mass. 2004):** The defendant pled guilty to failing to report income derived from his illegal gambling business on his individual tax return and failing to file tax returns for the gambling business. The defendant's guideline range was 21 to 27 months. The district court sentenced the defendant to two years' probation, six months of which was to be in home detention with electronic monitoring. The district court's downward departure was based on the defendant's advanced age, 69 years old, and various illnesses which required regular medical care, including lymphocytic leukemia, hypertension, colon polyps, and degenerative joint disease.

- ***U.S. v. Tomko*, 562 F.3d 558 (3d Cir. 2009):** The defendant pled guilty to one count of tax evasion. The defendant's guideline range was 12 to 18 months of imprisonment. The district judge sentenced the defendant to three years of probation, participation in an alcohol treatment program, and 250 hours of community service. The court's downward departure was based on the defendant's "negligible criminal history, his record of employment, his support for and ties in the community, and the extensive charitable work he has done." The Third Circuit affirmed (en banc).

- ***U.S. v. Taffaro*, 919 F.3d 947 (5th Cir. 2019):** The defendant was convicted by a jury of several counts of tax evasion and filing false income tax returns. The Presentence Report calculated a guideline range of 27 to 33 months of imprisonment. The district court sentenced the defendant to 60 months' probation and assessed a fine. In granting a downward departure, the court considered the defendant's age (71), physical condition, family responsibilities, charitable activity, work as a law enforcement officer, and voluntary service in the military during Vietnam.

These cases demonstrate a pattern of courts properly declining to apply the overly harsh advisory sentencing ranges as they apply to tax cases. In these instances, courts consider the defendant's charitable works, family commitments, age, health conditions, and likelihood to recidivate to determine that a downward departure is appropriate. Although each of the above-cited cases presented certain factual variations, they all serve as instructive comparisons to Mr. Kozel's case, and they provide highly relevant guidance regarding a range of sentences for similarly situated defendants.

## **CONCLUSION**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate . . . the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). This is one of those unique cases that merits a non-prison sentence despite the guideline range. Mr. Kozel's divorce destroyed his life. He has been litigating the divorce for over 10 years in multiple jurisdictions (including Lithuania), his life savings are depleted, whatever assets he once had have been frozen and he cannot open new accounts, he has not seen his children with his ex-wife in years, and he is currently battling cancer. He has no prior criminal record and the likelihood of recidivism is non-existent. A prison sentence of incarceration is greater than necessary to achieve the goals of the sentencing statute. We respectfully request that this Court sentence Mr. Kozel to probation and home confinement.

Dated: May 18, 2021                  Respectfully submitted,

By: _/s/Kendall Coffey_
 　　　　Kendall Coffey (Admitted pro hac vice)
 　　　　Jeffrey B. Crockett (Admitted pro hac vice)
 　　　　COFFEY BURLINGTON, P.L.
 　　　　2601 South Bayshore Drive, Penthouse
 　　　　Miami, Florida 33133
 　　　　Tel: 305-858-2900
 　　　　Fax: 305-858-5261
 　　　　kcoffey@coffeyburlington.com
 　　　　jcrockett@coffeyburlington.com
 　　　　bdiaz@coffeyburlington.com
 　　　　service@coffeyburlington.com

Case No. 19-cr-00460-KMW

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing was served by Notice of

Electronic Filing generated by CM/ECF, on May 18, 2021, on all counsel or parties of record.

By: _/s/Jeffrey B. Crockett_

COFFEY │ BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900  F. 305·858·5261