**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**UNITED STATES OF AMERICA**              :

    **- v. -**              :

**TODD KOZEL,**              :

             **Defendant.**              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

        **S1 19 Cr. 460 (KMW)**


## GOVERNMENT'S SENTENCING MEMORANDUM
## <u>REGARDING DEFENDANT TODD KOZEL</u>



        DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
        Attorney for the United States of America


LOUIS A. PELLEGRINO
OLGA I. ZVEROVICH
Assistant United States Attorneys
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

   - v. -                                    :

TODD KOZEL,                               :                    S1 19 Cr. 460 (KMW)

           Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM
## REGARDING DEFENDANT TODD KOZEL

      The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant Todd Kozel ("Kozel" or the "defendant"), which is scheduled for January 25, 2022, at 2:00 p.m.   Kozel pleaded guilty to five misdemeanor counts of willful failure to file individual tax returns for the calendar years 2011 through 2015, in violation of 26 U.S.C. § 7203.   As described in the Presentence Investigation Report ("PSR"), Kozel perpetrated a long-running scheme to hide wealth generated from his overseas employment from the U.S. government and avoid the filing and payment of U.S. taxes.   During the relevant period, between 2011 and 2015, Kozel was the Chief Executive Officer ("CEO") of a major international oil exploration company, from which he earned more than approximately $66 million in income. Despite earning this substantial income, Kozel willfully failed to file or pay any personal federal income taxes for the calendar years 2011 through 2015, resulting in a tax loss to the Internal Revenue Service ("IRS") of well over $20 million.   As part of his criminal conduct, Kozel used sophisticated offshore structures, trusts, and bank accounts to conceal a portion of his undeclared income during the relevant period.

      As a sophisticated individual of substantial means, who had a prior history of tax non-

1

compliance and dealings with the IRS, Kozel understood his tax obligations full well.   He knew that he was obligated to file accurate tax returns and pay his fair share of taxes on his income. Kozel also had access to some of the premier law firms and accountants in the world.   Put simply, there is no explanation, justification, or defense for the defendant's repeated willful failure to file tax returns and pay taxes.   The Government respectfully submits that this serious criminal conduct warrants a sentence within the stipulated Guidelines range of 57 to 60 months' imprisonment (the "Stipulated Range").   A lower sentence, much less Kozel's requested sentence of probation and home confinement, would fail to serve the essential sentencing goals of providing just punishment, affording general deterrence, and promoting respect for the law.

I.   **Factual Background**

    **A.  Kozel's Offense Conduct**

    From approximately 2004 through 2014, Kozel was the co-founder and CEO of a foreign, multi-national petroleum company called Gulf Keystone Petroleum Limited ("GKP") with its operations in the Kurdistan Region of Iraq.   Presentence Investigation Report ("PSR") ¶ 7.   GKP, which has been publicly traded on the London Stock Exchange since 2004, issued audited annual reports reporting Kozel's annual compensation as CEO, which consisted of a base salary of $675,000, as well as substantial share and cash bonuses.   *Id.*   In total, between 2011 and 2015, Kozel earned more than approximately $66 million in income as GKP's CEO.   *Id.*   Despite earning this substantial income, Kozel, a U.S. citizen, willfully failed to file or pay any personal federal income taxes for the calendar years 2011 through 2015, resulting in an estimated tax loss to the IRS of well over $20 million.   *Id.*

    Kozel used sophisticated means to hide his assets.   For example, during the relevant period, Kozel realized a portion of his undeclared, untaxed income through an entity called the

Gokana Trust, a foreign trust organized under the laws of the Isle of Jersey.   PSR ¶ 8.   In 2009, the year that the Gokana Trust was formed, Kozel transferred 20 million shares of GKP as well as $1,590,970 in cash to the Gokana Trust.   *Id.*   To date, despite the submission of several treaty requests to foreign countries, the Government has been unable to obtain a full set of records showing the Gokana Trust's financial transactions.   *Id.*

The Government did, however, obtain a limited set of transactional information relating to a PriceWaterhouseCoopers ("PWC") audit of an undeclared bank account at Near East Commercial Bank S.A.L. ("NECB") in Lebanon, in the name of Emeralp Trust Limited as trustee of the Gokana Trust (the "Lebanon Account").   PSR ¶ 8.   Kozel used the undeclared Lebanon Account to conceal a portion of his undeclared income during the relevant period.   *Id.* ¶ 13. Based on the transactional information in the audit report, the Lebanon Account was used to sell approximately 753,050 shares of GKP between July 2011 and May 2012, with more than 22 million shares of GKP remaining in the account in May 2012.   *Id.* ¶ 8.   While Kozel reported sales of GKP stock by the Gokana Trust as taxable income (capital gains) to himself on his 2010 tax return (thereby admitting that he is responsible for taxes on income generated by the Gokana Trust), Kozel failed to file any tax returns, or report or pay taxes on any income generated by the Gokana Trust, in any subsequent years after 2010.   *Id.*   Moreover, Kozel did not file a Report of Foreign Bank and Financial Accounts ("FBAR") form reporting the Lebanon Account to U.S. authorities, as he was required to do.   *Id.* ¶ 13.

In or around 2014, Kozel was terminated as the CEO of GKP.   PSR ¶ 9.   Nevertheless, following his termination, Kozel maintained a lavish lifestyle, and continued to not file or pay any U.S. income taxes.   Indeed, despite claiming that he has no income, Kozel, to this day, continues to live in a high-end Manhattan condominium (the "Condominium"), whose market value in 2013

was approximately $12.75 million.   PSR ¶ 12.   At the time of Kozel's arrest in December 2018,

he reported to Pretrial Services that his "rent" was $40,000 per month and that he had "traveled

extensively to Europe, South America, Asia and Africa for business, and recently returned from

London today."   *Id.*   Despite his extravagant lifestyle, Kozel reported to Pretrial Services at that

time that he had been unemployed for the past three years with zero income.   *Id.*   Kozel has not

timely filed or paid U.S. income taxes from 2011 through 2020.

