# EXHIBIT "A"

IN THE CIRCUIT COURT OF THE TWELFTH
JUDICIAL CIRCUIT IN AND FOR SARASOTA
COUNTY, FLORIDA

CASE NO: 2010DR8976NC

IN RE: THE MARRIAGE OF

ASHLEY KOZEL

    Petitioner/Wife,

vs.

TODD KOZEL

    Respondent/Husband.

Vs.

TEXAS KEYSTONE, INC., FALCON
DRILLING CORPORATION, LLC, FALCON
PARTNERS, AND FALCON PARTNERS
TRUST,

    Defendants.

_____/

## HUSBAND'S VERIFIED RESPONSE TO WIFE'S EMERGENCY MOTION FOR AN EX PARTE ASSET INJUNCTION AND OTHER RELIEF

COMES NOW the Respondent/Husband, TODD KOZEL, by and through his undersigned attorney and files this his Response to the Wife's Verified Emergency Motion for an Ex Parte Asset Injunction (hereinafter "Wife's Motion" or "Motion") and as grounds therefor states the following:

### BACKGROUND FACTS

1.    On or about December 10, 2010 the Wife filed her Motion. On December 13, 2010, the Court entered an Order denying the Wife's request for ex parte relief and

Kozel v. Kozel
Case No: 2010DR 8976 NC

requiring the Husband to provide a written response to her Motion no later than December 27, 2010. This response on behalf of the Husband is filed in accordance with the Court's Order.

2. As noted in the Wife's Motion, the parties have been married for 18 years. They were married on June 20, 1992 in Dallas, Texas. They met at Southern Methodist University where both were attending college. The Husband was 25 and the Wife was 24. The Husband did not graduate with a degree. The Wife did. Thereafter, the parties moved to Pennsylvania. The Wife worked for a couple of years and then completed a joint program with University of Pittsburgh and Carnegie Mellon University and obtained a combined MBA/JD degree. She graduated at the top of her class. Thereafter, she was employed by the prestigious law firm of Morgan, Lewis & Bockius. After 11 years of marriage, the parties had their first daughter, at which time the Wife quit working. She has remained unemployed outside the home since the birth of their first daughter in January of 2003.

3. For his entire adult life, the Husband has been involved in various aspects of the oil and gas business. His father was in that business and both of his brothers are in the business as well. The first company the Husband formed was Texas Keystone, Inc. It was formed prior to the parties' marriage. After the parties' marriage, a second company, Falcon Drilling Corporation, LLC was formed and a third entity, Falcon Partners was formed. The principle place of business of all of said entities is

Kozel v. Kozel
Case No: 2010DR 8976 NC

Pennsylvania, which is where the parties resided from shortly after their marriage until approximately 2004.

Texas Keystone is primarily involved in the sale of oil and gas from wells located in what is known as the Appalachian basin, which covers parts of New York, Pennsylvania and West Virginia. Falcon Drilling is primarily involved in the actual drilling and operating of wells. Its business is conducted solely in the Appalachian basin. Falcon Partners was formed to hold title to land, all of which is located in the Appalachian basin.

The Husband was actively involved in Texas Keystone, Falcon Drilling and Falcon Partners until approximately 2003. Currently the Husband's brother, Robert Kozel, is the president and CEO of Texas Keystone and the Husband's father, Frank Kozel is the president of Falcon Drilling and is the managing partner of Falcon Partners. Those are the individuals who are responsible for and oversee the day to day management of said entities. The Husband retains his interests in said entities, all of which have been disclosed to the Wife, not only in this proceeding, but throughout the parties' marriage.

4. In approximately 1999, the Husband began to explore oil and gas opportunities in other countries, specifically North Africa and the Middle East. He formed a company, Gulf Keystone, Ltd. (hereinafter GKP), a privately held company. In approximately 2004, it became necessary for him to spend considerable time in London in order to further research the prospects of drilling for oil outside the United

3

Kozel v. Kozel
Case No: 2010DR 8976 NC

States, obtain financing and otherwise grow the company. At that time, the parties discussed moving to London. They also acquired, at approximately the same time, their home in Sarasota. The plan at that time was that the parties would spend significant time in London and travel back and forth to Sarasota. (Ultimately, the Wife, however, choose not to spend significant time with the Husband in London, but rather only travelled there occasionally with or without the parties' children for short visits despite the Husband's request that she and the children live with him in London.)

