# EXHIBIT "D"

Nov. 16. 2011  4:01PM                                    No. 0091   P. 1/32



# FISHER & BENDECK, P.A.

JEFFREY D. FISHER*
ODETTE MARIE BENDECK*
KRISTINA M. CANDIDO
HARLEY TOUFANIAN
ZACHARY POTTER

501 SOUTH FLAGLER DRIVE, SUITE 450
WEST PALM BEACH, FLORIDA 33401
TELEPHONE: (561) 832-1005
FACSIMILE: (561) 820-9375
http://www.fisherbendeck.com

FLORIDA BAR BOARD CERTIFIED
*MARITAL AND FAMILY LAW ATTORNEY



| | | | |
|---|---|---|---|
| **To:** | Mark Luttier, Esq. | **From:** | ☑ Jeffrey D. Fisher     ☐ Odette Marie Bendeck |
| | | | ☐ J. Harley Toufanian   ☐ Kristina M. Candido |
| | | | ☐ Zachary R. Potter |

| | | | |
|---|---|---|---|
| **Fax:** | 844-6929 | **Date:** | November 16, 2011 |
| **Phone:** | 842-2820 | **Pages:** | (  ) including cover sheet |
| **Re:** | Kozel | **CC:** | Jaime Wallace, Esq. 941 366-6384 |
| | | | Jason Oletsky, Esq. 954 463-2224 |
| | | | Roy Fitzgerald, Esq. 655-5537 |

☐ Urgent     ☐ For Review     ☐ Please Comment     ☐ Please Reply     ☐ Please Recycle

•Comments:

The information contained in this facsimile message is attorney privileged and confidential information, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (561) 832-1005. Thank you.

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

IN RE:  The Marriage of                    FAMILY DIVISION

ASHLEY D. KOZEL,                           CASE NO. 2010DR8976NC

        Petitioner/Wife,

and

TODD KOZEL,

        Respondent/Husband,

and

TEXAS KEYSTONE, INC., FALCON
DRILLING COMPANY LLC, AND
FALCON PARTNERS,

        Defendants.

_____/

## WIFE'S MOTION FOR SANCTIONS AND/OR TO COMPEL TDF90 AND/OR SIMILAR FORMS IDENTIFIED IN HUSBAND'S DECMEBER 2010 DEPOSITION

The petitioner/wife hereby moves the Court, pursuant to Rule 1.380(a)(2)-(4), Florida

Rules of Civil Procedure, and Rule 12.380(a), Florida Family Law Rules, to enter an order

compelling production of a TDF90 or other similar forms identified in the husband's prior

deposition and to sanction him for failure to comply with the court's order compelling

production of these documents and in support thereof, states as follows:

      1.     One of the issues in this case is how to "equitably distribute" certain tax liabilities

caused by the husband's transfer of nearly $30 million to overseas bank accounts.

      2.     The wife takes the position that the husband moved more than $30 million into

Swiss and/or Lithuanian bank accounts without the wife's knowledge or consent and then

COPY TO CLIENT
DATE: 1/17/11

apparently he failed to file forms known as "TDF90's" with the United States government thereby causing in excess of $6 million in taxes and/or penalties.  Moreover, the foreign bank accounts were not in the wife's name, she never received statements on them, and she did not know the balances in them.  The wife's pleadings assert that these taxes or penalties are "waste, dissipation or depletion" for which the husband should be solely liable and/or that these liabilities should be distributed solely to the husband as part of an "unequal" distribution because he is the sole cause of them.

3.      The husband claims that he "did not know" he had to file the TDF90's and that if he failed to file them while being married to the wife, she should share equally in the $6 million loss. *See* November 9, 2011 deposition at pages 379-382.

4.      In order to get discovery relating to these claims, the wife has asked questions of the husband at deposition, has requested documents of him, and obtained an order compelling records from him.  The husband's non-compliance with a court order compelling records is prejudicing the wife's efforts both to advance her arguments in this case and to protect herself from actual or potential tax liabilities.

5.      The husband's deposition was taken December 21, 2010.  During the deposition, the husband testified that years ago while in Switzerland he **filled out a disclosure of foreign bank accounts form** similar to what is commonly referred to as a "TDF90." *See* Exhibit "1." This means, as the wife asserts, he knew **years ago** of the obligation to file these forms but willfully failed to do so.

6.      In January or February of 2011, months after the divorce was filed, the husband asked the United States government to enter the "voluntary disclosure program" regarding undisclosed overseas bank accounts in which program he is seeking immunity from criminal

2

prosecution for failure to file TDF90's and other forms (3520's).  While the application to the voluntary disclosure program does not extinguish the taxes and/or penalties which are due, the husband has asked for mitigation of the amount due.  Excerpts of the husband's latest deposition on this topic are attached hereto as Exhibit "2."  *See* pages 405-407.

       7.     However, as part of the mitigation request, the husband told the Internal Revenue Service in his voluntary disclosure application that he was **unaware** of his obligation to file TDF90's, yet his sworn deposition testimony in December 2010 shows that he was aware of the obligation.  *See* Exhibit "1" and Exhibit "3" at p. 5.

       8.     Not only was he aware of the obligation to file the TDF90's as admitted in his December 2010 deposition, but he also signed forms for the bank in Switzerland, where he represented to the bank that he knew of his United States Internal Revenue Service tax reporting obligations.  *See* Exhibit "4."

       9.     The wife is extremely concerned that the husband's inaccurate and/or misleading "voluntary disclosure" application to the Internal Revenue Service will result in the rejection of that application and additional penalties, interest or other liabilities that the husband will then claim are "marital" even though the wife disputes that any of these liabilities are marital and even though the inaccuracies in the application are solely due to the husband's conduct.

      10.    Equally important, the wife wants to get a copy of the previously filed TDF90 as described by the husband in his December 2010 deposition.  If a prior TDF90 was filed, it will prove conclusively that the husband knew of his obligation to file TDF90's (or similar forms) and that he alone willfully failed to file the forms thereby causing the $6 million liability.  In addition, the previously filed TDF90 may mitigate the penalties and interest due to the IRS.

11.     The husband was previously ordered to produce all such documents but has not produced them and has not even applied to the government to see if they have a TDF90 on file. *See* Exhibits "5" and "6", paragraph 1. The wife needs this forms for the reasons set forth above.

WHEREFORE, the wife moves the court to enter an order compelling the husband to produce the previously filed TDF90 and/or to file a form with the government requesting that TDF90 (or similar document as described by the husband in his December 2010 deposition) be produced. He should likewise request the form from the Internal Revenue Service and other government agencies, as well as Credit Agricole. The wife also seeks sanctions from the husband for the failure to comply with the courts order compelling him to produce tax reporting documents and for such other relief which is just and appropriate.

WE HEREBY CERTIFY that a copy of the foregoing was furnished by fax and regular mail to: Mark Luttier, Esq., Burman, Critton, Luttier & Coleman, 303 Banyan Boulevard, Suite 400, West Palm Beach, Florida 33401, Jason Oletsky, Esq., Akerman Senterfitt, 350 E. Las Olas Boulevard, Suite 1600, Fort Lauderdale, Florida 33301-4247, Jaime L. Wallace, Esq., Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., 2033 Main Street, Suite 600, Sarasota, Florida 34237 and Roy Fitzgerald, Esq., Page Mrachek, Fitzgerald & Rose, 505 South Flagler Drive, Suite 600, West Palm Beach, Florida 33401 on this *16* day of November, 2011.