### B.  Procedural History

On December 14, 2018, a complaint was filed in the Southern District of New York (the

"Complaint") charging Kozel with conspiracy to commit wire fraud, in violation of 18 U.S.C. §

1349; wire fraud, in violation of 18 U.S.C. §§ 1343, 2; and conspiracy to commit money

laundering, in violation of 18 U.S.C. § 1956(h).   Dkt. No. 1 ("Compl."); PSR ¶ 10.   The charges

in the Complaint were based on allegations that Kozel engaged in a long-running scheme to

defraud his ex-wife during their divorce proceeding in a Florida court and conspired with others to

make international transfers of funds in order to promote the fraudulent scheme.   The Complaint

further alleged that Kozel failed to file any U.S. personal income tax returns for the calendar years

2011 through 2014.   Compl. ¶ 8.

Kozel was arrested on December 18, 2018.   PSR ¶ 11.   On June 19, 2019, an Indictment

was filed charging Kozel with the same offenses as set forth in the Complaint.   Dkt. No. 14.

On September 24, 2020, a five-count Superseding Information (the "Information") was

filed charging Kozel with five misdemeanor counts of willful failure to file individual income tax

returns for the calendar years 2011 through 2015, in violation of 26 U.S.C. § 7203.   PSR ¶ 11.

On September 24, 2020, Kozel appeared before United States Magistrate Judge Sarah Netburn and

pleaded guilty to all five counts of the Information.[1]   During his plea allocution, while alluding to "mitigating reasons" to be "address[ed] later," Kozel admitted that he intentionally did not file income tax returns for the calendar years 2011 through 2015, although he knew he was legally required to do so.   Plea Tr. at 29 ("THE COURT: … Mr. Kozel, did you intentionally fail to file your tax returns from 2011 to 2015?   THE DEFENDANT: I did.   I know they're legally required, and I did not file those returns."), Dkt. No. 66; PSR ¶ 16.   This Court accepted Kozel's plea on September 29, 2020.   *See* Dkt. No. 68.

### C. Tax Loss and Restitution to the IRS

Pursuant to his plea agreement, Kozel agreed to make restitution to the IRS, the victim in this case, for the amount of additional tax owed as a result of his filing of accurate individual income tax returns for the calendar years 2011 through 2019, or entering into a Form 870 Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment ("Form 870").   Plea Agreement dated 9/14/2020, at 2.   Kozel further agreed that he would pay restitution "as determined by the IRS, but in no case less than $9,500,000."   *Id.*

### 1. Tax Liabilities for the Calendar Years 2011-2015

On July 8, 2021, Kozel entered into a Form 870 for the calendar years 2011 through 2015. *See* Exhibit A.   Pursuant to the Form 870, which Kozel signed, Kozel agreed that the tax losses to the IRS for this period totaled approximately $29 million, not including any interest or penalties. The Government seeks restitution to the IRS in the following amounts, with interest through

---

[1]  The Government plans to dismiss the charges in the Indictment at sentencing.

August 18, 2021:[2]

| Tax Year | Tax Loss | Interest | Requested Restitution Amount |
|---|---|---|---|
| 2011 | $12,571,645[3] | $253,953.56 | $12,825,598.56 |
| 2012 | $7,577,159.00 | $153,485.98 | $7,730,644.98 |
| 2013 | $2,830,219.00 | $57,330.05 | $2,887,549.05 |
| 2014 | $4,330,922.00 | $87,728.90 | $4,418,650.90 |
| 2015 | $1,568,831.00 | $31,690.74 | $1,600,521.74 |
| **Total:** | **$28,878,776.00** | **$584,189.23** | **$29,462,965.23** |

The Reports of Income Tax Examination Changes, IRS Forms 4549-A, detailing the calculations underlying these tax loss figures are attached hereto as Exhibit B and were produced to the defense on June 16, 2021.   To date, Kozel has not paid back any of these outstanding tax liabilities to the IRS.   The Government will submit a proposed restitution order to the Court in advance of sentencing.

### 2.   Tax Liabilities for the Remaining Calendar Years

On January 10, 2022, Kozel, through counsel, provided to the Government unsigned "client copies" of his federal and state tax returns for 2016 through 2020, which the defense represents have now been filed with the IRS and the Commonwealth of Pennsylvania.   To the date, the IRS

---

[2] The Government has not updated its interest calculations to run through the current sentencing date of January 25, 2022.   Doing so would result in higher interest amounts, which the Government is not seeking at this time.

[3] While the total tax liability for 2011 is $13,021,645.00, as reflected on the Form 870 that Kozel signed, Kozel made a payment of $450,000 toward this liability in June 2011, in connection with his OVDP participation.   The Government has reduced the restitution figure accordingly.

has no record of receiving these tax returns; the Government has requested confirmation of mailing

from the defense.[4]   On most of the federal tax return copies for these years, Kozel reported zero or

minimal tax liabilities:

| Tax Year | Tax Liability | Outstanding Tax Liability After Payment |
|---|---|---|
| 2016 | $0 | $0 |
| 2017 | $0 | -$38 (Refund) |
| 2018 | $34,200 | $12,000 |
| 2019 | $750 | $0 |
| 2020 | $0 | $0 |
| **Total for 2016-2020:** | **$34,950** | **$11,962** |

The Government is not seeking to include any amounts that Kozel reported on the 2016-

2020 tax returns in the restitution order.

### D.  Relevant Conduct

#### 1.  Kozel's Previous Federal Tax History

Kozel's multi-year pattern of willful disregard of his federal tax obligations in this case was

not the first time that the defendant flouted the U.S. tax laws.   Indeed, Kozel's history of tax-

related misconduct dates back to at least 2004, when he became CEO of GKP.   Kozel's tax

returns for the calendar years 2004 through 2006 were false in that they omitted offshore income,

and Kozel failed altogether to timely file any of his tax returns for the calendar years 2007 through

---

[4]  Inexplicably, the "client copies" of the 2016-2020 tax returns that Kozel recently provided to the
Government list a Naples, Florida address as Kozel's home address, whereas Kozel confirmed to his
U.S. Pretrial Officer on January 18, 2022 that he resides in the Condominium in Manhattan, which
is his home of record for purposes of pretrial supervision.

2009.   In March 2011, Kozel entered the Offshore Voluntary Disclosure Program ("OVDP") in an attempt to remedy his tax misconduct for 2004 through 2009.[5]   As part of his OVDP application, which Kozel signed under penalty of perjury, Kozel disclosed bank accounts in England, Switzerland, and Lithuania.   While Kozel now claims that he "provided all the requisite information regarding his assets" as part of the OVDP, Def. Mem. at 10,[6]  Kozel notably failed to disclose the Gokana Trust, or any financial accounts associated with the trust, as part of his disclosure.[7]

As part of the OVDP, Kozel amended his tax returns for 2004 through 2006 to include his offshore income, and filed his delinquent tax returns for the calendar years 2007 through 2009. The total balance due to the IRS was $6,046,684.16, which Kozel paid.