5. On September 8, 2004, GKP made an initial public offering and became a publically owned company traded on the London stock exchange. It disseminates public information (which is available on its website) regarding its business, its finances and the holdings of its officers and directors. All of this information has been available to the Wife since September of 2004. Nothing has been hidden from the Wife.

6. Since 2004, the Husband has been required to spend the majority of his time outside of the U.S. in England, Europe, Africa and the Middle East. The Wife has been well aware of the Husband's travels, and the parties have maintained regular contact with each other. The parties have, for all practical purposes, lived separate and apart since 2004, except for those occasions when either the Wife would come to London or other places in Europe to spend time with the Husband, or the Husband would travel to Sarasota.

7. During the entire marriage the Husband has fully supported the Wife and the parties' children. The Wife has never questioned any of the Husband's business

4

Kozel v. Kozel
Case No: 2010DR 8976 NC

dealings or financial transactions. Not unexpectedly, the Wife's refusal to join the Husband and live in Europe, took its toll on the marriage. Efforts were made to see if the parties could reconcile their differences and come to an agreement as to their living arrangements, but their efforts were unsuccessful. The Wife then filed her Petition on or about August 27, 2010.

## PARTIES' ASSETS

8.  Each party has filed Financial Affidavits. A copy of the Husband's Financial Affidavit is attached hereto as Exhibit A. A copy of the Wife's Financial Affidavit is attached hereto as Exhibit B. The Husband disclosed his assets with his estimated values of the assets. The Wife failed to include values for the majority of her assets, many of which are in her control and most of which are located in the United States. In order to fully understand the parties' financial picture and the why the Wife is not entitled to the relief which she seeks, a discussion of the parties' assets is necessary.

9.  As reflected on both parties' Financial Affidavits, the parties jointly own four parcels of real estate located in the United States, two are in Pennsylvania, two are in Sarasota, Florida. The Florida and Pennsylvania properties are titled in joint names and, therefore, neither party could convey or encumber them without the other party's consent.

The Wife resides with the parties' children in their home in Sarasota. The parties paid $2,000,000 for their home. In August 2008, the parties purchased a vacant lot in

5

Kozel v. Kozel
Case No: 2010DR 8976 NC

Sarasota for which they paid $2.7 million. The lot is not encumbered by a mortgage. In the same month the Husband purchased a home in Lithuania. It is worth approximately $2,000,000. The Husband has no intention of selling it.

The net value of the real estate located in the United States is approximately $3,000,000, none of which can be transferred or encumbered without the Wife's consent.

In addition, at the marital residence, the Wife has in her possession, two 2009 Ferraris, a 2010 Range Rover, 2009 Cadillac Escalade and a 2000 Mercedes. These vehicles are literally worth hundreds of thousands of dollars. (Both Ferraris are encumbered by loans, which are paid directly by the Husband from his PNC bank account.) In addition, the parties have a $600,000 boat and three jet skis, all of which are in the Wife's control. None of these assets as a practical matter can be transferred or disposed of without the Wife's consent since they are either titled in her name or in her possession.

In addition, the parties maintain a wine collection located in Sarasota, Florida the value of which is estimated by the Husband to be at least $700,000. The Wife has at least $800,000 of jewelry in her control (according to the schedule of insurance provided by the Wife). The Wife has sole possession of all her jewelry so it cannot be disposed of without her consent.