Respectfully submitted,

GROSSMAN, ROTH & PARTRIDGE
William Partridge, Fla. Bar No. 183140
1800 2nd Street, Ste. 777
Sarasota, Florida 34236-5994
Telephone: (941) 365-8666
Fax: (941) 316-0963
*Co-Counsel for Petitioner/Wife*

and

4

**FISHER & BENDECK, P.A.**
501 So. Flagler Drive, Suite 450
West Palm Beach, Florida 33401
Telephone: (561) 832-1005
Fax: (561) 820-9375
*Attorneys for Petitioner/Wife*

By: _____
     Jeffrey D. Fisher
     Florida Bar No. 326941

S:\Kozel\Pleadings\m compel TDF90 and other fonts from h 12-2010 depo.docx

5

Page 1

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT

IN AND FOR SARASOTA COUNTY, FLORIDA

FAMILY DIVISION

CASE NO. 2010DR8976NC


IN RE:  THE MARRIAGE OF

ASHLEY D. KOZEL,

        Petitioner/Wife,

and

TODD KOZEL,

        Respondent/Husband,

and

TEXAS KEYSTONE, INC., FALCON DRILLING
CORPORATION, LLC., FALCON PARTNERS,
AND FALCON PARTNERS TRUST,

        Defendant(s).

_____ /



            VIDEOTAPED DEPOSITION OF TODD KOZEL
        TAKEN AT THE INSTANCE OF THE PETITIONER/WIFE
                VOLUME I OF II (PAGES 1-199)




                        Sarasota, Florida
                        December 21, 2010
                        9:35 a.m. - 5:10 p.m.

EXHIBIT
1

Page 130

1  the funds?
2      A.  None.
3      Q.  How much more money does Markus Hugelshofer
4  owe you?
5      A.  Whatever the balance of the nine hundred, the
6  million and the six hundred.  Actually, the answer is
7  nothing.  It's all been repaid.
8      Q.  So the 900,000 to a million pounds that you
9  lent to Mr. Hugelshofer has been fully repaid?
10     A.  That's correct.
11     Q.  Are there more than these transfers into your
12  account?
13     A.  No, there's one additional transfer.
14     Q.  When did that occur?
15     A.  Sometime in the last month.  I don't know the
16  exact date.
17     Q.  How much?
18     A.  The balance between the six hundred and
19  whatever was due.
20         MR. FISHER:  Okay.  We can break for lunch
21  now.
22         THE VIDEOGRAPHER:  Off the record at 12:10.
23     (Off-the-record recess was had.)
24         THE VIDEOGRAPHER:  On record at 1:18.
25  BY MR. FISHER:

Page 131

1      Q.  Mr. Kozel, you understand you're still under
2  oath?
3      A.  Yes, I do.
4      Q.  Did you call your Swiss lawyer, Markus, on
5  lunch break?
6      A.  No, I did not.  It's after business hours.
7      Q.  Did you -- did you consult your attorney,
8  Markus, about protecting assets for Ashley -- from
9  Ashley in a divorce case?
10     A.  No, I did not.
11     Q.  Did you consult your attorney, Markus,
12  regarding protecting assets from any creditors?
13     A.  No, I did not.
14     Q.  What have you consulted with your attorney,
15  Markus -- your Swiss attorney, Markus, about?
16         MR. LUTTIER:  Objection; attorney/client
17  privilege.
18         Don't answer.
19  BY MR. FISHER:
20     Q.  Did you consult with your attorney -- strike
21  that.
22         Did you consult with your Swiss attorney,
23  Markus -- how do you say it, his last name?
24     A.  Hugelshofer.
25     Q.  -- Hugelshofer about moving assets to a trust

Page 132

1  in the Isle of Jersey?
2      A.  I've already answered the question.  I talked
3  to Mr. Hugelshofer about setting up a trust.
4      Q.  In the Isle of Jersey, correct?
5      A.  I'd have to see the document.  I don't know
6  what it said.
7      Q.  You don't know where your twenty -- you don't
8  know where the trust that holds the 20 million shares
9  of Gulf Keystone is located?
10     A.  Not off the top of my head, no.
11     Q.  Is it in the United States?
12     A.  I don't know.
13     Q.  Is it in the State of Florida?
14     A.  I have nothing to do with the trust.  I can't
15  opine to the location of the trust at the current
16  moment.
17     Q.  So you put 20 million shares of Gulf Keystone
18  stock acquired during the marriage in a trust and you
19  don't know the location of the trust?
20     A.  That's correct.
21     Q.  You don't know the location of the trustee?
22     A.  I know the name of the trustee.
23     Q.  I'm asking you the location of the trustee.
24     A.  Last I was aware, it was in Ireland.
25         MR. FISHER:  A couple of things I wanted to

Page 133

1  ask you here on a different topic.
2     (Wife Exhibit No. 7 was marked for
3  identification purposes only and is attached
4  hereto.)
5         MR. FISHER:  Exhibit 7.
6     (Document(s) handed to the witness and
7  Counsel Luttier.)
8  BY MR. FISHER:
9      Q.  Exhibit 7 is a TD F 90.  It's a form to
10  report foreign bank and financial accounts.
11         Have you ever completed a TD F 90?
12     A.  Yes, I have.
13     Q.  When?
14     A.  I don't remember the date.
15     Q.  Did you file one in the year 2010?  Strike
16  that.
17         Have you ever filed a TD F 90 with the United
18  States Government?
19     A.  I'm not aware if this is the same form, but
20  the title of the form looks the same, but yes, I have.
21     Q.  Did you file Form TD F 90 with the United
22  States Government in the year 2010?
23     A.  I don't know if it's TD F 90, but I filed a
24  foreign bank account financial report, yes.
25     Q.  Did you file a foreign bank account financial

Page 134

1  report in the year 2010 with the United States
2  Government?
3      A.  No.
4      Q.  Did you file a foreign bank account form with
5  the United States Government in 2009?
6      A.  No.
7      Q.  Did you file a foreign bank account form with
8  the United States Government in 2008?
9      A.  Maybe.
10      Q.  Who prepared the foreign bank account form
11  that you -- strike that.
12          You say that you filled out a form that is
13  similar to Exhibit 7?
14      A.  It was -- I know it was a form for the U.S.
15  Government reporting a foreign bank account. I cannot
16  opine if it's the same form.
17      Q.  Fair enough. All right. When do you
18  remember filling it out?
19      A.  Oh, it's been -- been a few years. I
20  think -- I don't know. I don't know the exact year,
21  quite frankly.
22      Q.  Where did you fill it out?
23      A.  Zurich, Switzerland.
24      Q.  Who gave you the form?
25      A.  It was -- it's -- one of the U.S. tax

Page 135

1  advisors in Zurich was called over to Markus's office
2  to have me fill it out relating to my Credit Agricole
3  account.
4      Q.  All right. And you filled it out and signed
5  it?
6      A.  Yes, sir.
7      Q.  And who did you send it to for filing with
8  the United States Government, or who did you give it to
9  for filing?
10      A.  I -- I left -- I left -- I left it with the
11  advisor for filing.
12      Q.  So you don't know whether it was ever
13  filed -- you don't know whether any reported foreign
14  bank accounts was ever filed with the United States
15  Government?
16      A.  I have no reason to believe that it has not
17  been.
18      Q.  You remember filling out such a form on one
19  occasion?
20      A.  Yes, correct.
21      Q.  And it was regarding a Credit Agricole
22  account?
23      A.  That's correct.
24      Q.  You don't remember ever completing a report
25  of foreign bank accounts for your Swedbank account