As his convictions in this case show, notwithstanding his participation in the OVDP in 2011, Kozel continued to flout the tax laws for years to come, starting the very year (2011) when he entered into the OVDP, and continuing until his guilty plea in this case.

### 2.   Kozel's State Tax Delinquencies

In addition to owing nearly $30 million in federal taxes to the IRS, Kozel has also disregarded his state tax obligations.   The Commonwealth of Pennsylvania (the "Commonwealth"), through counsel, submitted letters to this Court in connection with Kozel's

---

[5] The OVDP was a voluntary disclosure program designed for U.S. taxpayers with exposure to potential criminal liability and/or substantial civil penalties due to a willful failure to report foreign financial assets and pay all tax due on those assets.   It provided taxpayers with protection from criminal liability in exchange for their resolving their civil tax and penalty obligations and cooperating with the U.S. government.

[6] "Def. Mem." refers to the defendant's May 18, 2021, sentencing memorandum.   Dkt. No. 88.

[7] Kozel also did not disclose his 40% interest in an entity called GKP LLC, which owned 90 million shares of GKP in 2004, when GKP became publicly traded on the London Stock Exchange.

sentencing to advise the Court of Kozel's unpaid state tax liabilities and efforts to thwart the

Commonwealth's efforts to collect the defendant's delinquent taxes.   *See* Exhibit C.[8]   In a letter

dated April 13, 2021, the Commonwealth wrote as follows, in pertinent part:

> As of May 25, 2021, Mr. Kozel will owe the Commonwealth the sum of $355,249.55 for
> personal income taxes, penalties, accruing interest and attorneys' fees. Throughout this
> criminal proceeding, Mr. Kozel has demonstrated a pattern of recalcitrant conduct showing
> a flagrant disregard of his tax obligations to the Commonwealth and making every effort to
> evade service in the process. The Commonwealth has been pursuing the collection of the
> taxes owed by Mr. Kozel, dating back to June 26, 2014, when a tax lien in the amount of
> $212,949.72, plus penalties and interest was issued against Mr. Kozel . . . for delinquent
> personal income tax liabilities owed to the Commonwealth. On or about June 22, 2017, a
> tax lien in the amount of $15,073.74, plus penalties and interest was issued against him . . .
> for delinquent personal income tax liabilities owed to the Commonwealth.
> . . .
> The Commonwealth has on numerous occasions, since at least 2014, asked Mr. Kozel to
> resolve this matter, but he has ignored all such requests. On December 28, 2020, the tax
> judgments were recorded in Florida, where the Commonwealth was informed that he had a
> residence, and on November 12, 2020, the Commonwealth also filed a complaint and
> motion for summary judgment for recognition of the Pennsylvania tax liens, in New York,
> based upon his residence at [the Condominium in] New York, New York 10011-4553. . . .
>
> The Commonwealth believes it is significant that Mr. Kozel has continued his pattern of
> ignoring tax obligations, not only to the Internal Revenue Service, but also to states like the
> Commonwealth. He shows no remorse or intention to rectify his past wrongs, because he
> has consciously been evading service of the aforementioned pleadings (or example,
> instructing his doormen not to allow the Commonwealth's process server access to his
> apartments), particularly in New York. He has also, on April 5, 2021, filed a motion to stay
> enforcement and vacate the foreign judgment the Commonwealth recorded in Florida. This
> has resulted in an unnecessary delay in the collection of these taxes. We understand that the
> Court will consider in sentencing whether Mr. Kozel's conduct is willful and if the
> sentence will deter future behavior. Thus, the current failure of Mr. Kozel to willfully
> ignore his tax obligations to the Commonwealth, should be considered in this sentence. His
> conduct demonstrates that the IRS proceedings and the Justice Department's prosecution of
> him has not caused Mr. Kozel to change his past behavior in evading taxes and that there is
> a likelihood that he will continue to engage in this unlawful behavior going forward.

Exh. C (Letter dated April 13, 2021).   On November 8, 2021, the New York County Clerk entered

judgment in the Commonwealth's favor against Kozel in the amount of $377,186.22.   *See* Exh. C

---

[8]  These letters were previously submitted to the Court via email by counsel for the Commonwealth.

(Letter dated November 8, 2021).

**E.   Sentencing Guidelines Range and the Recommendation of the Probation Office**

In the plea agreement, the parties stipulated that the applicable Guidelines range is 57 to 60 months' imprisonment, based on a total offense level of 25 and a criminal history category of I. The PSR contains the same Guidelines calculation as that set forth in the plea agreement.   PSR ¶¶ 18-36.   The offense level of 25 is calculated as follows:

- A base offense level of 26, based on a tax loss of more than $9,500,000 but not more than $25,000,000, PSR ¶ 20[9];

- A 2-level enhancement for sophisticated means, based on Kozel's use of "offshore structures and trusts and foreign bank accounts, including at least one undeclared account in Lebanon, to conceal a portion of his undeclared income," PSR ¶ 21; *see also id.* ¶ 13; and

- A 3-level reduction for acceptance of responsibility, PSR ¶¶ 27-28.

The Probation Office recommends a sentence of 366 days' imprisonment on each count to run concurrently, explaining as follows:

> During the presentence interview, the defendant admitted guilt in the offense. Without minimizing his conduct, he stated that his behavior was influenced by advice he received from professionals who were assisting him in his divorce against his ex-wife. Notwithstanding, Kozel admitted that his actions were his "own fault." During the plea allocution, Kozel admitted that he willfully, knowingly, and intentionally failed to file his tax returns. . .
>
> We have considered the sentencing factors set forth in 18 USC 3553, specifically,

---

[9]  The Government initially conservatively estimated the tax loss to the IRS to be $22,168,177.   PSR ¶ 13.   Subsequently, the Government obtained additional evidence that showed that the tax loss for the calendar years 2011 through 2015 was higher, approximately $29 million, as described above. As noted above, the defendant agreed to the higher tax loss amounts by entering into the Form 870. However, the Government is not requesting any adjustments to the Guidelines calculation to which the parties stipulated in the plea agreement.

the nature of the case and the history and characteristics of the defendant, as well as the objectives of punishment, deterrence and respect for the law. This non-violent offense represents the defendant's first known criminal conviction. As previously noted, for several years, Kozel, despite earning a substantial income, willfully and intentionally did not file or pay any federal income taxes as required. His actions were calculated, in that he used sophisticated means to hide his income, which resulted in a significant loss to the IRS. Considering the length of the scheme and the loss amount, we believe that a term of imprisonment will hold the defendant accountable of his actions. Nonetheless, given Kozel's familial ties and responsibilities, his lack of criminal history, his compliance with bail, his prior employment record, and his physical health issues, we opine that a variance from the guidelines range is warranted. As such, we believe a total sentence of 366 days' imprisonment is sufficient and not greater than necessary to satisfy the above-noted sentencing objectives.