The Husband has disclosed on his Financial Affidavit each and every bank account in which he has an interest. The total of the account balances is approximately

6

Kozel v. Kozel
Case No: 2010DR 8976 NC

$3,000,000. (He has also produced the statements for those accounts from 2007 to the present.)  The Wife wishes to create an aura of suspicion in her Motion, simply because the accounts are located in Europe. That is where the Husband spends the majority of his time. He has accounts in London, Lithuania, and Switzerland. Those are the countries where he spends the majority of his time and therefore his bank accounts are there. This is not a case in which the Husband had some "Swiss bank account" that he failed to disclose. The fact that the funds are located in Europe, rather than in the U.S. when the Husband resides a majority of his time is not grounds for an asset injunction.

The Wife's Financial Affidavit reflects bank accounts totaling $250,000 and a brokerage account with a balance of approximately $1,000,000. (The Husband has no brokerage account.)

Of particular interest and perhaps most significant, is that while the Wife is attempting to portray the Husband as hiding things from her, the Wife fails to mention in her Motion or reflect on her Financial Affidavit the most significant asset she owns. The Wife's Financial Affidavit was signed by her on November 8, 2010. <u>Nowhere on her Financial Affidavit does she reflect the ownership of 2,050,000 share of GKP stock!</u> The Husband voluntarily transferred to her on September 28, 2010 2,050,000 shares of GKP. (See public disclosure statement dated September 29, 2010 attached hereto as Exhibit C). The Husband transferred those shares to the Wife after being requested by Wife's counsel to reimburse the Wife for $1,200,000 she paid in taxes. (See Exhibit D

7

Kozel v. Kozel
Case No: 2010DR 8976 NC

attached hereto). On the date of transfer the stock was worth approximately $2.25 per share. Consequently instead of the requested $1,200,000 the Husband transferred $4,530,500 to the Wife! The voluntary transfer of $4.5 million to the Wife during the pendency of this divorce establishes that the Wife has no reasonable concern that she will be left without support or that the Husband intends to somehow preclude her from receiving that which the Court determines is due her. The failure of the Wife to disclose in her Motion or on her Financial Affidavit this transaction speaks volumes about her true intentions. Furthermore, not only did the Husband transfer the stock to her, but the Husband also obtained the appropriate approval from the AIM Team of the London Stock Exchange, so that the Wife could freely trade her stock. In fact, the Wife advised the Husband that she recently sold 50,000 shares. Currently the stock is trading for $2.95 a share, which means the Wife has remaining marketable securities worth approximately $5,900,00 while she is claiming to this Court that her Husband is trying to take advantage of her. (Also of note, is the fact that while the Wife complains that the Husband has not produced documents, the Wife failed to produce any documents reflecting her ownership of said stock.)

As reflected on the parties' Financial Affidavits, they own various interests in oil wells. The ownership entitles the parties to receive income from the sale of oil and gas produced from the wells in which they have an interest. The income from those oil wells is paid either monthly or quarterly. All of the jointly titled oil well interests are paid by direct deposit from Texas Keystone into bank accounts maintained by the Wife. (In

8

Kozel v. Kozel
Case No: 2010DR 8976 NC

2009 those distributions were approximately $700,000. In 2010 the Wife has received over $500,000. The December distributions have not yet been calculated but those distributions will increase substantially the total amount received by the Wife.) The parties have maintained this practice of distributing the oil well interest directly to the Wife's account for as long as the Husband has been residing in Europe, further indicating that the Wife has no well founded belief that the Husband will not continue to provide her support.

### GKP STOCK

10.  The Husband is the executive chairman and chief executive officer of GKP. As is reflected on the Husband's Financial Affidavit, he owns 3.7 million shares of GKP stock, which shares are in his possession. The Wife owns (after the recent sale) 2,000,000 shares, which are in her possession. As a practical matter, the Husband cannot trade his shares because of his position with the company and the applicable rules of the London stock exchange which severely restrict when he is permitted to sell shares, given that he has information not otherwise available to the public. The Wife, however, can freely trade her shares. Her shares are worth substantially more than the Husband's, simply by virtue of the fact that they are unrestricted. The Husband has no intention of selling or transferring ownership of his shares during the pendency of this action. Since the Husband initially started this company he has never sold a single share nor is there any evidence that he intends to

9

Kozel v. Kozel
Case No: 2010DR 8976 NC

sell any shares. (If the chief executive officer of a publically traded company begins to sell his shares, that may well result in a decline in the value of the stock, which would not be to either his or his Wife's benefit.)