Page 136

1  which you maintain in Lithuania, correct?
2      A.  Swedbank account? I don't believe I have.
3      Q.  And you don't recall ever completing a report
4  of foreign bank accounts for Coutts account, correct?
5      A.  I believe the same form may have encompassed
6  that account as well. Or at the same time may have
7  encompassed that account.
8          (Wife Exhibit No. 8 was marked for
9          identification purposes only and is attached
10          hereto.)
11      MR. FISHER:  Exhibit 8.
12      (Document(s) handed to the witness and
13      Counsel Lutfier.)
14      MR. FISHER:  Yeah, I know.
15      MR. STOHLMAN:  Wait, that part (indicating)?
16      MR. FISHER:  Okay.
17  BY MR. FISHER:
18      Q.  Let's go back to Exhibit 7 for a minute, the
19  report of foreign bank accounts. Exhibit 7, sir, the
20  prior.
21      A.  I'm aware.
22      Q.  Okay. Now, you're the executive chairman of
23  a public company, correct?
24      A.  That's correct.
25      Q.  Your stock trades on the AIM Exchange over

Page 137

1  there in England, correct?
2      A.  Correct.
3      Q.  You're aware of the fact that you're supposed
4  to comply with the civil and criminal laws of the
5  United States in your capacity as the chairman of a
6  public company, correct?
7      A.  I -- you're going to have to explain the
8  question.
9      Q.  Well, do you think that you have a -- strike
10  that.
11          You do have a fiduciary duty to your
12  shareholders, don't you?
13      A.  Of course.
14      Q.  Do you think that being a fiduciary -- strike
15  that.
16          What -- what's your capitalization of your
17  stock? What's your market cap?
18      A.  Two and-a-half billion.
19      Q.  All right. So you have shareholders owning
20  $2 1/2 billion worth of stock in your company, correct?
21      A.  Mm-hmm.
22      Q.  Yes?
23      A.  Yes.
24      Q.  And you act as a fiduciary to them, correct?
25      A.  Okay.

Page 333

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
CASE NO. 2010DR8976NC

IN RE:  The Marriage of

ASHLEY D. KOZEL,

           Petitioner/Wife,

and

TODD KOZEL,

           Respondent/Husband,

and

TEXAS KEYSTONE, INC., FALCON
DRILLING CORPORATION, LLC, FALCON
PARTNERS, AND FALCON PARTNERS
TRUST,

           Defendants.

_____/


VOLUME III
CONTINUED VIDEOTAPED DEPOSITION OF TODD F. KOZEL
TAKEN AT THE INSTANCE OF THE PETITIONER/WIFE
(Pages 333 - 469)



West Palm Beach, Florida

Wednesday, November 9, 2011

9:55 a.m. - 12:40 p.m.

1:41 p.m. - 4:58 p.m.

Reported by:  Lisa D. Danforth

EXHIBIT
2

Page 402

```
1       Q.  Very good.
2            Okay.  So now getting back to these TD F 90s
3   that were filed in 2011, were they filed by you?
4            MR. LUTTIER:  Object to the form.
5            THE WITNESS:  They were filed by counsel.
6   BY MR. FISHER:
7       Q.  And the counsel you're referring to is
8   Williams & Connolly?
9       A.  That's correct.
10      Q.  Out of Washington?
11      A.  That's correct.
12      Q.  Mr. Bruton?
13      A.  Jim Bruton and Jim Fuller.
14      Q.  Okay.  And are they your personal counsel?
15      A.  Yes.
16      Q.  Are you getting billed by them?
17      A.  Yes.
18      Q.  Have you paid any bills to them?
19      A.  I have an outstanding balance to them, yes.
20      Q.  Do you know about how much it is?
21      A.  300 grand, 350 grand.
22      Q.  Really?
23      A.  Yeah.
24      Q.  Wow.
25      A.  That's a general firm bill.  I don't know
```

Page 403

```
1   what's attributable to this side and general advice
2   side.
3       Q.  I don't know what you mean.
4       A.  I also get other advice from Williams &
5   Connolly personally.
6       Q.  You do?
7       A.  Yes.
8       Q.  Personally, okay.
9            How long have you been using Williams &
10  Connolly personally?
11      A.  I don't know.  At some point they switched
12  from working for Gulf Keystone to just working for me.
13  I don't know what the date was.
14      Q.  Well, when is the first time you personally
15  engaged Williams & Connolly?
16      A.  I don't know.
17      Q.  Was it this year?
18      A.  It was either end of last year or this year.
19      Q.  End of 2010, beginning 2011?
20      A.  Yeah.
21      Q.  Now, you're aware of the fact that Williams &
22  Connolly came to a hearing before Judge Donnellan in
23  your divorce case?
24           MR. LUTTIER:  Object to the form.
25           THE WITNESS:  No.  I thought they weren't
```

Page 404

```
1   allowed to practice in Florida by your
2   objection.
3   BY MR. FISHER:
4       Q.  Well, they came to the hearing?
5       A.  They came to the hearing.
6       Q.  That young lady, whatever her name was?
7       A.  They came to the hearing, yes.
8       Q.  Right.
9       A.  I believe so.  I wasn't at the hearing, so I
10  don't know.
11      Q.  Okay.  So an attorney from Williams & Connolly
12  came to a hearing in your divorce case?
13      A.  Okay.
14      Q.  And they -- she asked to speak on behalf of
15  Gulf Keystone Petroleum.
16           You're aware of that?
17      A.  I wasn't at the hearing.  I don't know.
18      Q.  Have you read the transcript?
19      A.  No, sir.
20      Q.  Okay.  So are you saying that since the
21  hearing, whenever it was, I think it was in May, that
22  the Williams & Connolly lawyer appeared before the
23  judge in the divorce case and asked to speak on behalf
24  of Gulf Keystone that Williams & Connolly has stopped
25  representing Gulf Keystone?
```

Page 405

```
1       A.  Yes.
2       Q.  So prior to that time, Williams & Connolly
3   represented both you personally and Gulf Keystone?
4       A.  As I said, it was very gray.  I don't know
5   when they dropped one and picked up the other.
6       Q.  Well, we'll figure that out.
7       A.  Yeah, I can find out.  I just don't know.
8       Q.  Okay.  But your personal bill with Williams &
9   Connolly you say is about 300,000?
10      A.  Correct.
11      Q.  And it's for personal advice?
12      A.  Correct.
13      Q.  Okay.  Now, these TD F 90s we're talking
14  about, they were prepared and filed by you in
15  connection with an application to enter the Voluntary
16  Disclosure Program, correct?
17           MR. LUTTIER:  Object to the form.
18           THE WITNESS:  They were prepared not by me.
19  As I said, they were not filed by me.  But yes,
20  they were for the Voluntary Disclosure Program.
21  BY MR. FISHER:
22      Q.  Okay.  And you're aware that the Voluntary
23  Disclosure Program is an amnesty program?
24      A.  I'm advised by counsel.  If you want to cover
25  issues involving TD F 90s and the filing of this, I
```

19 (Pages 402 to 405)

**Page 406**

1  advise, as you have tax counsel, we sit down with
2  Williams & Connolly and we cover it as well.
3      Q. Are you aware of the fact that the Voluntary
4  Disclosure Program is a request from amnesty from
5  criminal prosecution?
6          MR. LUTTIER: Object to the form.
7          THE WITNESS: As I said, this has been a
8      while and I've got so much going on, if you want
9      to talk about details of the program, I'd be
10     happy to do it with Williams & Connolly.
11 BY MR. FISHER:
12     Q. But I'm asking you. Are you aware --
13     A. I'm not sure what all the details are.
14     Q. Are you asking for amnesty from criminal
15 prosecution?
16     A. I believe so. I don't know what it all
17 entails.
18     Q. And what crimes are you asking for amnesty
19 from?
20     A. Jeff, I'm going to repeat myself. My answer
21 to all these issues are going to be, if you want to
22 sit with Williams & Connolly, who prepared this
23 information and who are dealing with it in front of
24 the Internal Revenue Service, I will be happy to do
25 that and answer any questions. I am not prepared with