(PSR at 21-22).[10]   For the reasons discussed in detail below, the Government respectfully submits

that Kozel's willful and repeated choice to flout his tax obligations on tens of millions of dollars in

income; his sophisticated efforts to conceal a portion of his income from the IRS through offshore

structures and accounts; and the staggering losses to the U.S. Treasury caused by his criminal

actions warrant a sentence within the Stipulated Range of 57 to 60 months' imprisonment, and that

the factors cited by the Probation Office and the defense do not support a downward variance in

this case.

## II.   <u>Sentencing Legal Principles</u>

The Guidelines are no longer mandatory, but they continue to play a critical role in trying

to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act,

namely, "ensuring similar sentences for those who have committed similar crimes in similar

ways."  *United States v. Booker*, 543 U.S. 220, 252 (2005); *see also United States v. Crosby*, 397

---

[10]  The Government notes that the Probation Office's recommended sentence (a year and a day on each count, to run concurrently) is not permitted under the law since the maximum term of imprisonment on each count is one year.   The Court is, of course, permitted to impose consecutive sentences on the five counts to which Kozel pleaded guilty to achieve an overall sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").   "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."   *Gall v. United States*, 552 U.S. 38, 49 (2007).   The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion.   *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.   *See* 18 U.S.C. § 3553(a).

## III.   <u>Section 3553(a) Analysis</u>

The Government respectfully submits that a sentence of 57 to 60 months' imprisonment is

necessary to reflect the seriousness and aggravated nature of Kozel's offense conduct, provide just punishment, afford deterrence, and promote respect for the law.

### A. Nature and Circumstances of the Offense

Tax fraud is theft from the pockets of every taxpaying citizen of this nation.   The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received."   *Spies v. United States*, 317 U.S. 492, 495 (1943).   A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes.   As Justice Oliver Wendell Holmes stated, "[t]axes are what we pay for a civilized society. . . ."   *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, *J.*, dissenting).

The tax crimes that Kozel perpetrated in this case cost the U.S. Treasury and this nation's honest taxpayers millions of dollars in losses.   The staggering tax losses in this case—well over $20 million in losses to the IRS—itself warrant a sentence within the Stipulated Range. Moreover, Kozel's offense conduct is further aggravated by the manner in which he carried out his tax crimes.   Kozel's crimes were not a one-time mistake or a fleeting lapse in judgment.   As described above, Kozel's history of tax misconduct dates back to 2004, and after making an effort to remedy his non-compliance for the calendar years 2004 through 2009 by entering into the OVDP, Kozel immediately began the tax crimes for which he stands to be sentenced.   This defendant made a conscious and deliberate choice to cheat the U.S. government through a sophisticated scheme that involved using offshore structures, trusts, and bank accounts, including at least one undeclared account in Lebanon, to conceal undeclared income from the IRS.   And

year after year, over the course of a decade, this defendant made a willful decision not to file any tax returns or pay any taxes, even as he earned tens of millions of dollars in income as the CEO of a major international oil exploration company between 2011 and 2015.   This prolonged and serious criminal conduct warrants a term of incarceration within the Stipulated Range.

### B.  History and Characteristics of the Defendant

Kozel enjoyed a good upbringing and "disclaimed any exposure to any form of abuse, maltreatment, or substance use during his childhood."   PSR ¶ 42.   Following in his father's footsteps, Kozel found success in the oil and gas business.   From approximately 2004 through 2014, Kozel served as the co-founder and CEO of GKP, a foreign, multi-national petroleum company with operations in the Kurdistan Region of Iraq.   PSR ¶ 7.   Kozel achieved tremendous wealth as GKP's CEO, earning more than approximately $66 million in income between 2011 and 2015.   *Id.*   Despite these privileges, Kozel deliberately chose to cheat the tax authorities of many millions of dollars over the course of multiple years.   Although Kozel continues to try to make excuses for his criminal conduct, he clearly knew right from wrong; he knew that he was obligated to pay his fair share of taxes on his income, if for no other reason than by virtue of his previous tax misconduct and participation in the OVDP.   And yet, unlike millions of hard-working taxpayers who timely file and pay their taxes each year, Kozel chose, once again, to flout his tax obligations, year after year.   He chose to hide a portion of his income offshore through the use of sophisticated structures and accounts.   And he chose not to file any income taxes or pay any taxes on his income as GKP's CEO starting in 2011.   Kozel continued not to file any taxes for a decade, until he was finally caught.   And even as he stands to be sentenced by this Court, Kozel still has made no effort to pay back his staggering tax liabilities to the IRS.

Kozel argues that he deserves leniency because he is a first-time, non-violent offender,

suggesting that he is not likely to re-offend.   Def. Mem. 15-16.   The Government respectfully submits that this argument should be rejected.   To start, Kozel's criminal history and the white-collar nature of his offenses are already reflected in the Stipulated Range.   Plainly, if Kozel were a recidivist violent offender, his Guidelines range would have been much higher.   In addition, while Kozel is in criminal history category I, there is no dispute that he previously violated the tax laws, leading to his participation in the OVDP.   And finally, the criminal conduct in this case was ongoing and spanned multiple years.   This is emphatically not a case where the offense conduct was aberrant or prompted by a lapse in judgment and where, as a result, it might be appropriate to give more weight to the defendant's otherwise law-abiding life.   For a period of many years, Kozel methodically flouted his federal (and state) tax obligations, cheating the government of well over $20 million in taxes.   This long-running, lucrative criminal conduct warrants a sentence within the Stipulated Range.