In addition, the Husband owns approximately 13,000,000 shares of options that have been awarded to him. Those options have not yet vested and the Husband claims that a portion or all of them are non-marital. The life of the options is 10 years. If the Husband exercises the options, it would give him the right to buy more shares. In other words, one asset would be replaced with another.

The Husband also was awarded approximately 5,000,000 shares of restricted shares, which have not yet vested. The Husband claims that these shares are in whole or in part non-marital. For the reasons stated above, the Husband has no intention of selling or otherwise transferring the same.

On April 15, 2009, the Husband transferred 20 million shares of stock to Gokana Trust. There was no secret about the transfer. The Husband discussed with the Wife transferring the stock to a trust and what arrangements should be made for the distribution of the stock and any income it generated in the event of his death. In accordance with the parties' discussions, the Husband instructed the Trustee as to his desires. A copy of the letter providing those instructions is attached hereto as Exhibit E. At the time the stock was transferred, it had a value of approximately 17 cents per share (for a total of $3,400,000). The transfer of the stock into a Trust was publically disclosed by Gulf Keystone when the transfer was made and is reflected on each

10

Kozel v. Kozel
Case No: 2010DR 8976 NC

financial statement produced by Gulf Keystone since the transfer. The Wife has known about the transfer since it occurred and did not oppose it until this divorce. (The Wife utilizes a feature on the GKP website that automatically notifies her of any public announcements such as the transfer of stock.) The parties have a legal dispute about this transfer, which will be resolved in this case. The stock is held by the Trustee, not the Husband. The Husband intends to comply with whatever ruling the Court makes as to that issue and has no reason to believe that the Trustee will not do likewise. Simply because the Wife disputes a transaction that occurred with her knowledge and which was publically disclosed, but which does not suit her at the present time is not a basis to impose an asset injunction.

## TRANSFERS AND EXPENDITURES OF FUNDS

11. It is admitted that the Wife and the parties' children are solely dependent upon the Husband. The Husband has provided, and intends to continue to provide, for both his Wife and the parties' children. For example, over the last several years, the Husband has literally transferred or caused to be transferred to the Wife into accounts controlled by her, millions of dollars. In 2010 alone, the Husband has transferred over $2.5 million into the parties' joint Morgan Stanley account which is controlled by the Wife (that is in addition to the 2 million shares of GKP stock he transferred to her).

12. The Husband fully recognizes that to the extent he has expended marital funds on any third party, the Wife is entitled to one-half of the same. The Husband fully

11

Kozel v. Kozel
Case No: 2010DR 8976 NC

intends to pay the Wife one-half of any amount that is determined to constitute a "dissipation" for which the Wife is entitled to reimbursement.

### WIFE'S ALLEGATIONS

13. The allegations of the Wife's Petition are, by and large, based upon the supposition and speculation. (Her Affidavit reflects that her Motion is not based upon personal knowledge but rather is "to the best of her knowledge and belief".)

14. As noted above, the Husband transferred 20 million shares of Gulf Keystone Petroleum to a Trust. The value of the stock when it was transferred was approximately $17 per share or $3,400,000 not $60 million. The value of the stock fluctuates with the market. The fact that the stock increased in value confirms that putting the stock in a Trust to defer taxes made a great deal of sense. The value of the stock on the date the Wife filed this action was approximately $1.74 share or $34,000,000. (Even if the stock was held individually in the Husband's name, the Husband's position is that the stock value should be determined as of the date of filing since any increase in value was due to his work efforts. Therefore, the Wife's claim would be to one-half of $34,000,000, not one-half of $60 million.)

15. The Husband acknowledges that $20 million was transferred to his account in Switzerland. He has provided records from that account, which reflect exactly how the money was utilized. It is untrue that $17 million is unaccounted for. All of it is accounted for as reflected on his bank statements. Among other things, funds

12