**Page 407**

1  the details enough to have a detailed conversation
2  about such a serious topic at this time.
3      Q. So you don't know what crimes you're asking
4  for amnesty from?
5          MR. LUTTIER: Object to the form.
6          THE WITNESS: I'm no lawyer. I don't know
7      what the statutes and the crimes are.
8          (Wife's Exhibit Number 38 marked.)
9  BY MR. FISHER:
10     Q. Here's Exhibit 38. This is a letter to James
11 Bruton dated February 23, 2011 in re: voluntary
12 disclosure communication received January 26, 2011 for
13 Todd Francis Kozel.
14     Do you see that?
15     A. Yes.
16     Q. Okay. And it says, "Dear Mr. Bruton, we
17 received notification of your client's desire to
18 participate in the I.R.S. Voluntary Disclosure
19 Program."
20     Do you see that? It's the first sentence.
21     A. I'm sorry. I was reading down below.
22     Q. That's okay. It's right here (indicating).
23     A. That's okay.
24     Q. Okay. And then it says, "In order for the
25 I.R.S. to accept a voluntary disclosure, the

**Page 408**

1  communication must be truthful, complete, timely, and
2  the taxpayer must show a willingness to cooperate with
3  the I.R.S."
4      Is that your understanding of what you must do
5  to have your voluntary disclosure accepted?
6          MR. LUTTIER: Object to the form.
7          THE WITNESS: I was advised by Mr. Bruton
8      on what needs to be done.
9  BY MR. FISHER:
10     Q. Well, do you understand you need to be
11 truthful?
12     A. That's what it says.
13     Q. Do you understand you need to give complete
14 information?
15     A. That's what it says.
16     Q. Do you understand you need to do it timely?
17     A. That's what it says.
18     Q. And you understand that you must show a
19 willingness to cooperate with the I.R.S.?
20     A. Yes, we have.
21     Q. Okay. And have you prepared documents and
22 submitted them to the I.R.S. to ask for admission to
23 the Voluntary Disclosure Program?
24          MR. LUTTIER: Object to the form.
25          THE WITNESS: Those documents have all been

**Page 409**

1  produced to you in this case.
2  BY MR. FISHER:
3      Q. Well, that's what I'm asking you. Have you
4  prepared documents and submitted them to the I.R.S.
5  for admission to the Voluntary Disclosure Program?
6      A. Me, no.
7          MR. LUTTIER: Object to the form.
8          THE WITNESS: I didn't prepare anything.
9  BY MR. FISHER:
10     Q. Did you have people prepare them on your
11 behalf?
12     A. Yes, sir.
13     Q. Did you sign them?
14     A. Yes, sir.
15     Q. Do you understand that it's important when you
16 sign documents and give them to the I.R.S. as part of
17 the Voluntary Disclosure Program that they be
18 truthful?
19     A. I followed the complete advice of what I
20 believe to be competent counsel.
21     Q. I'm asking you a different question.
22     I'm asking you, do you understand that you're
23 asking for amnesty from criminal prosecution and you
24 need to be truthful to get it?
25     A. Mr. Fisher, again --

March 23, 2011

<u>VIA FIRST CLASS MAIL</u>
Offshore Voluntary Disclosure Coordinator
600 Arch Street
Room 6406
Philadelphia, PA 19106

RE:    <u>Disclosure of Off-Shore Accounts and Assets for Todd Francis Kozel</u>

Dear Sir or Madam:

This letter is submitted in accordance with the Criminal Investigation letter of February 23, requesting that we provide your office the Offshore Voluntary Disclosure Letter for your review of my participation in the Voluntary Disclosure Program. I requested admission to this program through my authorized representatives' letter dated January 26, 2011, to Special Agent-in-Charge Shelia Olander, of the Washington, DC CID Field Office.

The information below is provided, in part, based on my memory of events several years ago. In some instances, I have not had complete bank account records, so the details, dates, and figures below may include estimates provided in good faith in order to make the most complete disclosure possible at this time. If, during the course of obtaining additional documents for the purposes of filing tax returns, I, or my advisors, discover any corrections or additions to the information provided below, the below-referenced Taxpayer Representatives will promptly advise you of such additional information.

To assist in a timely determination of my acceptance into the Voluntary Disclosure Program *(for Voluntary Disclosures involving offshore accounts or assets)*, I have addressed *all* of the following items:

**EXHIBIT
3**

Koz 0000011617

Offshore Voluntary Disclosure Coordinator
March 23, 2011
Page 2

- Please include your:

    o  Complete name: Todd Francis Kozel
    o  Social Security Number: ████-3858
    o  DOB: 01/18/1967
    o  Address: EZERELIU g. 21 LT-10103
            Vilnius, Lithuania
    o  Passport Number (and Country): ████28580/USA
    o  Current Occupation: Chairman & CEO, Gulf Keystone Petroleum Ltd.

- Taxpayer Representatives and his/her contact information.

    James A. Bruton, III
    Williams & Connolly LLP
    725 Twelfth Street, N.W.
    Washington, D.C. 20005
    (202) 434-5216
    jbruton@wc.com

    James T. Fuller, III
    Williams & Connolly LLP
    725 Twelfth Street, N.W.
    Washington, D.C. 20005
    (202) 434-5100
    jfuller@wc.com

- Explain the source of the funds.

    The principal sources of funds for the accounts in question are from salaries,
    dividends, and sales proceeds from my oil and gas exploration and production
    ventures.  My family has been involved in U.S. oil and gas businesses for many
    years.  One of the three companies with which I was involved is Texas Keystone,
    Inc., headquartered in Pittsburgh, Pennsylvania, which is engaged with affiliates
    in the acquisition, exploration, development and production of natural gas and
    oil properties in the Appalachian Basin.  Prior to 2004, I was actively involved in
    the U.S. operations.

    In or around 1999, I became involved in the exploration of oil and gas
    opportunities in North Africa and the Middle East.  With foreign and U.S.
    private investors, I co-founded Gulf Keystone Petroleum, Ltd. ("Gulf
    Keystone"), which was incorporated in Bermuda in 2001.  Gulf Keystone is an
    independent oil and gas exploration company, administered out of London, with

Offshore Voluntary Disclosure Coordinator
March 23, 2011
Page 3

offices in Bermuda, Algeria and Iraq, and publicly traded on the Alternative
Investment Market ("AIM") of the London Stock Exchange. The company
initially conducted drilling operations in the country of Algeria, but is currently
focused on exploration in the Kurdistan region of Northern Iraq.

In 2004, I began to spend the majority of my time in London and in Europe, to
serve as CEO of Gulf Keystone. I subsequently opened bank accounts in
London and in Switzerland to serve my personal banking needs. Much of my
time is spent in business travel in Europe, Africa, and the Middle East. In 2008 I
purchased a house in Vilnius, Lithuania, where I also opened an account, and
established residency under Lithuanian law in 2009.

The accounts are funded from my salary from Gulf Keystone, interest, dividends
and proceeds from family oil and gas companies, namely Texas Keystone, Inc.,
Falcon Partners, and Falcon Drilling. The largest offshore deposit was in 2008
of approximately $20 million, which was my share of proceeds from the sale by
Falcon Partners of certain natural gas properties to XTO Energy, Inc., now
owned by Exxon Mobil Corporation.

- Disclose if you or any related entities are currently under audit or criminal investigation
  by the Internal Revenue Service or any other law enforcement authority.

  o Has the IRS notified you that it intends to commence an examination or
    investigation?   No

  o Are you under criminal investigation by any law enforcement authority?
    Not to my knowledge

    o    If yes, please explain.