**C.  The Need to Afford Adequate Deterrence**

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a)—but that Kozel does not address in his sentencing submission—is the need for the sentence to "afford adequate deterrence to criminal conduct."   18 U.S.C. § 3553(a)(2)(B). General deterrence is particularly important in cases like this because it is essential to reducing the ever-increasing amount of money lost each year through tax fraud.   An IRS study of tax compliance estimates that only 83.6% of individuals are compliant with their tax obligations, leaving a yearly tax gap of over $441 billion dollars in unreported and uncollected taxes.   *See* "Tax Gap Estimates for Tax Years 2011-2013," September 2019, *available at* https://www.irs.gov/pub/irs-pdf/p5364.pdf.   This means that hundreds of billions of dollars are lost every year because of tax cheats like Kozel—who choose to shirk their responsibilities as

taxpayers but otherwise fully enjoy the myriad public benefits that the tax system supports.

Widespread noncompliance with the Internal Revenue Code is an ongoing problem that merits the Court's strong consideration when imposing a sentence.   Meaningful sentences must be given in cases such as this to forewarn others of the consequences for engaging in multi-year tax crimes.  *See* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect.").

The importance of affording general deterrence through meaningful sentences is particularly acute in criminal tax cases.   As a result of the significant resources required to mount a criminal tax prosecution, such prosecutions are relatively rare.   As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system.   Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws.   Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a *primary consideration* underlying these guidelines.   Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch. 2, pt. T, introductory cmt (emphasis added).   Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence.

The need for general deterrence is at its peak in tax fraud cases, which are lucrative, easy to perpetrate, and difficult to detect.  *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *see also United*

*States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").

Offshore tax offenses are especially difficult to detect and remedy.   *See Taxing Hidden Wealth: The Consequences of U.S. Enforcement Initiatives on Evasive Foreign Accounts*, available at https://www.irs.gov/pub/irs-soi/19rptaxinghiddenwealth.pdf, at p. 2.   The instant prosecution of Kozel was the result of a years-long investigation by the IRS and the U.S. Attorney's Office, which included the submission of requests for foreign evidence pursuant to mutual legal assistance treaties.   In order to provide adequate general deterrence, sentences in hard-to-prosecute cases such as this one, involving sophisticated offshore structures and overseas evidence, must be substantial.

In an effort to escape accountability for his crimes, Kozel requests a sentence of "probation and home confinement."   Def. Mem. at 1, 12.   The Government respectfully submits that such a sentence would not only fail to reflect the seriousness of Kozel's crimes, but also fail *entirely* to serve the goal of general deterrence.   The message that would be sent to others by such a sentence is that tax crimes are not a big deal and that a multi-year, sophisticated, lucrative tax fraud is, essentially, not worthy of punishment at all.   Such a sentence would provide a would-be tax cheat every incentive to commit tax crimes—the reward is high, the chance of being caught and successfully prosecuted is very low, and the punishment in the unlikely event of a successful prosecution is minimal (home confinement and the requirement to pay back the stolen money, which should have been paid to the Government in the first place).   Respectfully, that is *not* the message that this Court should send to the public through its sentence of Kozel.   As Judge Weinfeld aptly observed in a pre-Guidelines setting:

17

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment.   The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns.   I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community.

*United States v. Tana*, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13).   Judge Gardephe echoed the very same view in a more recent case involving a defendant who utilized an undeclared Swiss bank account and caused hundreds of thousands of dollars of tax loss, resulting in a Guidelines range of 24 to 30 months:

> Our tax system is, at bottom, a voluntary one.   Those who use sophisticated means of tax evasion, the sorts of sophisticated means seen here, when their activities come to light they must be punished in a manner that will discourage others from engaging in similar conduct.   I believe in the views of Judge Weinfeld, for whom I have the greatest respect, and specifically his views as expressed in the case of United States versus Tana, that absent extraordinary circumstances, cases of significant tax evasion often call for a sentence of imprisonment.   There's nothing about the facts here that suggest to me that a different outcome is appropriate.

*United States v. Werdiger*, 10 Cr. 325 (PGG) (November 9, 2011; Tr. at 49-50); *see also United States v. Trupin*, 475 F.3d 71, 76 (2d Cir. 2007) (holding that a seven-month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million failed to reflect seriousness of offense, observing that a tax evader, in effect, "steal[s] from his fellow taxpayers through his deceptions"); *United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.").

In a case involving a business owner defendant who used unreported corporate receipts over a three-year period to pay payroll and personal expenses, resulting in a tax loss of between $250,000 and $550,000 and a Guidelines range of 18 to 24 months, Judge Hellerstein imposed an 18-month sentence on the 54-year-old, first-time offender, explaining that:

I think the obligation to pay taxes is basic to our civilization.   It makes it possible to have a lawful society.   You read every day of crimes and violence in our country.   But so much so in so many other countries where people can't get out of their house without fearing their lives.   Where the path of getting food is strewn with threats and violence against them.

In order to have a society, you must have money.   You must be able to pay what society requires.   And its basic functions of policing and other functions of making sure there is a safety net under people.   If people don't pay their taxes, they cheat each other.   Your not paying taxes cheats me.   If I don't pay my taxes, I cheat you. It's as bad, in many ways, as ripping off the delivery worker that the last fellow did. You're ripping off everybody else by not paying your share of taxes. So I look upon this and I think the guidelines have it right here.   I think a year and a half, 18 months, is a just sentence.   I impose it.

I think you're going to have to reflect on what you did and the seriousness of what you did.   You just can't make it good by paying the back tax.   You've got to understand that when  you do something bad, you get punished.   It's got to be a lesson to everyone else.   Everyone else is tempted to draw a line and cheat a little bit, get an extra edge.

Sentencing Tr. at 22-23, *United States v. Joseph Ciccarella*, 16 Cr. 738 (AKH), Dkt. No. 19.

In arguing for his requested sentence of probation and home confinement, Kozel repeatedly emphasizes the misdemeanor nature of his offenses of conviction, suggesting that this fact warrants a 100% downward variance from the Stipulated Range.   *See, e.g.*, Def. Mem. at 14 ("[I]ncarceration for a misdemeanor is not needed to reflect the seriousness of the offense.").   This argument should be rejected.   As the Court knows, the Court can (and should) consider the full scope of Kozel's criminal conduct, including relevant conduct, as part of its Section 3553(a) analysis and impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.   The Government respectfully submits that, in this case, an analysis of the Section 3553(a) factors requires that the Court impose consecutive sentences on Kozel's five counts of conviction, to achieve an overall sentence that will appropriately reflect the serious, aggravated, and prolonged nature of Kozel's tax crimes and achieve general deterrence.