- Do you believe that the IRS has obtained information concerning your tax liability?   No

  o If yes, please specify.

- Please check the box to estimate the annual range of the highest aggregate *value* of your
  offshore accounts/assets.

Koz 0000011619

Offshore Voluntary Disclosure Coordinator
March 23, 2011
Page 4

| Highest Aggregate Account/Asset Value | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|
| $0 to $100,000 | no acct. | ✓ | | | | | | |
| $100,000 to $1,000,000 | | | ✓ | ✓ | ✓ | | | |
| $1,000,000 to $2,500,000 | | | | | | | | |
| $2,500,000 to $10,000,000 | | | | | | | | ✓ |
| Greater than $10,000,000 | | | | | | | | |
| Greater than $100,000,000 | | | | | | ✓ | ✓ | |

In addition, in my role as CEO of Gulf Keystone, I have signatory authority over, but not ownership of, approximately seven bank accounts (excluding sub-accounts) owned by Gulf Keystone as of December 31, 2010.

- Please check the box to estimate the potential total unreported *income* from the offshore account(s) during each disclosure period. If known, please enter exact amounts/assets.

  Please note that while I am delinquent in filing my 2007-2009 returns, I have timely paid estimated tax for each of the years 2007-2010 which I had intended to be sufficient to cover my federal income tax on all my income, including income that was paid into, and earned on my foreign accounts.

| Estimated Total Income From Foreign Accounts | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|
| $0 to $100,000 | no acct. | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| $100,000 to $1,000,000 | | | | | | | | |
| $1,000,000 to $2,500,000 | | | | | | | | |
| $2,500,000 to $10,000,000 | | | | | | | | |
| Greater than $10,000,000 | | | | | | | | |

- For accounts or assets where you have control or are a beneficial owner of the account or asset, list any and all financial institutions and the country where the institution is located. For accounts, please also list the dates the accounts were opened and/or closed. Provide your point of contact at each financial institution.

  o Coutts Bank, England – opened August 2005
    Point of contact: Jessica Allen, London

  o Credit Agricole, Switzerland – opened December 2004
    Point of contact: Filippo Lindt, Zurich

Koz 0000011620

Offshore Voluntary Disclosure Coordinator
March 23, 2011
Page 5

- o   Swedbank, Lithuania – opened August 2008
  Point of contact: Aidas Seibokas, Vilnius

- Explain the purpose for establishing the offshore account or assets. For example:
  Holocaust Compensation or Restitution; inherited account; account established prior to
  World War II, etc.; if tax non-compliance – please explain.

  As explained above, the personal accounts were established subsequent to my
  frequent travel to London and Europe in 2004. Before then, I lived in the United
  States, and had maintained banking accounts in the United States, but when my
  foreign travel became substantial, I needed accounts in Europe for personal
  banking. All of these accounts are for my personal banking, checking, and
  credit card needs, and were not created for any tax motivated purpose. The
  accounts serve to receive my salary, interest and dividend income and sales
  proceeds from various oil and gas ventures. I use the accounts to pay my
  personal bills and living expenses and to make personal investments. In
  addition, I also have had signatory authority on Gulf Keystone business accounts
  even prior to my working in Europe.

  My wife and I filed joint U.S. income tax returns through 2006. For 2007-2009,
  due to marital discord, and for other reasons, returns for these years have not
  been filed. I did, however, direct the payment of substantial estimated tax
  payments during those years in expectation that the payments would fulfill my
  tax obligations when the returns were filed. Those estimated payments were:
  2007 - $1,031,700; 2008 - $4,603,000; and 2009 - $759,500.

  I am not an accountant or a tax professional, and until 2004, had no occasion to
  own a foreign bank account. I was not aware of the annual requirement to file
  FBARs and other informational returns with respect to overseas accounts.
  Moreover, I believed that the payment of substantial estimated tax payments
  would cover my U.S. tax obligations until the forms 1040 could be completed. I
  have recently become aware of the need to file FBARs and, possibly, other
  informational returns for the foreign accounts owned by me and over which I
  have signatory authority. Accordingly, I have engaged CPAs and counsel to
  assist me in becoming current on my U.S. tax reporting obligations. My wife
  and I are engaged in a contentious divorce proceeding at the present time, and I
  will therefore be filing separate income tax returns.

- List each person or entity affiliated with the account, their formal structure (i.e., if a
  corporation, foundation, or trust), and the nature of their relationship to the account (i.e.
  owner, power of attorney, parent entity of corporate account holder, etc.).

Koz 0000011621

Nov. 16. 2011  4:04PM                                    No. 0091   P. 18/32

Offshore Voluntary Disclosure Coordinator
March 23, 2011
Page 6

    o   Coutts Bank
          Owner – Todd F. Kozel

    o   Credit Agricole
          Owner – Todd F. Kozel
          Power of Attorney in favor of Zurich attorney Markus Hugelshofer

    o   Swedbank
          Owner – Todd F. Kozel

- Explain all face to face meetings, and any other communications you had regarding the accounts or assets with the financial institution(s). Also include face to face meetings or communications regarding the accounts or assets with independent advisors/investment managers not from the financial institution(s) where the funds are held. Provide the names, locations and dates of these meetings and/or communications.

    o   The accounts were established by me personally, and not upon the recommendation of any independent advisor/investment managers. To open the accounts, I visited the offices of each of the banks, and dealt with the bank representative who happened to be on duty. I continue to communicate with the banks as needed, sometimes in person and sometimes by phone. My usual contacts are private bankers at the banks, identified above. I do not have records of the dates or details of such communications.

By signing this document, I certify that I am willing to continue to cooperate with the Internal Revenue Service, including in assessing my income tax liabilities and making good faith arrangements to pay all taxes, interest, and penalties associated with this voluntary disclosure.

Under penalties of perjury, I declare that I have examined this document and accompanying statements, and to the best of my knowledge and belief, they are true, correct, and complete.

_____                    ___3/23/11___
Signature of Taxpayer                               Date
Todd Francis Kozel

The taxpayer, through his counsel, recognizes that the IRS reserves the right to make further contacts with the taxpayer to clarify his/her submission.

Koz 0000011622



TODD P. KOZEL
668 ESPLICON DR
PITTSBURGH, PA 15280-2327

122

Date  9/7/11

Pay to the
Order of _____

$2,171,270.00

Two million one hundred seventy one thousand two hundred seventy and 00/100 _____ Dollars

PNCBANK
PNC Bank, N.A.
Pittsburgh, PA

For _____

"0122"

Nov. 16. 2011  4:04PM                                      No. 0091   P. 20/32

 Express

FedEx Express
Customer Support Trace
3875 Airways Boulevard
Module H, 4th Floor
Memphis, TN 38116

U.S. Mail: PO Box 727
Memphis, TN 38194-4643

Telephone: 901-369-3600

June 30, 2011

Dear Customer:

The following is the proof-of-delivery for tracking number 481051541547.

## Delivery Information:

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered to: | Mailroom |
| Signed for by: | J.SMALL | Delivery location: | Michigan, MI |
| Service type: | First Overnight Envelope | Delivery date: | Jun 30, 2011 07:58 |

NO SIGNATURE IS AVAILABLE
FedEx Express proof-of-delivery details appear below; however, no signature is currently available for this shipment.
Please check again later for a signature.

## Shipping Information:

| | | | |
|---|---|---|---|
| Tracking number: | 481051541547 | Ship date: | Jun 29, 2011 |
| | | Weight: | 0.5 lbs/0.2 kg |

Recipient:                              Shipper:
Michigan, MI US                         WASHINGTON, DC US

Reference                               45343.0001/jtful

Thank you for choosing FedEx Express.