On this point, *United States v. Snipes*, 611 F.3d 855 (11th Cir. 2010), is instructive.   In that

case, defendant Wesley Snipes was convicted following a jury trial on three misdemeanor counts of willful failure to file individual federal income tax returns for the calendar years 1999, 2000, and 2001, in violation of 26 U.S.C. § 7203—the same statute underlying Kozel's five counts of conviction.   The district court sentenced Snipes principally to a total term of 36 months' imprisonment, comprised of three one-year terms, one for each of his three convictions, to be served consecutively.   *Id.* at 863.   The Eleventh Circuit affirmed, holding that "[t]he district court acted well within its considerable discretion in sentencing Snipes to thirty-six months in prison." *Id.* at 873.   In particular, the Eleventh Circuit rejected the defendant's argument that "the district court allegedly placed undue reliance on general deterrence as a sentencing factor under 18 U.S.C. § 3553(a)," finding that the district court's lengthy discussion of this factor "correspond[ed] with the emphasis the Sentencing Guidelines placed on deterrence in the criminal tax context."   *Id.* at 872 (citing U.S.S.G. ch. 2, pt. T, introductory cmt).

In short, compliance with the Internal Revenue Code will be unattainable if the general public believes there are no meaningful repercussions for willful failure to comply with the tax laws.   Sentencing Kozel to a significant term of incarceration is, therefore, necessary to send the message to others in our society that systematic and repeated efforts to cheat on one's taxes will be met with serious punishment.   Or as Judge Hellerstein succinctly put it in *Ciccarella*: "You've got to understand that when you do something bad, you get punished."   *Id.*

### D.  The Need to Avoid Unwarranted Disparities

The Sentencing Guidelines were promulgated, in significant measure, to minimize disparities in federal sentences.   Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor that the Court must consider pursuant to 18 U.S.C. § 3553(a)(6).   To that end, the Government attaches for the

Court's consideration a chart of sentences in other recent tax cases (or cases that had a significant tax component), including cases with comparable loss amounts to the loss amount in this case. *See* Exhibit D.   The sentencing chart breaks out the sentences imposed and various other sentencing data in a broad variety of criminal tax contexts.

Although the Government believes that there is significant utility in having Your Honor consider sentencings in other tax cases, the Government understands that, at best, such guidance can get the Court only so far.   Every case is unique; every individual defendant is unique.   We do not mean to suggest otherwise.   The reason for our reference to the other relevant sentences is straightforward: while we recognize that the Government's recommendation in this case calls for a substantial sentence, the data shows that sentences within or slightly below the Guidelines range are common in criminal tax cases.   In fact, as the attached chart shows, defendants who have caused much smaller losses to the IRS have received and served significant prison sentences.

## IV.   <u>Kozel's Remaining Arguments</u>

The Government respectfully submits that none of Kozel's remaining arguments support a below-Guidelines sentence in this case, much less his requested sentence of probation and home confinement.

### A.  Kozel's Efforts to Blame Others for His Failure To File or Pay His Taxes

In his sentencing submission, while purporting to "accept[] full responsibility for his conduct," Def. Mem. at 2, Kozel attempts to mount several explanations and excuses for his criminal actions.   He attempts to blame others—his ex-wife, the Florida state courts, and even the IRS—for his willful failure to file and pay taxes on his tens of millions of dollars in income. These hollow efforts—which only reflect the defendant's continuing effort to deflect accepting

true responsibility—should be rejected, and Kozel should be held to account for his conduct.[11]

## 1.    The State-Court Injunctions

First, the defendant claims that "Mr. Kozel did not profit from his failure to file taxes and has been under an asset injunction since 2011, which by its terms prevented even the payment of taxes or use of any funds."  Def. Mem. at 2.  These claims are false.  To start, Kozel's willful failure to file and pay taxes over a multi-year period caused well over $20 million in losses to the IRS, and Kozel was the one who profited from this criminal tax scheme.  As a result of Kozel's willful crimes, millions and millions of dollars in taxes that should have been paid over to the U.S. Treasury—and used to fund the numerous critical public benefits that the tax system supports in our country—went instead to line Kozel's pockets.  Nor, contrary to Kozel's claim, was there any "asset injunction since 2011" that prevented the defendant from filing or paying his taxes.  Indeed, Kozel's own position before this Court has been that, as of early 2012, "all claims that the [ex-wife] may have had against Defendant and the Gokana Trust (other than for GKP stock or its value) were released in the [Property Settlement Agreement], *and there was no injunction against any spending, transferring, or liquidating of his assets aside from a restriction for a two-month period on certain transfers of GKP stock*."  Kozel's Motion to Dismiss Indictment at 4, Dkt. No.

---

[11] In his sentencing submission, Kozel argues that he "accepted responsibility for his actions from the outset, "fully cooperated with the government," and has always maintained transparency with the IRS.  Def. Mem. at 14; *see also id.* at 10-11.  The Government sharply disagrees with this characterization.   While Kozel is entitled to acceptance-of-responsibility points under the Guidelines for pleading guilty, Kozel did not otherwise "fully cooperate" or "maintain[] transparency" with the Government.  Indeed, despite early offers by the IRS to work with Kozel's tax professionals to calculate and assess his tax liabilities, Kozel did not meaningfully engage with the IRS, or provide any information that ultimately helped the agency calculate his tax liabilities.  Rather, the evidence and tax calculations in this case are based entirely on the Government's own investigative work.   In short, despite having the means and wherewithal to access some of the most elite law firms and accounting corporations in the world, Kozel did nothing to assist the IRS's understanding of his tax obligations.

40.[12]   Kozel's new claims that he was somehow prevented by a state-court injunction from filing and paying his federal taxes during the relevant period are false, even by his own account, and demonstrate his lack of candor and remorse, even as he stands to be sentenced before this Court.

### 2.    The Divorce

Next, Kozel attempts to explain his criminal actions by pointing to his "bitter divorce with his ex-wife."   Def. Mem. at 1.   This explanation, too, should be rejected.   While Kozel's machinations with offshore entities and accounts may also have been an effort to hide his income and assets from his ex-wife in addition to the IRS, that is neither an excuse nor a justification for the defendant's tax crimes.   Kozel knew full well that, like all taxpayers, he had an obligation to truthfully report and pay taxes on his income—in his case, over $66 million in income over the course of five years, a portion of which Kozel concealed from the IRS through sophisticated means.   In any event, Kozel's attempt to use his divorce as a cover for his tax crimes rings hollow considering that his pattern of tax non-compliance began well before his divorce, culminating in his participation in the OVDP, and continued until his guilty plea in this case.