FedEx Worldwide Customer Service
1.800.GoFedEx 1.800.463.3339

Koz 0000011650

Nov. 16. 2011  4:05PM                                    No. 0091   P. 21/32

 CREDIT AGRICOLE (SUISSE) S.A.

[ 1413270 ]
Relationship No

## DECLARATIONS AND AUTHORIZATION OF DISCLOSURE USA
## FOR US PERSONS
## (BANKING SECRECY WAIVER)

Client: Kozel Todd Flancis

This document is completed in connection with the Client's interest in entering into and/or maintaining banking relations with the Bank.

### A. DECLARATION OF NON-US RESIDENCE AND OTHER DECLARATIONS

The Client hereby represents and warrants to the Bank, on a continuing basis, that

- Neither Client, nor the beneficial owner, nor any of his authorised representatives (including as the case may be any trustee or estate executor or administrator and for them to the extent described below) is/are a US resident, nor a legal entity organised or incorporated under US laws or maintaining a place a business in the US, nor is/are in any other way a US person as defined in Regulation S under Securities Act.

- If the Client is represented by any estate executor or administrator : any of them, or at least one of them having sole or share investment discretion with respect to the estate's assets, meet the condition of the preceding paragraph, and the estate is governed by foreign law. If the Client acts as trustee for a trust : any trustee, or at least one trustee having sole or share investment discretion with respect to the trust's assets, meet the condition of the preceding paragraph, and no beneficiary of the trust (and no settlor in the event of revocable trust) is a US person.

- Unless otherwise expressly specified, the Client and any of its authorised representatives (including as the case may be any trustee or executor) shall be located outside the US when communicating with the Bank, and that they shall not use US means to so communicate (e.g. mobile phone or email of US providers).

- The Client is fully aware of the tax and other regulatory requirements pertaining to foreign accounts owned by US persons (as per US tax regulations) and that he, and the beneficial owner, fully abides by and complies with such requirements with respect to the assets under the above mentioned relationship.

- The Client has never received any tax or legal advice from the Bank or its affiliates and agrees and undertakes not to request from the Bank or any of its affiliates any such advice in the future.

The Client hereby certifies that the information provided above is true and correct and undertakes to immediately and spontaneously inform the Bank in writing of any changes, the Bank being deemed not to have obtained knowledge of any such changes prior to having received a written notification thereof. The Bank may further request at any time a written declaration from the Client that this representation and warranty is still true and accurate. The Client hereby agrees and undertakes to indemnify the Bank from and against any prejudice resulting from an inaccurate or outdated statement.

### B. AUTHORIZATION OF DISCLOSURE / BANKING SECRECY WAIVER

The Client agrees that if, and to the extent that, the Bank or any service provider shall consider that non-disclosure of any information and record requested by any Court or Government agency or regulatory authority or other authority of the United States of America, or any auditor or other person appointed for purposes of satisfying the requirements, whether contractual or otherwise, of any such agency or regulatory authority, would result in any asset, operations or personnel of the Bank or such service provider or of any of the Bank's or such service provider's holding company's branches, affiliates, subsidiaries and/or representative offices becoming liable to seizure, interference or prejudice in the United States of America,

1/3                                    LBWS+D-USP/09.09

EXHIBIT
4

KOZ 0007358

the Bank or, as the case may be, such service provider shall be entitled (and is fully authorised by the Client) to make disclosure of any such information and records to such party as this Bank or, as the case may be, such service provider considers necessary in the particular circumstances.

The Client therefore hereby irrevocably authorize the Bank and any such service provider (and as regards the Bank as the case may be through any such service provider) to disclose and produce, without any further consent, to the above mentioned bodies such information and records pertaining to his relationship, including information and records related to any authorized representatives and/or beneficial owners, if so required.

The Client agrees and understands that should the Bank receive such a request for information and records, it will however inasmuch as possible use its best efforts to contact him and inform him about the extent and scope of such request, to discuss the coming action and communicate to him the contents of its reply.

The Client agrees that the disclosure of any such information and records shall not constitute a breach of Swiss banking secrecy and confidentiality laws.

The Client understands that any information transmitted in the US or elsewhere in the frame of this Authorization shall be governed by US laws and by the local laws of the respective recipient and shall accordingly no longer be protected by Swiss banking secrecy and confidentiality laws.

The Client shall alone assume, without any restriction and to the entire discharge of the Bank, any risks and prejudices which may result from the transmission of information and records in the context of this Authorization.

This Authorization shall not be terminated by the death of the Client or of any of them or by any of the causes provided for in Articles 35 and 405 of the Swiss Federal Code of Obligations. It shall remain applicable until written revocation is received by the Bank.

In case of joint or collective relationships, the Client takes due note that this Authorization requires the agreement of all the co-holders.

The revocation of this Authorization (by any holder as the case may be) carries authorization to the Bank to sell all the Clients assets and to close all his outstanding positions, and may lead to the termination of the prevailing business relationships maintained with the Bank.

The signature by or on behalf of the Client at the bottom of this document carries his agreement with the whole of its contents, on all its pages.

This document shall be governed by Swiss law exclusively.

Furthermore, the General Conditions of the Bank shall apply, in particular in respect of the applicable law and place of jurisdiction.

<br>

19/10/09

_____                          _____
(Date)                                            (Signature(s))

<br>

LUW91D-USA09.08

KOZ 0007359

Nov. 16. 2011  4:05PM                                    No. 0091   P. 23/32

**CRÉDIT AGRICOLE** (SUISSE) S.A.                              A

                                                    | 1413271 |
                                                    Account/deposit N°

Contracting partner :  ___TODD F. KOZEL___

## Declaration of Identity of the beneficial owner
### (Form A pursuant to art. 3 and 4 CDB)

The contracting partner hereby declares:
(mark with a cross where appropriate)

☒   that the contracting partner is the sole beneficial owner of the assets concerned

OR

☐   that the beneficial owner/s of the assets concerned is/are :
     Full name (or Company), Date of Birth, Nationality, Address/Domicile, Country

     _____

     _____

     _____

     _____

     _____

     _____

The contracting partner undertakes to automatically inform the Bank about any changes.

It is a criminal offence to deliberately provide false information on this form (art. 251 of the Swiss Penal Code, document forgery; penalty: imprisonment for up to five years or a fine).

Date :  ___22/06/10___

Signature(s) of the contracting partner:  _____

                                                    ADF/A/1.08

KOZ 0007354

Page 333

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
CASE NO. 2010DR8976NC

IN RE:  The Marriage of

ASHLEY D. KOZEL,

          Petitioner/Wife,

and

TODD KOZEL,

          Respondent/Husband,

and

TEXAS KEYSTONE, INC., FALCON
DRILLING CORPORATION, LLC, FALCON
PARTNERS, AND FALCON PARTNERS
TRUST,

          Defendants.

_____/


VOLUME III
CONTINUED VIDEOTAPED DEPOSITION OF TODD F. KOZEL
TAKEN AT THE INSTANCE OF THE PETITIONER/WIFE
(Pages 333 - 469)


West Palm Beach, Florida

Wednesday, November 9, 2011

9:55 a.m. - 12:40 p.m.

1:41 p.m. - 4:58 p.m.