---

[12] An injunction dated September 11, 2015, did restrict Kozel's ability to use his liquid assets. Notably, however, that injunction was issued *after* Kozel's taxes for the calendar years 2011 through 2014 (which underlie most of the tax loss in this case) were due.   Moreover, this injunction plainly did not prevent Kozel from *filing* any of his taxes, nor from *paying* any of his taxes prior to September 2015.   And even after the September 2015 injunction was issued, Kozel could have sought permission from the Court to use enjoined funds to pay his taxes, but he did not.   Instead, Kozel was held by a court to have violated the injunction to support his life of luxury.   *See Kozel v. Kozel*, No. 2010-DR-008976-NC, 2016 WL 2902152, at *2 (Fla. Cir. Ct. May 9, 2016) ("The Former Husband incredibly claims he has no money. Yet, he continues to live a lavish lifestyle in the face of the injunction, including, but not limited to, maintaining luxury residences in three countries, international travel, dining at expensive restaurants, shopping at luxury boutiques, etc. The court will not exercise its equitable discretion to stay an injunction that is not even remotely being complied with by either Former Husband or his agents.").

**B. Kozel's Health**

Next, Kozel argues that a non-incarceratory sentence is appropriate given his medical conditions, particularly his throat cancer, first diagnosed in November 2020.   Based on a letter dated December 1, 2021, from Kozel's physician (the "December 1 Letter")—which is the latest medical update the Government received from the defense—Kozel's cancer was treated with radiation and chemotherapy, which left him with several side effects, including ███████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████  Notably, the December 1 Letter does not mention the status of Kozel's throat cancer, and the Government has not received any subsequent medical updates from the defense.[13]

As an initial matter, the Government's actual knowledge of Kozel's condition is extremely limited.   While counsel for the defense has periodically provided updates to the Government from Kozel's doctor, these were typically delivered orally, or in brief correspondence that spanned no more than one to two pages.   Such updates generally provided little information that would enable the Government to accurately assess Kozel's present condition, or to determine his long-term prognosis.   The December 1 Letter is one such example.   From reading between the lines, it can

---

[13] At least as of last month, the U.S. Probation Office likewise has not received any additional medical information from the defense.

be inferred that Kozel's cancer is in remission, as the December 1 Letter states that Kozel has

"complet[ed] head and neck radiation therapy," and it is therefore reasonable to assume that if the

treatment had been unsuccessful, the letter would have explained so.   But the letter is silent on

Kozel's longer-term prognosis.   Moreover, no medical records have been produced to the

Government, and most of the updates the Government received regarding Kozel's medical

condition were provided as third-hand hearsay—passed from Kozel's doctor, to Kozel, then on to

his lawyers, and finally, to the Government.   Nevertheless, despite the lack of adequate

documentation, the Government will assume that Kozel's condition is as he has represented it, and

that it is potentially serious—and the Government wishes Kozel a speedy and full recovery.

 Even assuming that Kozel's condition is potentially serious, however, the Government still

respectfully submits that Kozel's health issues do not warrant a downward variance from the

Stipulated Range, much less the 100% variance that Kozel is requesting, which would be plainly

unreasonable and contrary to the purposes of sentencing in this case.   *See Gall v. United States*,

552 U.S. 38, 50 (2007) (the district court "must consider the extent of the deviation and ensure that

the justification is sufficiently compelling to support the degree of the variance").

 Part H of the Sentencing Guidelines provide that departures based upon a defendant's age,

medical health, and mental status "may be relevant" in imposing a sentence, but only when those

characteristics "are present to an unusual degree and distinguish the case from the typical cases

covered by the guidelines."   U.S.S.G. §§ 5H1.2, 1.3, 1.4.   Departure under Section 5H1.4 is

rarely granted, and the cases in which the courts have found a physical impairment to be

"extraordinary" generally are cases where medical care required by the defendant is demonstrated

to be beyond the competence of the Bureau of Prisons ("BOP").   *See, e.g.*, *United States v.*

*Thomas*, 49 F.3d 253, 261 (6th Cir. 1995) (defendant "would only be entitled to a departure if his

HIV had progressed into advanced AIDS, and then only if his health was such that it could be termed as an 'extraordinary physical impairment'"); *United States v. Guajardo*, 950 F.2d 203, 208 (5th Cir. 1991) (age, cancer, high blood pressure, fused right ankle, amputated leg, drug dependency insufficient to justify § 5H1.4 relief). If the medical care required by a defendant is within the competence of the BOP, even a terminal illness does not constitute an "extraordinary physical impairment." *Thomas*, 49 F.3d at 261. The Government respectfully submits that these principles are also relevant when the Court considers whether a variance under Section 3553(a) is appropriate based on the defendant's medical status.

In this case, while the Government accepts that Kozel's condition is potentially serious, it is not so extreme or unusual as to warrant a downward variance. For example, in *United States v. Turner*, the court sentenced a defendant on charges of fraud and bribery to imprisonment and denied a downward departure pursuant to USSG § 5H1.4 based upon age and infirmity. 531 F. Supp.2d 123, 124-125, 127-28 (D.D.C. 2008). At the time of the defendant's sentencing in *Turner*, the defendant had the following issues:

> [A]sthma requiring treatment with steroids and inhalers; sleep apnea requiring the use of a continuous positive airway pressure ("CPAP") device and oxygen at night; post-traumatic stress disorder resulting in headaches and seizures; congestive heart failure; gout and degenerative joint disease occasionally requiring treatment with narcotics; diabetes, which was treated by medication but not fully controlled; severe peripheral neuropathy; renal failure; temporary spells of blindness; and a possible autoimmune disease such as lupus.