Reported by:  Lisa D. Danforth

EXHIBIT
5

Page 398

1     involved with --
2       MR. FISHER: All right. Just pass me
3   notes. Just pass me notes, please, okay?
4 BY MR. FISHER:
5     Q. Okay. So once again, when you opened this
6 sub account, you filled out this Declaration and
7 Authorization of Disclosure U.S.A. form?
8     A. Correct.
9     Q. I just want to show you your signature. You
10 signed this (indicating)?
11     A. Correct.
12     Q. Okay. And it says you are the client?
13     A. Correct.
14     Q. Okay. And it says, "The client is fully aware
15 of the tax and other regulatory requirements
16 pertaining to foreign accounts owned by U.S. persons
17 as per U.S. tax regulations and that he and the
18 beneficial owner fully abides by and complies with
19 such requirements with respect to the assets under the
20 above-mentioned relationship."
21     Do you see that? Do you see that language
22 right here (indicating)?
23     A. I'm thinking. I'm allowed to do that.
24     Q. Yeah, you are.
25     A. Thanks.

Page 399

1       MR. LUTTIER: I think --
2       MR. FISHER: Is it a duplicate of the last
3 one?
4       MR. LUTTIER: This is just a duplicate of
5 the last one.
6       MR. FISHER: It could be. Okay. I
7 apologize. All right.
8       MR. LUTTIER: I have got to run to the
9 restroom.
10       MR. FISHER: All right.
11       MR. LUTTIER: Yeah, I don't know maybe if
12 when they copied it they did that, but that's
13 the same one.
14       THE VIDEOGRAPHER: Going off the record at
15 10:56 a.m.
16     (Recess from 10:56 a.m. to 11:13 a.m.)
17       THE VIDEOGRAPHER: We're back on the record
18 at 11:13 a.m.
19 BY MR. FISHER:
20     Q. All right. So we were talking about these
21 forms that you signed with Credit Agricole indicating
22 that you were fully aware of the tax and other
23 regulatory requirements pertaining to foreign accounts
24 owned by U.S. persons certainly as far back as
25 November 2009 when you signed them, correct?

Page 400

1       MR. LUTTIER: Object to the form.
2       THE WITNESS: That's what the form says,
3 but honestly, I probably never read it.
4 BY MR. FISHER:
5     Q. The form says, "Client hereby represents and
6 warrants to the bank on a continuing basis that you're
7 aware of, among other things, your tax requirements."
8     Do you see that language?
9     A. Yes.
10     Q. Okay. Now, this $6 million tax liability that
11 you say Ashley should pay a portion of --
12     A. Yes.
13     Q. -- and the $1 million -- $1,141,000 tax
14 liability related to the gift tax that you say Ashley
15 should pay a part of --
16     A. Yes.
17     Q. -- those were paid this year, correct? Strike
18 that. I'm wrong.
19     The 1,141,000 was paid?
20     A. Correct.
21     Q. Okay. The $6 million is owed?
22       MR. LUTTIER: Object to the form.
23       THE WITNESS: I'm being advised on counsel
24 with regard to those issues and tax
25 professionals and counsel are working on the

Page 401

1 money.
2 BY MR. FISHER:
3     Q. Okay.
4     A. So it's an estimate I guess at this point.
5     Q. But the estimate was made this year?
6     A. Yes.
7     Q. Based on your filing this year of TD F 90s?
8     A. I believe so.
9     Q. By the way, I was asking you about that old
10 TD F 90, the one that you talked to me about in your
11 December depo.
12     Have you written to the United States
13 Government or had someone write to the U.S. Government
14 to see if it ever got filed?
15     A. I didn't know if you could do that. If you
16 can, I'd be happy to do it.
17     Q. So you haven't done it yet?
18     A. Me personally, no.
19     Q. Well, or have you had someone do it on your
20 behalf?
21     A. I didn't know you can, so I didn't instruct
22 somebody to do it.
23     Q. Okay. All right. Anyway...
24     A. I will do that though, if you make a note of
25 it.

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

IN RE: The Marriage of                    FAMILY DIVISION

ASHLEY D. KOZEL,                          CASE NO. 2010DR8976NC

        Petitioner/Wife,

and

TODD KOZEL,

        Respondent/Husband,

and

TEXAS KEYSTONE, INC., FALCON
DRILLING COMPANY LLC, AND
FALCON PARTNERS,

        Defendants.

_____/

## ORDER REGARDING MOTION TO COMPEL
## RECORDS FROM HUSBAND SET FOR HEARING ON MAY 12, 2011

THIS MATTER came before the court for a hearing on May 12, 2011 upon the Wife's

motions to compel records from the husband regarding her August, 2010 and March 24, 2011

requests to produce. The court having reviewed the motions, having heard argument of counsel,

and being duly advised does thereupon

ADJUDGE as follows:

1.    With respect to the August, 2010 request to produce, and by agreement of the

parties, and without the husband admitting that he has failed to produce any documents and

without the court making any such finding, the husband is hereby ordered to produce the items

not previously produced, if any, as identified below within thirty (30) days of the entry of this

EXHIBIT
6

Kozel v. Kozel
Case No. 2010DR8976NC
*ORDER COMPELLING DOCUMENTS*
*RESPONSIVE TO THE WIFE'S REQUESTS TO*
*PRODUCE*
*Page 2*

order that are in his custody, possession, or control (the court makes no determination at this time as to what is in the husband's possession, custody, or control). To the extent a privilege is asserted as a basis to withhold or redact a document, the husband shall provide a privilege log to the wife within thirty (30) days. The agreement of the parties is without prejudice to the wife seeking broader discovery pursuant to the identified requests at a later date should the need arise and without prejudice to the husband arguing his previously-filed objections. Unless otherwise stated by date in this order, the relevant time period is from January 1, 2007 to December 31, 2010.

Request No. 1: The husband shall produce all bank or brokerage account statements, wire transfer receipts, canceled checks (including records, regardless of date, related to the opening of the accounts and any amendments thereto) for all accounts or sub-accounts thereof owned or controlled by him, individually or jointly with someone other than the wife, or in which he has any beneficial interest and/or signature privileges other than accounts with GKP, TKI, Falcon Partners, or their affiliated entities. The husband shall also produce any tax-reporting records generated by the bank or brokerage company (such as 1099s) for such accounts.

Request No. 2: The husband shall produce all documents identified with respect to Request No. 1 with respect to any "sub-accounts" for the accounts identified in Request No. 1. The husband shall also produce any other records, including documents, texts, emails, or data files, showing his ownership of, or beneficial interest in, stocks, bonds, shares, or other

Kozel v. Kozel
Case No. 2010DR&976NC
*ORDER COMPELLING DOCUMENTS*
*RESPONSIVE TO THE WIFE'S REQUESTS TO*
*PRODUCE*
Page 3

securities, whether they are held in an account or in his own name (other than information available on the GKP website).

**Request No. 8:**  The husband shall produce any records reporting interest earned on overseas accounts.

**Request No. 10:** The husband shall produce all invoices relating to charters for private air travel, including, but not limited to, invoices related to NetJets, Blue Star Jets, GainJet Aviation, and Marquis Jet.

**Request No. 11:** The husband shall produce any records, including documents, texts, emails, or data files, reflecting any beneficial interest that he has in any trust or estate.

**Request No. 18:** The husband shall produce all records responsive to this request related to the number and location of any safe deposit boxes, vaults, safes, storage units, or other places of deposit and safekeeping in which he is authorized to enter or store items outside of the United States.

**Request No. 19:** The husband shall produce all statements of credit cards the husband has charged on.

**Request No. 22:** The husband shall produce all wills and testaments, including all codicils thereto, whether signed or unsigned, and all related drafts, emails, texts, and data files.

**Request No. 23:** The husband shall produce all records, including documents, texts, emails, or data files, described in the last sentence of this request for which he was a grantor (or contributor, as applicable) or settlor and for all trusts in which the husband participated in the trust's formation, whether directly or through an agent.