*Id*. at 127. In denying the defendant's motion for a downward departure, the court noted that the defendant's conditions were chronic rather than acute, and that the BOP could provide care for the defendant. *Id*. In *United States v. Tucker*, 986 F.2d 278, 280 (8th Cir. 1993) the Eighth Circuit reversed a district court's decision to depart downward for a defendant who suffered from stress associated with prosecution, degeneration of the jawbone, dizziness, eye trouble, frequent colds,

tooth problems, shortness of breath, heart palpitation, arthritis, cramps in her legs, a painful shoulder, knee problems, pressure in her chest, and who had clinically died for 4 minutes during a surgery.   The Eighth Circuit noted that the Guidelines indicate that "departures were intended to be quite rare, and thus should be restricted to situations in which substantial atypicalities are found to exist."   *Tucker*, 986 F.2d at 280; *see also United States v. Kurland*, 718 F. Supp. 2d 316, 318 (S.D.N.Y. 2010) (imposing a custodial sentence and finding that medical issues of defendant convicted of securities fraud, including hyperlipidemia, diabetes mellitus, and prostate cancer in remission, did not warrant a downward departure).

Of note in this district, during the COVID-19 pandemic, Judge Berman sentenced Harald Joachim von der Goltz, an 83-year-old defendant with multiple health conditions to 48 months' imprisonment for offshore tax fraud.   Defendant von der Goltz had multiple serious health conditions at the time of his sentencing, which took place during the pandemic and before the availability of vaccines.   Specifically, von der Goltz had long-term cardiovascular issues, suffered a double heart attack in 2018, requiring the insertion of three stents and a pacemaker, and suffered from an irregular heartbeat, high blood pressure, poor kidney function, arthritis of the spine, a stomach hernia, an inflamed esophagus, asthma, and certain life-threatening allergies.   *See* Sentencing Tr. at 26, *United States v. Harald Joachim von der Goltz*, 18 Cr. 693 (RMB), Dkt. No. 251; *see also id.* at 24-25.   Notwithstanding these conditions, Judge Berman sentenced von der Goltz to 48 months' imprisonment, explaining, "It can't be that you could commit so many crimes for so long a period in such an excessive amount and then say: I'm 83, pandemic, home confinement. It's just not in the realm of justice, in my opinion."   Sentencing Tr. at 57.   Judge Berman recommended that von der Goltz be designated to serve his sentence at a medical BOP facility, which this Court can do in this case as well if appropriate.

In this case, whatever the precise degree of Kozel's present health condition, the BOP is well-equipped to treat the defendant.   As the Court is no doubt aware, female prisoners give birth while in BOP prisons, and inmates receive surgery, physical therapy, chemotherapy, and even hospice care during their incarceration.   Inmates requiring special care can be designated to serve their sentence at BOP Care Level III and Care Level IV facilities.   All such facilities are affiliated with outside medical providers, and many of these outside providers are among the very best medical care facilities in the United States.   For example, the following Care Level IV facilities, are all affiliated with world-class universities or medical centers:

- **Devens, Massachusetts:** affiliated with the University of Massachusetts

- **Butner, North Carolina**: affiliated with Duke University

- **Rochester, Minnesota:** affiliated with the Mayo Clinic

Similarly, FCI Allenwood Medium prison, in Pennsylvania, is a Care Level III facility that is affiliated with the Geisinger Health System, one of the top medical systems in the state of Pennsylvania.[14]

In sum, while Kozel's conditions are potentially serious, they do not support a below-Guidelines sentence, much less a sentence of probation and home confinement.   The critical point here is that Kozel's medical issues can be monitored and addressed by the BOP.   Therefore, to the extent that the Court believes it appropriate, the Court can recommend that the defendant serve his sentence in a BOP medical facility, and the Government has no objection to any recommended designation on the basis of any documented medical needs.   The Government respectfully

---

[14] The Government notes that FCI Rochester is often a preferred designation for cancer patients because of its affiliation with the Mayo Clinic, while FCI Allenwood is often a preferred designation for many SDNY defendants, because it is one of the closest BOP prisons to New York City that offers intensive medical care.

submits, however, that the defense's requested sentence of probation and home confinement, which essentially amounts to no punishment at all for a lucrative, multi-year criminal tax scheme, is not appropriate and would frustrate rather than serve the essential goals of sentencing.

### C. Kozel's Alleged Good Deeds

Finally, the defense asserts that Kozel's alleged humanitarian acts in Kurdistan warrant a diminished sentence.   For example, the defense claims that Kozel "was a good corporate citizen in Kurdistan," Def. Mem. at 4, hired local Kurds, *id.*, established a university where senior staff from GKP taught locals about the oil and gas industry, *id.*, established scholarships, *id.*, provided resources for religious pilgrims, *id.*, and provided substantial assistance to the Yazidi and Syrian refugee crisis, *id.* at 5, among other things.   While the Government is not directly in a position to affirm or refute these assertions, the full picture of GKP and Kozel's involvement in that region in the years immediately after the second Gulf War is far murkier than the defense submission would suggest.   Indeed, Kozel has been dogged by allegations that his accession to rights to the Shaikan oil block—at the time one of the world's most lucrative unexplored oil fields—was tainted by fraud corruption and kickbacks, which if true, likely would be a violation of the Foreign Corrupt Practices Act.   *See e.g.*, https://www.occrp.org/en/investigations/the-rise-and-fall-of-a-us-oilman-in-iraq ("[Kozel] struck a deal to kick back potentially huge revenues to a veteran Kurdistan politician's company in order to secure the oil block.   The deals—one public and official, the other secret and illegal—transformed the fortunes of Gulf Keystone and its founder. The company's operations are now entirely based on the block in question, named Shaikan.   Kozel made more than US$100 million and began to live a lavish lifestyle, flying by private jet and splashing out thousands on fine wines and strippers.").   In any event, the Court should place little stock in assertions of humanitarian deeds, given that at least a portion of the proceeds used to fund

them were the product of Kozel's failure to pay his fair share of U.S. taxes.

V.      **Conclusion**

On the facts of this case, a sentence within the Stipulated Range of 57 to 60 months in prison is appropriate and just.   Such a sentence would reflect the seriousness of Kozel's crimes, afford just punishment, and send a message to would-be tax cheats that a meaningful jail term is the likely consequence of such criminal conduct.   By contrast, a sentence involving minimal or no prison time would be perceived by the public as a slap on the wrist and would fail to deter anyone from flouting the tax laws.   Accordingly, the Government respectfully requests that the Court impose a sentence within the Stipulated Range and order restitution to the IRS in the amount of $29,462,965.23.

Dated:  New York, New York
        January 18, 2022

                                    Respectfully submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney

                        By:     _____/s/_____
                                    Louis A. Pellegrino
                                    Olga I. Zverovich
                                    Assistant United States Attorneys
                                    (212) 637-2617/ 2514