Kozel v. Kozel
Case No. 2010DR8976NC
*ORDER COMPELLING DOCUMENTS
RESPONSIVE TO THE WIFE'S REQUESTS TO
PRODUCE*
*Page 4*

Request No. 24: The husband shall produce all records, including documents, texts, emails, or data files, reflecting the purchase of all artwork, jewelry, and collectible items (gold, coins, stamps, antiques, wine, etc.) with a value in excess of $1,000.

Request No. 33: The husband shall produce all records, including data files, responsive to this request.

Request No. 34: The husband shall produce all invoices responsive to this request related to "professional services," subject to the right to withhold documents or redact privileged information properly identified on a privilege log (subject to the wife's right to challenge any redactions or withholdings). The husband is not compelled to produce responsive documents related to the provision of legal services by Burman, Critton, Luttier, & Coleman, by Icard, Merrill, Cullis, Timm, Furen, & Ginsburg, P.A, or by the forensic accountant retained by such firms in conjunction with this action.

2.      With respect to the March 24, 2011 request to produce:

Request No. 4: The husband shall produce all records, including documents, texts, emails, or data files, reflecting his ownership (if a trust, documents reflecting the husband's contributions, rights, or duties), if any, in GKP, GKP LLC, GKP International, the Etamic Trust, Emerald Trust Limited, Emeralp Trust Limited, Gokana Trust, Geomatica, Vytautas Partners, Global Exploration Limited, and GIBCA Limited.

Request No. 5: The husband shall produce all records, including documents, texts, emails, or data files, regarding his ownership, if any, in GKP LLC; records identifying the officers, directors, members, or principals, board minutes, board committee minutes; and any

Kozel v. Kozel
Case No. 2010DR8976NC
*ORDER COMPELLING DOCUMENTS*
*RESPONSIVE TO THE WIFE'S REQUESTS TO*
*PRODUCE*
*Page 5*

records, including documents, texts, emails, or data files, identifying any beneficial owners of
GKP stock held by GKP LLC.

The husband has advised that he has been unable thus far to obtain but a few of these
records and that he has retained counsel in the UAE to assist in obtaining them. He shall utilize
his best efforts to obtain the records, but that does not require him to file suit against GKP LLC.

Request No. 6: The husband shall produce all records, including documents, texts,
emails, or data files, reflecting his ownership (if a trust, documents reflecting the husband's
contributions, rights, or duties) with respect to the following entities: Gulf Keystone Petroleum
International Limited, the Btamic Trust, Emerald Trust Limited, Emeralp Trust Limited, the
Gokana Trust, Geomatica Limited, Vytautas Partners, Global Exploration Limited, GIBCA
Limited, and Kalegran Limited (collectively, the "Overseas Entities").

Request No. 7: The husband shall produce all records, including documents, texts,
emails, or data files, responsive to this request related to the Overseas Entities.

Request No. 8: The husband shall produce all records, including documents, texts,
emails, or data files, responsive to this request.

Request No. 11: The husband shall produce all records, including documents, texts,
emails, or data files, responsive to this request related to the Gulf Keystone Petroleum, Ltd.
public announcement in or around April, 2009 regarding the husband's transfer of assets to the
Gokana Trust for the purpose of "estate planning."

Request Nos. 12, 14: The husband shall produce all records, including documents, texts,
emails, or data files, related to Marcus Hugelshofer and (i) his representation of the husband, (ii)

*Kozel v. Kozel*
*Case No. 2010DR8976NC*
*ORDER COMPELLING DOCUMENTS*
*RESPONSIVE TO THE WIFE'S REQUESTS TO*
*PRODUCE*
*Page 6*

Emerald Trust Limited, (iii) Gokana Trust, (iv) the formation of Gokana Trust, (v) the transfer of

GKP stock from the husband to the Gokana Trust or Emeralp Trust Limited around April, 2009,

(vi) the purchase of additional shares by Gokana Trust around August, 2009, (vii) the legality of

the August, 2009 purchase, (viii) the purchase or sale of any asset the cost of which exceeds

$5,000, or (ix) the organization of any entity actually formed subject to the right to withhold

documents properly identified on a privilege log.  The production of documents related to

Marcus Hugelshofer pursuant to this order will not constitute a waiver of the attorney-client

privilege with respect to any other documents withheld on the basis of privilege.

3.      The failure to address any paragraph of the requests to produce herein is without

prejudice to the wife's right, at a later date (after reviewing the emails husband's counsel is

producing to the wife), to move to compel further production and without prejudice to the

husband's right to argue any objections not overruled by the court.  Likewise, this order is

without prejudice to the wife's right to seek other records or documents at a later date or for a

different time period and without prejudice to the Husband's right to object to the same.

ORDERED in chambers at Sarasota, Sarasota County, Florida on this ___ day of

May, 2011.

NANCY DONNELLAN, SR. JUDGE

Copies furnished:

All parties on attached service list

Kozel v. Kozel
Case No. 2010DR8976NC
*ORDER COMPELLING DOCUMENTS*
*RESPONSIVE TO THE WIFE'S REQUESTS TO*
*PRODUCE*
*Page 7*

## SERVICE LIST

*In Re: The Marriage of Ashley Kozel v. Todd Kozel v. Texas Keystone, Inc. et al.*
12th Circuit, Sarasota County, Case No. 2010DR8976NC

Jeffrey D. Fisher, Esq.
FISHER & BENDECK, P.A.
501 So. Flagler Drive, Suite 450
West Palm Beach, FL 33401
(561) 832-1005
FAX: (561) 820-9375
*Counsel for Petitioner/Wife Ashley Kozel*

William Partridge, Esq.
GROSSMAN, ROTH & PARTRIDGE
1800 2nd Street, Suite 777
Sarasota, FL 34236-5994
(941) 365-8666
FAX: (941) 316-0963
*Co-Counsel for Petitioner/Wife Ashley Kozel*

Mark T. Luttier, Esq.
BURMAN, CRITTON, LUTTIER & COLEMAN
303 Banyan Boulevard, Suite 400
West Palm Beach, FL 33401
(561) 842-2820
FAX: (561) 844-6929
*Counsel for Respondent/Husband Todd Kozel*

Jaime L. Wallace, Esq.
ICARD, MERRILL, CULLIS, TIMM, FUREN, &
GINSBURG, P.A.
2033 Main Street, Suite 600
Sarasota, FL 34237
(941) 366-8100
FAX: (941) 366-6384
*Co-Counsel for Respondent/Husband Todd Kozel*

Jason S. Oletsky, Esq.
AKERMAN, SENTERFITT
Las Olas Centre II, Suite 1600
350 East Las Olas Blvd.
Ft. Lauderdale, FL 33301
(954) 463-2700
FAX: (954) 463-2224
*Counsel for Defendant Falcon Drilling Company,*
*LLC*

Jack E. Fernandez, Jr., Esq.
Nathan M. Berman, Esq.
ZUCKERMAN SPAEDER LLP
110 East Kennedy Blvd.
Suite 1200
Tampa, FL 33602-5838
(813) 321-8215
FAX: (813) 223-7961
*Counsel for Gulf Keystone Petroleum Ltd.; Gulf*
*Keystone Petroleum International Ltd.*

Roy E. Fitzgerald, Esq.
Peggy A. Stumhofer, Esq.
PAGE, MRACHEK, FITZGERALD & ROSE,
P.A.
505 South Flagler Drive, Suite 600
West Palm Beach, FL 33401
(561) 655-2250
FAX: (561) 655-5537
*Counsel for Defendants, Texas Keystone, Inc. and*
*Falcon Partners*

S:\Kozel\Pleadings\20 xe w RTP to H re may 18 hearing 5-20-11.doc